ORIGINAL

E-filing

FILED
07 DEC -3 PM 3: 58
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1  DILLINGHAM & MURPHY, LLP
   WILLIAM F. MURPHY (SBN 82482)
2  EDWARD E. HARTLEY (SBN 122892)
   BARBARA L. HARRIS CHIANG (SBN206892)
3  225 Bush Street, 6th Floor
   San Francisco, California 94104
4  Telephone: (415) 397-2700
   Facsimile: (415) 397-3300
5  Email: wfm@dillinghammurphy.com

6  HANGLEY ARONCHICK SEGAL & PUDLIN
   STEVE D. SHADOWEN (PA SBN 41953 – *Pro Hac Vice Pending*)
7  MONICA L. REBUCK  (PA SBN 78225 – *Pro Hac Vice Pending*)
8  30 North Third Street, Suite 700
   Harrisburg, PA 17101-1701
9  Telephone:  (717) 364-1030
   Facsimile:  (717) 364-1020
10 Email:  sshadowen@hangley.com

11            Attorneys for PLAINTIFFS

12                UNITED STATES DISTRICT COURT
13             NORTHERN DISTRICT OF CALIFORNIA

                    CV 07              6120

14 RITE AID CORPORATION; RITE AID HDQTRS. :    Case No.:
   CORP.; JCG (PJC) USA, LLC; MAXI DRUG, INC.:
15 D/B/A BROOKS PHARMACY; ECKERD          :
   CORPORATION; CVS PHARMACY, INC.;       :    COMPLAINT        JSW
16 and CAREMARK, L.L.C.,                  :    JURY TRIAL DEMANDED
                           Plaintiffs      :
17                                         :
                  v.                       :
18                                         :
19 ABBOTT LABORATORIES,                    :
                                           :
20                        Defendant.       :

21

22        This is a civil antitrust action challenging Abbott Laboratories' unlawful

23 monopolization and attempted monopolization of the market for boosted protease inhibitors, a

24 class of drugs used to treat medical disorders caused by the human immunodeficiency virus, or

25 HIV.  Abbott Laboratories ("Abbott") has unlawfully leveraged its monopoly position as the sole

26 provider of Norvir, a protease inhibitor ("PI") that is used to boost the therapeutic effects of other

27 protease inhibitors, in order to disadvantage its competitors and restrict competition in the closely

28

   COMPLAINT

1  related boosted PI market.  This unlawful scheme has resulted in a suppression of competition in

2  the boosted PI market and has caused Plaintiffs and other purchasers to pay supracompetitive

3  prices for the relevant drugs.

4

5                                                   **PARTIES**

6         1.        Plaintiffs Rite Aid Corporation and Rite Aid Hdqtrs. Corp. (collectively "Rite

7  Aid") are corporations organized and existing under the laws of the State of Delaware with a

8  principal place of business in Camp Hill, Pennsylvania.  Rite Aid purchases substantial quantities

9  of pharmaceutical products and other goods for resale to the public through more than 5,000

10  drugstores owned and operated by its affiliates.  During the relevant period of time, Rite Aid has

11  purchased Norvir and Kaletra from wholesaler McKesson Corporation ("McKesson").

12  McKesson purchases Norvir and Kaletra directly from Abbott, and Rite Aid is the assignee of

13  McKesson's antitrust claims with respect to Norvir and Kaletra that was subsequently resold to

14  Rite Aid.  Rite Aid brings this action in its own right and as the assignee of McKesson.

15

16         2.        Plaintiff JCG (PJC) USA, LLC ("JCG USA") is a Delaware limited liability

17  corporation with a principal place of business in Camp Hill, Pennsylvania.  On June 4, 2007, JCG

18  USA became a wholly-owned subsidiary of Rite Aid Corporation.  JCG USA is the parent

19  corporation of Plaintiffs Maxi Drug, Inc. d/b/a Brooks Pharmacy ("Brooks") and Eckerd

20  Corporation ("Eckerd"), both of which are Delaware corporations.  JCG USA, Brooks and Eckerd

21  hereafter are collectively referred to as "Brooks/Eckerd."  Brooks/Eckerd purchases substantial

22  quantities of pharmaceutical products and other goods for resale to the public through its retail

23  stores.  During the relevant period of time, Brooks/Eckerd has purchased Norvir and Kaletra from

24  McKesson.  McKesson purchases Norvir and Kaletra directly from Abbott, and Brooks/Eckerd is

25  the assignee of McKesson's antitrust claims with respect to Norvir and Kaletra that was

26

27

28

1    subsequently resold to Brooks/Eckerd. Brooks/Eckerd brings this action in its own right and as

2    the assignee of McKesson.

3         3.    Plaintiff CVS Pharmacy, Inc. ("CVS") is a corporation organized and existing

4    under the laws of the State of Rhode Island, with its principal place of business in Woonsocket,

5    Rhode Island. CVS purchases substantial quantities of pharmaceutical products and other goods

6    for resale to the public through more than 6,200 drugstores operated by its affiliates. During the

7    relevant period of time, CVS has purchased Norvir and Kaletra from wholesalers Cardinal Health,

8    Inc. ("Cardinal") and McKesson. Cardinal and McKesson purchase Norvir and Kaletra directly

9    from Abbott, and CVS is the assignee of McKesson's and Cardinal's antitrust claims with respect

10   to Norvir and Kaletra that was subsequently resold to CVS. CVS brings this action in its own

11   right and as the assignee of Cardinal and McKesson.

12
13         4.    Plaintiff Caremark, L.L.C. ("Caremark") is a California limited liability company

14   having its principal place of business in Nashville, Tennessee. Caremark purchases substantial

15   quantities of pharmaceutical products and other goods, including Norvir and Kaletra, for resale to

16   the public through approximately eleven mail service pharmacies and seventy specialty

17   pharmacies owned and operated by its affiliates. During the relevant period of time, Caremark

18   has purchased Norvir and Kaletra from Cardinal. Cardinal purchases Norvir and Kaletra directly

19   from Abbott, and Caremark is the assignee of Cardinal's antitrust claims with respect to Norvir

20   and Kaletra that was subsequently resold to Caremark. Caremark brings this action in its own

21   right and as the assignee of Cardinal.

22
23         5.    Defendant Abbott is a corporation organized and existing under the laws of the

24   State of Illinois and having its principal place of business in Abbott Park, Illinois. Abbott is

25   engaged in the development, manufacture and sale of pharmaceutical and nutritional products.

26   Abbott has facilities in at least six states, including four facilities in California.

27
28

**JURISDICTION AND VENUE**

6.     This action arises under section 2 of the Sherman Act, 15 U.S.C. § 2, and sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.  The Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a).

7.     Venue is proper in this Court pursuant to section 12 of the Clayton Act, 15 U.S.C. § 22, because Abbott is an inhabitant of this District or is found or transacts business here. Venue is also proper pursuant to 28 U.S.C. § 1391.

**TRADE AND COMMERCE**

8.     The pharmaceutical products at issue in this case are sold in interstate commerce, and the unlawful activities alleged in this Complaint have occurred in, and have had a substantial effect upon, interstate commerce.

**FACTUAL BACKGROUND**

9.     PIs are considered the most powerful treatment in the medical battle against HIV and the disorders it causes, including acquired immune deficiency syndrome ("AIDS").  These drugs work by blocking the action of protease, an enzyme needed for HIV to reproduce and infect other cells.

10.     Although PIs present an effective treatment, they have several impediments, including pill burden, dietary requirements and severe side effects.  Each PI presents different degrees of impediment and efficacy.  In addition, patients develop resistance to certain PIs -- a significant challenge to the treatment of HIV -- as the disease progresses.

11.     There are several PIs currently on the market, including Norvir, manufactured by Abbott and introduced in 1996, and Kaletra, also manufactured by Abbott and introduced in 2000. Kaletra is a combination drug consisting of Norvir and another Abbott PI, whose chemical or generic name is lopinavir.  As explained below, while Norvir was introduced as a stand-alone

1    treatment, its principal use today is to boost the therapeutic effects (and reduce the required

2    dosage) of other PIs.

3        12.    Abbott developed Norvir with the assistance of a National Institutes of Health

4    grant and spent only about $15 million of its own funds on pre-approval clinical trials for the

5    drug. By the end of 2001, Norvir had generated cumulative sales for Abbott of more than $1

6    billion. Securities analysts have estimated that, even without the price increase that is the subject

7    of this Complaint, Norvir would have generated more than $2 billion for Abbott over the next ten

8    
9    years.

10       13.    After Norvir's release, it was discovered that, when used in small quantities with

11   another PI, Norvir would boost the anti-viral effects of the other PI. Not only did a small dose of

12   Norvir make other PIs more effective and decrease side effects associated with high doses, but it

13   also slowed down the rate at which HIV developed resistance to the effects of PIs. Norvir is the

14   only PI known to have such properties and, as a result, for such "boosting" purposes, there is no

15   substitute for Norvir. Physicians recognize that Norvir is the only effective boosting compound

16   available and is an essential component to almost every PI-based treatment for HIV/AIDS.

17       14.    In addition to its direct therapeutic benefits, a regimen consisting of a PI boosted

18   by Norvir improves convenience for patients in comparison to an unboosted regimen by reducing

19   the required dosage of the PI and lessening food restrictions, both important factors in ensuring

20   adherence to HIV antiviral therapy.

21       15.    Recent research has also shown significant benefits from the use of boosted PI

22   regimens, especially for patients who experience failure of treatment regimens combining PIs

23   with other anti-HIV drugs. Such treatment failures are marked by the emergence of drug-resistant

24   
25   mutations that limit the benefits of other drugs in the future, because of cross-resistance among

26   
27   HIV medications. When patients experience failure of initial boosted PI regimens, there is no

28

1  evidence of PI resistance and, moreover, there is less resistance to other drugs in the regimen.

2  Hence, by using Norvir as a booster, physicians can maximize the treatment options remaining

3  for the patients experiencing treatment failure.

4
5         16.    As noted above, Abbott also markets Kaletra, which consists of Norvir and another

6  Abbott PI, lopinavir, combined in a single pill. Kaletra is lopinavir boosted by Norvir. Although

7  effective and widely used, Kaletra has significant side effects, including hyperlipidemia, which

8  renders patients more vulnerable to heart attacks and strokes.

9         17.    Thus, in the "boosting" market, Norvir is the only product available, while in the

10  "boosted" market, Kaletra competes with other PIs, each of which is prescribed and taken in

11  conjunction with Norvir. This creates a situation in which the same firm participates in two

12  closely related markets, with the product sold in one of the two markets being an input or

13  component of the product sold in the other market. If such a firm lacks competition in the market

14
15  for sales of the input or component product, it may be able to use its monopoly position in that

16  market to disadvantage its competitors in the related market and monopolize or attempt to

17  monopolize the related market. That is exactly what Abbott has done here.

18                    **ABBOTT'S ANTICOMPETITIVE CONDUCT**

19
20        18.    Prescriptions for Kaletra rose steadily from its introduction in September 2000

21  through mid-2003, at which point it enjoyed approximately a 75% share of the boosted PI market.

22  Kaletra's dominance of the boosted market, however, was about to be threatened.

23        19.    In June 2003, Bristol-Myers Squibb introduced Reyataz, a PI designed to be

24  boosted by Norvir. In October 2003, GlaxoSmithKline ("GSK") introduced Lexiva, another PI

25  designed to be boosted by Norvir. Studies showed that, when boosted with Norvir, the new PIs

26  were as effective as Kaletra, and were more convenient. As a result, Kaletra's share of the

27  boosted market began to decline. The average daily dose of Norvir also fell. Before the release

28

COMPLAINT                        - 6 -

of Reyataz, the most common boosting dose of Norvir ranged from 200 milligrams to 400 milligrams per day. Clinical trials, however, showed that a Norvir dose of only 100 milligrams a day effectively boosted Reyataz.

20.    Beginning in the second half of 2003, both Reyataz and Lexiva started to make steady inroads into Kaletra's share of the boosted PI market.

21.    Faced with the prospect of new competitors to Abbott's boosted PI, Kaletra -- i.e., two new PIs from GSK (Lexiva) and BMS (Reyataz) -- Abbott's executives declined to engage in legal and procompetitive, but potentially ineffective, approaches to defending against a loss of market share. Instead, its executives formulated an anticompetitive monopolization scheme using Abbott's control of Norvir as leverage to maintain and/or enhance Kaletra's dominant market position. Abbott executives were well-aware that Abbott had facilitated the use of Norvir as a booster and caused its competitors to rely on the availability of Norvir -- through Abbott's past course of conduct and formally through licensing its competitors to promote their PIs with Norvir. Abbott executives realized that if Abbott could make Norvir unavailable or less desirable when paired with its competitors' PIs -- by actually pulling it from the market or by manipulating its price -- then its competitors' products in the boosted market, which by that time almost always relied on Norvir for boosting due to Abbott's prior conduct, would never become a significant competitive threat to Kaletra's market dominance.

22.    As reported in the Wall Street Journal, internal Abbott documents reveal, among other things, that: (a) Abbott understood the illegal nature of the price-increase scheme and contemplated other strategies, like ceasing sales of Norvir, to "minimize any federal investigations regarding price increases in the US"; (b) Abbott understood the adverse consequences of the scheme, including that it would "tarnish" the reputation of Abbott's CEO, "[p]osition [Abbott] as [a] big, bad, greedy pharmaceutical company," "[f]uel[] perception[s]

regarding lack of Abbott commitment to HIV," and create a "[b]acklash from [the] advocacy community, legislators, [and] physicians"; and (c) Abbott floated pretextual rationales for the price increase but worried about its "[e]xposure on price if forced to open [its] books."

23.    According to internal Abbott emails and other documents released by the Wall Street Journal, one Abbott executive explained Abbott's concern in the following manner: Abbott could not "continue to trade a prescription of Kaletra for a prescription of Norvir at 100 mg." Rather than rely on any competitive advantage in the medicinal characteristics of Kaletra, or even on lowering Kaletra's price so that it was more attractive to patients, this executive outlined alternative anticompetitive plans that had been discussed among Abbott management and warned other senior Abbott employees not to be "stunned by the outcome of the thought process."

24.    The emails outlined two potential scenarios for increasing the price of Norvir in an effort to artificially decrease demand for its competitors' PIs. In both scenarios, they suggested leaving the price of Kaletra unchanged, thus giving Abbott a huge price advantage over PIs boosted by Norvir. They outlined a "rationale" for the proposed Norvir price increase, suggesting that Abbott mislead the public into believing that "it is no longer feasible for Abbott to provide a production line of Norvir capsules at the current price." The emails, however, frankly admit the "weakness" of this "rationale" – its falsity.

25.    The Abbott emails also suggested an alternative approach to the price increase: withdraw Norvir capsules from the market entirely, leaving HIV patients with only a liquid form of Norvir that Abbott's own executives admit "taste[s] like someone else's vomit." Other materials reveal that Abbott planned to make up a justification for this withdrawal. Executives considered misleading the public into believing that Abbott was diverting the capsules for humanitarian efforts in "the developing world (i.e. Africa)."

26.     An Abbott slide presentation created around the time of these emails further illustrates the anticompetitive and illegitimate motives behind Abbott's price hike. The presentation reveals, for example, that Abbott sought to "[p]osition Kaletra as a more economical option for boosted ARV [anti-retroviral] therapy."

27.     Abbott acknowledged the illegitimacy of its plan, but Abbott apparently found it easier to mislead the public regarding an anticompetitive price increase than to try to explain a complete withdrawal of Norvir capsules from the market. On December 3, 2003, Abbott raised the wholesale price of Norvir by more than 400%, from $205.20 to $1,028.40 for a 120-count bottle of 100 mg capsules. Abbott, however, did not raise the price of Kaletra, which incorporates Norvir. In effect, Abbott raised the price of Norvir only when it is used to boost a non-Abbott PI.

28.     By instituting this enormous price hike, Abbott drastically increased the cost of regimens using Norvir to boost competing PIs. For Aptivus (tipranavir), a new PI marketed by Boehringer Ingelheim, the optimal Norvir booster dose increased by more than $12,000 per year. The wholesale acquisition cost of GSK's boosted Lexiva treatment, meanwhile, increased from $19.43 to $33.15. At the same time, the wholesale acquisition cost of Kaletra, Abbott's PI treatment remained unchanged at $18.76.

29.     True to its pre-hike plan, Abbott then concealed from the public the anticompetitive and illegitimate goal of increasing Norvir's price. Abbott's false and misleading communications had the intention and effect of confusing prescribers and purchasers about the real impact of the price increase among different classes of PI patients, and thus further harmed competing PIs' uptake by the market.

30.     According to news articles published shortly after the price increase, Abbott representatives publicly stated -- in direct contradiction to the internal Abbott materials cited

COMPLAINT                                          - 9 -

1   above -- that the company *had not* considered the effect of Norvir's price increase on Kaletra

2   sales or raised the price for the purpose of driving patients to Kaletra.

3       31.     Abbott further attempted to manage the fallout from its Norvir price increase by

4   publishing misleading comparisons of PI prices. In promotional and informational materials

5   about Norvir after the price increase, Abbott represented that Norvir was the lowest-priced PI on

6   the market.

7

8       32.     The Department of Health & Human Services ("DHHS") responded with a

9   Warning Letter to Abbott about such materials, calling Abbott's price comparison chart "false or

10  misleading in violation of section 502(a) of the Federal Food, Drug, and Cosmetic Act (Act) (21

11  U.S.C. 352(a))." Specifically, DHHS stated that the price chart was misleading because it

12  compared a "subtherapeutic dose of Norvir (100 mg once daily) to the labeled dosing regimens of

13  other antiretroviral agents" and it "implies that Norvir may be used other than in combination

14  therapy, when it is not labeled for such use." Abbott did not contest the FDA letter, choosing

15  instead to send a letter to healthcare providers retracting and "clarifying" its false statements.

16

17      33.     On information and belief, internal Abbott documents state Abbott's intentions:

18  the huge price increase for Norvir would create the "[p]otential for increased market share for

19  Kaletra." Abbott's December 3, 2003 price increase was an attempt to leverage its monopoly

20  position in the boosting market in order to disadvantage competitors and maintain its dominant

21  position in the boosted market. The attempt succeeded.

22

23      34.     Abbott's leveraging scheme effectively halted the decline in market share of

24  Kaletra. By 2006, Kaletra's share of the boosted PI market had risen to approximately 75%, the

25  same share it held prior to the introduction of Reyataz. This change of course was due entirely to

26  the competitive disadvantage imposed on non-Abbott PIs by the December 2003 price increase.

27

28

COMPLAINT                            - 10 -

35.     As a direct and proximate result of Abbott's unlawful conduct, Plaintiffs have been deprived of the benefit of free and open competition in the boosted PI market and have been injured in their business and property by paying more for the relevant Abbott drugs than they would have in the absence of Abbott's unlawful, anticompetitive conduct.

## RELEVANT MARKETS

36.     There are two product markets relevant to Plaintiffs' antitrust claims: the boosting market, which consists of only Norvir, and the boosted market, which consists of Kaletra and a number of non-Abbott PIs, each of which is prescribed and used in conjunction with Norvir. The relevant geographic market is the United States. With respect to both product markets, a firm that was the only seller of such products in the United States would have the ability to sell those products at a price substantially above the competitive level without losing significant sales.

37.     At all relevant times, Abbott has had a 100% share of the boosting market and a dominant share of the boosted market. At all relevant times, Abbott possessed monopoly power (the ability to raise price significantly above marginal cost without losing significant sales) in both relevant markets.

38.     There are barriers to entry in both the market for PI boosters and the market for boosted PIs. The products in these markets require millions of dollars and years to design, develop, and distribute. Compounding these barriers to entry, both markets require government approvals to enter and are may be covered by patents and other forms of intellectual property. Thus, competitors or potential market entrants lack the capacity to increase output in the short run.

39.     The unlawful actions alleged above were taken for the purpose of maintaining Abbott's dominant share of the boosted market.

COMPLAINT                              - 11 -

**FIRST CAUSE OF ACTION**
**Monopolization (15 U.S.C. § 2)**

40.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 39 above.

41.     At all relevant times, Abbott has had monopoly power in both the boosting market and the boosted market.

42.     Abbott has willfully maintained its monopoly power in the boosted market through exclusionary and anticompetitive means. As described in more detail above, Abbott induced competitors in the boosted market to rely upon Norvir, then overnight raised the price of Norvir by approximately 400% in December 2003, and has maintained that price to the present day. Norvir is sold at a much lower price when used as one component of Abbott's own boosted PI, Kaletra. By engaging in this conduct and instituting such a price increase, Abbott has used its monopoly position in the boosting market to gain an artificial competitive advantage and to unfairly disadvantage its competitors in the boosted market. The purpose and effect of Abbott's conduct have been to suppress rather than promote competition on the merits. Abbott's conduct would make no economic sense, absent its effect of impairing competition in the boosted market.

43.     There is no procompetitive justification for Abbott's conduct.

44.     Plaintiffs have been injured in their business and property by reason of Abbott's unlawful monopolization. Plaintiffs' injury consists of paying higher prices to purchase the relevant products than they would have paid absent Abbott's conduct. This injury to Plaintiffs' business and property is injury of the type the antitrust laws were designed to prevent and flows from that which makes Abbott's conduct unlawful.

45.     Abbott's unlawful conduct threatens continuing loss and damage to Plaintiffs if not enjoined by this Court.

## SECOND CAUSE OF ACTION
### Attempt to Monopolize 15 U.S.C. § 2

46.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 39 above.

47.    At all relevant times, Abbott has had monopoly power in the boosting market and a dangerous probability of achieving monopoly power in the boosted market.

48.    Abbott has attempted to monopolize the boosted market through exclusionary and anticompetitive means.  As described in more detail above, Abbott induced competitors in the boosted market to rely upon Norvir, then overnight raised the price of Norvir by approximately 400% in December 2003, and has maintained that price to the present day.  Norvir is sold at a much lower price when used as one component of Abbott's own boosted PI, Kaletra.  By engaging in this conduct and instituting such a price increase, Abbott has used its monopoly position in the boosting market to gain an artificial competitive advantage and to unfairly disadvantage its competitors in the boosted market.  The purpose and effect of Abbott's conduct have been to suppress rather than promote competition on the merits.  Abbott's conduct would make no economic sense, absent its effect of impairing competition in the boosted market.

49.    At all relevant times, Abbott has had the specific intent to monopolize the boosted market.

50.    There is no procompetitive justification for Abbott's conduct.

51.    Plaintiffs have been injured in their business and property by reason of Abbott's unlawful attempted monopolization.  Plaintiffs' injury consists of paying higher prices to purchase the relevant products than they would have paid absent Abbott's conduct.  This injury to Plaintiffs' business and property is injury of the type the antitrust laws were designed to prevent and flows from that which makes Abbott's conduct unlawful.

1    52.    Abbott's unlawful conduct threatens continuing loss and damage to Plaintiffs if not

2    enjoined by this Court.

3            WHEREFORE, Plaintiffs pray for judgment against Defendant Abbott

4    Laboratories and for the following relief:

5

6    A.    A judgment for three times the damages sustained by Plaintiffs, as determined by a
            jury;

7

8    B.    A declaration that Abbott has violated the antitrust laws in the ways described
            above;

9

10   C.    Permanent injunctive relief which enjoins Abbott from continuing its unlawful
            conduct, and requires Abbott to take affirmative steps to dissipate the
            anticompetitive effects of its prior violations;

11

12   D.    The costs of this suit, including a reasonable attorneys' fee; and

13   E.    Such other and further relief as the Court deems just and proper.

14                            **Jury Trial Demand**

15   Plaintiffs demand a trial by jury of all issues so triable.

16   Dated: December 3, 2007
                            By:    _____
17                                 William F. Murphy (SBN 82482)
                                   Edward E. Hartley (SBN 122892)
18                                 Barbara L. Harris Chiang (SBN206892)
                                   DILLINGHAM & MURPHY, LLP
19                                 225 Bush Street, 6th Floor
                                   San Francisco, California 94104
20                                 Telephone: (415) 397-2700
                                   Facsimile: (415) 397-3300
21                                 Email: wfm@dillinghammurphy.com

22                                 Steve D. Shadowen (PA SBN 41953)
                                   Monica L. Rebuck (PA SBN 78225)
23                                 HANGLEY ARONCHICK SEGAL & PUDLIN
                                   30 North Third Street, Suite 700
24                                 Harrisburg, PA 17101-1701
                                   Telephone:  (717) 364-1030
25                                 Facsimile:   (717) 364-1020
                                   Email:  sshadowen@hangley.com
26

27                                 *Attorneys for PLAINTIFFS*

28

COMPLAINT                          - 14 -