1  LIEFF, CABRASER, HEIMANN &
   BERNSTEIN, LLP
2  Joseph R. Saveri (State Bar No. 130064)
   Embarcadero Center West
3  275 Battery Street, 30th Floor
   San Francisco, CA 94111-3339
4  Telephone: (415) 956-1000
   Facsimile:  (415) 956-1008
5  Email: jsaveri@lchb.com

6  *Local Counsel for Rochester Drug Cooperative, Inc.*

7  IRELL & MANELLA LLP
   Alexander Frank Wiles (CA 73596)
8  Brian Hennigan (CA 86955)
   Stephanie Kaufman (CA 162644)
9  Trevor Stockinger (CA 226359)
   1800 Avenue of the Stars #900
10 Los Angeles, CA 90067
   Telephone: (310) 277-1010
11 Facsimile:  (310) 203-7199
   Email: awiles@irell.com; bhennigan@irell.com
12 skaufman@irell.com; tstockinger@irell.com

13 *Counsel for SmithKline Beecham Corporation, d/b/a GlaxoSmithKline*

14
   [Additional Attorneys and Plaintiffs on Signature Page]
15

16            **UNITED STATES DISTRICT COURT**

17            **NORTHERN DISTRICT OF CALIFORNIA**

18                    **OAKLAND DIVISION**

19 SAFEWAY INC.,; WALGREEN CO.; THE        )   **Case No. C 07-5470 (CW)**
   KROGER CO.; NEW ALBERTSON'S, INC.;     )
20 AMERICAN SALES COMPANY, INC.; and      )   *Related per October 31, 2007 Order to*
   HEB GROCERY COMPANY, LP,               )   *Case No. C-04-1511 (CW)*
21                                         )
                  Plaintiff,               )
22                                         )   **PLAINTIFFS' OPPOSITION TO**
           vs.                             )   **ABBOTT'S OMNIBUS MOTION TO**
23                                         )   **DISMISS**
   ABBOTT LABORATORIES,                    )
24                                         )   **Date:        March 6, 2008**
                  Defendant.               )   **Time:        2:00 p.m.**
25                                         )   **Courtroom: 2 (4th Floor)**
                                           )   **Judge:       Hon. Claudia Wilken**
26                                         )
                                           )
27                                         )
                                           )
28        [caption continues next page]    )
                                           )

| | |
|---|---|
| 1  SMITHKLINE BEECHAM CORPORATION )<br>   d/b/a/ GLAXOSMITHKLINE, )<br>2 )<br>                    Plaintiff,  )<br>3 )<br>   vs.  )<br>4 )<br>   ABBOTT LABORATORIES,  )<br>5 )<br>                    Defendant.  )<br>6 )<br> )<br>7 )<br> )<br>8 )<br> )<br>9  MEIJER, INC. & MEIJER DISTRIBUTION, )<br>   INC., on behalf of themselves and all others )<br>10 similarly situated, )<br> )<br>11                    Plaintiffs,  )<br> )<br>12   vs.  )<br> )<br>13 ABBOTT LABORATORIES,  )<br> )<br>14                    Defendant.  )<br> )<br>15 )<br> )<br>16 )<br> )<br>17 ROCHESTER DRUG CO-OPERATIVE, )<br>   INC., on behalf of itself and all others similarly )<br>18 situated, )<br> )<br>                    Plaintiff,  )<br>19 )<br>   vs.  )<br>20 )<br>   ABBOTT LABORATORIES,  )<br>21 )<br>                    Defendant.  )<br>22 )<br> )<br>23 )<br> )<br>24 )<br> )<br>25 )<br> )<br>26 )<br> )<br>27 )<br> )<br>28        [caption continues next page] ) | **Case No. C 07-5702 (CW)**<br><br>*Related per November 19, 2007 Order to*<br>*Case No. C-04-1511 (CW)*<br><br>**PLAINTIFFS' OPPOSITION TO**<br>**ABBOTT'S OMNIBUS MOTION TO**<br>**DISMISS**<br><br>**Date:        March 6, 2008**<br>**Time:        2:00 p.m.**<br>**Courtroom:  2 (4th Floor)**<br>**Judge:       Hon. Claudia Wilken**<br><br><br>**Case No. C 07-5985 (CW)**<br><br>*Related per November 30, 2007 Order to*<br>*Case No. C-04-1511 (CW)*<br><br>**PLAINTIFFS' OPPOSITION TO**<br>**ABBOTT'S OMNIBUS MOTION TO**<br>**DISMISS**<br><br>**Date:        March 6, 2008**<br>**Time:        2:00 p.m.**<br>**Courtroom:  2 (4th Floor)**<br>**Judge:       Hon. Claudia Wilken**<br><br><br>**Case No. C 07-6010 (CW)**<br><br>*Related per December 3, 2007 Order to*<br>*Case No. C-04-1511 (CW)*<br><br><br>**PLAINTIFFS' OPPOSITION TO**<br>**ABBOTT'S OMNIBUS MOTION TO**<br>**DISMISS**<br><br>**Date:        March 6, 2008**<br>**Time:        2:00 p.m.**<br>**Courtroom:  2 (4th Floor)**<br>**Judge:       Hon. Claudia Wilken** |

| | | |
|---|---|---|
| 1 | LOUISIANA WHOLESALE DRUG COMPANY, INC., on behalf of itself and all | ) ) | **Case No. C 07-6118 (CW)** |
| 2 | others similarly situated, | ) | *Related per December 10, 2007 Order to* |
| | | ) | *Case No. C-04-1511 (CW)* |
| 3 | Plaintiff, | ) ) | |
| | | ) | **PLAINTIFFS' OPPOSITION TO** |
| 4 | vs. | ) | **ABBOTT'S OMNIBUS MOTION TO** |
| | | ) | **DISMISS** |
| 5 | ABBOTT LABORATORIES, | ) | |
| 6 | Defendant. | ) ) | **Date:       March 6, 2008** |
| | | ) | **Time:       2:00 p.m.** |
| 7 | | ) | **Courtroom:  2 (4th Floor)** |
| | | ) | **Judge:      Hon. Claudia Wilken** |
| 8 | | ) | |
| 9 | RITE AID CORPORATION; RITE AID HDQTRS, CORP,; JCG (PJC) USA, LLC; | ) ) | **Case No. C 07-6120 (CW)** |
| 10 | MAXI DRUG, INC. d/b/a BROOKS PHARMACY; ECKERD CORPORATION; | ) ) | *Related per December 5, 2007 Order to* |
| | CVS PHARMACY, INC.; and CAREMARK, | ) | *Case No. C-04-1511 (CW)* |
| 11 | L.L.C., | ) | |
| | | ) | **PLAINTIFFS' OPPOSITION TO** |
| 12 | Plaintiff, | ) | **ABBOTT'S OMNIBUS MOTION TO** |
| | | ) | **DISMISS** |
| 13 | vs. | ) | |
| | | ) | **Date:       March 6, 2008** |
| 14 | ABBOTT LABORATORIES, | ) | **Time:       2:00 p.m.** |
| | | ) | **Courtroom:  2 (4th Floor)** |
| 15 | Defendant. | ) | **Judge:      Hon. Claudia Wilken** |
| 16 | | | |

17

18
                    **DOCUMENT SUBMITTED UNDER SEAL**
19
                           **REDACTED VERSION**
20

21

22

23

24

25

26

27

28

## TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................... 4

I.    ABBOTT'S MOTION SHOULD BE DENIED BECAUSE *CASCADE* DOES NOT APPLY TO THESE CASES. ................................................................. 4

    A.    *Cascade* Issued a Narrow Holding Applicable Only to One Category of Anticompetitive Conduct: Bundled Discounting. ................................. 4

    B.    Because These Cases Involve Abbott's Massive Price Increase – Not Bundled Discounting – the Rationale for a Bright Line Rule Set Forth in *Cascade* Does Not Apply Here. ................................................. 6

    C.    Abbott's Effort to Apply *Cascade* to This Case Should Be Rejected Because This Court and Abbott Have Recognized That Discount Bundling, and Thus Implicitly *Cascade* Itself, Have No Relevance to This Case. ..................................................................................................... 9

II.   THIS COURT'S PRIOR HOLDING THAT PLAINTIFFS HAVE ADEQUATELY ALLEGED ANTICOMPETITIVE CONDUCT APPLIES EQUALLY TO THE NEWLY-FILED NORVIR CASES. ................................... 11

    A.    The Newly Filed Norvir Cases Adequately Allege Monopoly Leveraging. .................................................................................................. 11

    B.    *Kodak* Still Applies to Abbott's Conduct. ............................................ 13

        1.    Plaintiffs Allege Conduct Proscribed by *Kodak*. ................... 13

        2.    Ninth Circuit, Not Federal Circuit, Law Applies Here. ............ 15

III.  THE NEWLY-FILED CASES ALLEGE ADDITIONAL ANTICOMPETITIVE CONDUCT THAT INDEPENDENTLY REQUIRES DENIAL OF ABBOTT'S MOTION TO DISMISS. ................................... 17

IV.   CONCLUSION ................................................................................................... 20

1

# TABLE OF AUTHORITIES

2

Page(s)

3 **Cases**

4 *Anton/Bauer, Inc. v. PAG, Ltd.,*
        329 F.3d 1343 (Fed. Cir. 2003) ................................................................. 17

5

6 *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*
        472 U.S. 585 (1985) ........................................................................ 14, 20

7 *Bell Atl. Corp. v. Twombly,*
        127 S. Ct. 1955 (2007) ........................................................................... 9

8

9 *Broadcom Corp. v. Qualcomm Inc.,*
        501 F.3d 297 (3d Cir. 2007) ...................................................................... 20

10 *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,*
        509 U.S. 209 (1993) ............................................................................ 7

11

12 *Cascade Health Solutions v. PeaceHealth,*
        479 F.3d 726 (2007) .............................................................................. 6

13 *Cascade Health Solutions v. PeaceHealth,*
        502 F.3d 895 (9th Cir. 2007), *as amended by* Nos. 05-35627 et al.,

14 --- F.3d ----, 2008 WL 269506 (9th Cir. Feb. 1, 2008) ................................. passim

15 *Cascade Health Solutions v. PeaceHealth,*
        Nos. 05-35627 et al., --- F.3d ----, 2008 WL 269475 (9th Cir. Feb. 1, 2008) ................... 5

16

17 *Christianson v. Colt Indus. Operating Corp,*
        486 U.S. 800 (1988) ........................................................................... 16

18 *City of Anaheim v. S. Cal. Edison Co.,*
        955 F.2d 1373 (9th Cir. 1992) ................................................................... 11

19

20 *Delaware & Hudson Ry. Co. v. Consol. Rail Corp.,*
        902 F.2d 174 (2d Cir. 1990) ................................................................... 14

21 *Doe v. Abbott Labs.,*
        No. C 04-1511 CW (N.D. Cal. Oct. 21, 2004) ....................................... 1, 2, 12

22

23 *Eastman Kodak Co. v. Image Tech. Servs., Inc.,*
        504 U.S. 451 (1992) ......................................................................... 8, 20

24 *Electric Industrial Co. v. Zenith Radio Corp.,*
        475 U.S. 574 (1986) ............................................................................ 8

25

26 *Erickson v. Pardus,*
        127 S. Ct. 2197 (2007) ........................................................................ 8, 9

27 *Holmes Group, Inc. v. Vornado Air Circulation Systems, Inc.,*
        535 U.S. 826 (2002) ....................................................................... 16, 17

28

- ii -

Page(s)

*Image Tech. Servs., Inc. v. Eastman Kodak Co.,*
   125 F.3d 1195 (9th Cir. 1997)....................................................passim

*In re Abbott Labs. Norvir Anti-Trust Litig.,*
   442 F. Supp. 2d 800 (N.D. Cal. 2006) ....................................2, 9, 12, 13

*In re Dell Computer Corp.,*
   121 F.T.C. 616 (1996) ................................................................20

*In re Indep. Servs. Orgs. Antitrust Litig.,*
   203 F.3d 1322 (Fed. Cir. 2000)..................................................15, 17

*In re Rambus, Inc.,*
   No. 9302, 2006 WL 2330117 (F.T.C. Aug. 2, 2006)................................20

*Jacobs v. Nintendo of Am., Inc.,*
   370 F.3d 1097 (Fed. Cir. 2004) ....................................................17

*Leatherman Tool Group Inc. v. Cooper Indus. Inc.,*
   131 F.3d 1011 (Fed. Cir. 1997) ....................................................16

*LePage's, Inc. v. 3M,*
   324 F.3d 141 (3d Cir. 2003)............................................................2

*McKenzie-Williamette Hosp. v. PeaceHealth,*
   2003 WL 23537980 (D. Or. Aug. 15, 2003) ..........................................5

*Metronet Servs. Corp. v. Qwest Corp.,*
   383 F.3d 1124 (9th Cir. 2004) ......................................................14

*Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.,*
   311 F. Supp. 2d 1048 (D. Colo. 2004) ..............................................14

*Service Employees Int'l Union Health & Welfare Fund v. Abbott Labs.,*
   No. C 04-4203 CW (N.D. Cal. Mar. 2, 2005) ......................................1, 2

*Skaff v. Meridien N. Am. Beverly Hills, LLC,*
   506 F.3d 832 (9th Cir. 2007 ..........................................................9

*Telecomm Tech. Servs., Inc. v. Siemens Rolm Commc'ns, Inc.,*
   150 F. Supp. 2d 1365 (N.D. Ga. 2000) ..........................................16, 17

*Telecomm Tech. Servs., Inc. v. Siemens Rolm Commc'ns, Inc.,*
   295 F.3d 1249 (Fed. Cir. 2002)....................................................16, 17

*Tucker v. Apple Computer, Inc.,*
   493 F. Supp. 2d 1090 (N.D. Cal. 2006) ............................................20

*United States v. Microsoft Corp.,*
   253 F.3d 34 (D.C. Cir. 2001) ........................................................20

1808392

1
                                                                                          Page(s)
2

3  *Verizon Commc'ns., Inc., v. Law Offices of Curtis V. Trinko, LLP,*
       540 U.S. 398 (2004) .................................................................................... 20
4
   *Visa U.S.A. Inc. v. First Data Corp.,*
5      2006 WL 1310448 (N.D. Cal. May 12, 2006) .......................................... 11

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1808392          PLAINTIFF'S OPPOSITION TO ABBOTT'S OMNIBUS MOTION TO DISMISS

1

**INTRODUCTION**

2    This is the fourth time since 2004 that Abbott Laboratories ("Abbott") has moved to

3 dismiss the antitrust claims filed in this Court regarding its conduct in the boosted protease

4 inhibitor ("boosted PI") market (the "Norvir cases"). Discovery is complete in two of the earlier-

5 filed Norvir cases (*Doe* and *SEIU*), and trial is only months away. Related cases have recently

6 been filed against Abbott by other purchasers of Norvir (including Safeway, Rite Aid, and a

7 consolidated proposed class action on behalf of all direct purchasers by Meijer, Inc., Meijer

8 Distribution, Inc., Rochester Drug Cooperative, Inc., and Louisiana Wholesale Drug Co., Inc.),

9 and a competitor of Abbott (GlaxoSmithKline ("GSK")) (collectively, the "Plaintiffs" in the

10 "newly-filed cases"). Pursuant to the Court's direction, the plaintiffs in the newly-filed cases

11 submit this joint opposition to the Omnibus Motion of Abbott Laboratories to Dismiss Plaintiffs'

12 Sherman Act Claims Pursuant to Rule 12(b)(6) ("Motion").

13    Abbott bases its latest attempt to avoid antitrust scrutiny of its massive Norvir price hike

14 and other anticompetitive conduct solely on a Ninth Circuit decision, *Cascade Health Solutions v.*

15 *PeaceHealth*, 502 F.3d 895 (9th Cir. 2007), *as amended by* Nos. 05-35627 et al., --- F.3d ----,

16 2008 WL 269506 (9th Cir. Feb. 1, 2008) ("*Cascade*"). Significantly, *Cascade* begins its analysis

17 of the "bundled discounting" issue in that case with the statement that the Supreme Court has

18 instructed lower courts to be cautious in condemning "discounted prices" because "price cutting is

19 a practice the antitrust laws aim to promote." *Id.* at \*6. Despite the obvious fact that Abbott's

20 massive price hike here can hardly be termed "price cutting," Abbott claims that this Court should

21 use *Cascade* to reject at the pleading stage each of the theories of liability alleged by the plaintiffs

22 in the newly-filed cases.[1]

23    While *Cascade* is a recent decision, it does not enunciate any new law that would apply to

24 the Norvir cases (earlier- or newly-filed). Instead, *Cascade* merely clarifies the law of this Circuit

25 as to "when bundled discounts constitute the exclusionary conduct proscribed by § 2." *Id.* at \*12.

26

---

27    [1] Abbott also has raised this argument in its motion for summary judgment filed
February 13, 2008 in the related *Doe/SEIU* action. Plaintiffs respectfully suggest that the briefing
28 in the *Doe/SEIU* action may further illuminate why *Cascade* does not apply to shield Abbott's
conduct.

1   *Cascade* holds that, to prove anticompetitive conduct in a bundled discount case, the plaintiff must

2   establish that, "after allocating the discount given by the defendant on the entire bundle of

3   products to the competitive product or products, the defendant sold the competitive product or

4   products below its average variable cost of producing them." *Id.* at *18. In so ruling, the *Cascade*

5   court rejected a jury instruction based on the more lenient bundled discounting test set forth in

6   *LePage's, Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003) (en banc). 2008 WL 269506, at *7-12.

7       *Cascade* is irrelevant here because the crux of Abbott's anticompetitive conduct involves a

8   massive price hike, and thus plaintiffs have not alleged that Abbott engaged in bundled

9   discounting and are not relying on the *LePage's* test for when bundled discounting constitutes

10  anticompetitive conduct. Moreover and tellingly, until all its other (and presumably better)

11  arguments in support of dismissal were repeatedly rejected, Abbott never had suggested that

12  bundled discount analysis applies to the facts of this case.

13

14

15

16

17      For this reason (and others), this Court has not relied upon allegations or evidence of

18  bundled discounts in its several opinions denying Abbott's motions to dismiss or for entry of

19  summary judgment. *In re Abbott Labs. Norvir Anti-Trust Litig.*, 442 F. Supp. 2d 800, 807 (N.D.

20  Cal. 2006) (denying motion for summary judgment); *Doe v. Abbott Labs.*, No. C 04-1511 CW

21  (Docket # 63), at 4-6 (N.D. Cal. Oct. 21, 2004) (Order Denying Defendant's Motion to Dismiss

22  First Amended Class Action Complaint) ("2004 Denial of Motion to Dismiss (Docket # 63)");

23  *Service Employees Int'l Union Health & Welfare Fund v. Abbott Labs.*, No. C 04-4203 CW

24  (Docket # 44), at 6-7 (N.D. Cal. Mar. 2, 2005) (Order Denying Defendant's Motion to Dismiss)

25  ("2005 Denial of Motion to Dismiss (Docket # 44)"). Abbott nowhere explains the fundamental

26  discrepancy between the instant Motion (flatly claiming that Abbott engaged in bundled

27  discounting) and the report of its expert economist (flatly claiming that Abbott did *not* engage in

28  bundled discounting) – nor could Abbott reasonably or credibly do so.

- 2 -

1   Try as it might, Abbott simply cannot turn allegations concerning its 400 percent price

2   increase into a claim that its conduct constitutes a form of "discounting" that should be evaluated

3   under *Cascade,* a decision whose key concern was that judicial scrutiny not stifle actual

4   discounting. *Cascade* and the line of cases upon which it relies address a form of price cutting –

5   *not* a price increase that happens to have made other unchanged prices look low by comparison.

6   Just because some of the challenged conduct in these cases involves pricing does not make these

7   predatory pricing cases, and does not bring this conduct within the rubric of bundled discounts.

8   The conduct at issue here was intended by Abbott to make Norvir essentially unavailable to large

9   segments of the market in order to impair the ability of its rivals to compete in the boosted PI

10  market and stifle competition in that market. There are other antitrust theories for analyzing that

11  kind of conduct. *Cascade* is inapposite.

12  Plaintiffs in all of the Norvir cases allege monopolization and attempted monopolization of

13  the boosted PI market. In the earlier-filed Norvir cases, this Court already has held that plaintiffs

14  allege and present a material issue of fact as to whether Abbott's conduct was anticompetitive

15  monopoly leveraging under *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195 (9th

16  Cir. 1997) *("Kodak").*[2] The allegations in the newly-filed Norvir cases mirror in this respect those

17  in the earlier filed cases. The newly-filed Norvir cases also contain allegations of anticompetitive

18  conduct under a number of different theories besides the monopoly leveraging theory sustained in

19  *Kodak.* None of those theories involves below-cost pricing, and each independently would require

20  denial of Abbott's motion to dismiss. Given that *Kodak* applies here, and that Abbott does not

21  even argue that *Cascade* reverses or amends *Kodak*, *Cascade* cannot as a matter of logic justify or

22  ground a dismissal of this case. Put another way, *Cascade* can only be a problem for plaintiffs

23  here if it means that below-cost pricing is a prerequisite to a finding of any anticompetitive

24  conduct. That is, Abbott can only succeed if it can show that so long as pricing is above cost,

25

26  [2] The "monopoly leveraging" that was held to constitute exclusionary conduct in *Kodak* and under which this Court has held that plaintiffs have alleged exclusionary conduct is the use of monopoly power in one market to gain a monopoly or a dangerous probability of monopoly in a

27  second market. Bundled discounting can be a way of using predatory pricing to leverage a monopoly, but not all monopoly leveraging cases are predatory pricing cases, and most predatory

28  pricing cases involve one product in one market.

1    there can be no Sherman Act liability under *Kodak* or any other theory.   But, that is not the

2    holding of *Cascade* (or any other case).  *Cascade* does not erase a hundred years of antitrust law

3    and replace it with a rule that the existence of above-cost prices immunizes a defendant against all

4    conceivable claims that it engaged in anticompetitive conduct.

5    Abbott's latest arguments are a desperate attempt to avoid being held to account for its

6    anticompetitive conduct.  These arguments are as flawed as the earlier contentions that this Court

7    has repeatedly rejected (or more so), and they deserve the same fate.[3]

8                                        **ARGUMENT**

9    **I.    ABBOTT'S MOTION SHOULD BE DENIED BECAUSE CASCADE DOES NOT**

10         **APPLY TO THESE CASES.**

11         **A.    *Cascade* Issued a Narrow Holding Applicable Only to One Category of**

12              **Anticompetitive Conduct: Bundled Discounting.**

13    The *Cascade* court's holding was limited to one particular category of potentially

14    anticompetitive conduct: discount bundling.  In *Cascade,* the parties, McKenzie and PeaceHealth,

15    were the only two providers of hospital care in Lane County, Oregon.  2008 WL 269506, at *3.

16    PeaceHealth offered substantial discounts to customers who agreed exclusively to use PeaceHealth

17    for various health care services, some of which McKenzie did not provide. *Id.* at *3-4.  McKenzie

18    sued PeaceHealth for monopolization, attempted monopolization and tying under sections 1 and 2

19    of the Sherman Act and for violation of Oregon's anti-price discrimination law. *Id.* at *2.

20    McKenzie based its claims on a number of theories, including bundled discounting, exclusive

21    dealing, and tying. *Id.* at *2-4.  The district court granted PeaceHealth's motion for summary

22    judgment on McKenzie's tying theory, but allowed McKenzie to go to trial on its other theories.

23    *Id.* at *4.  After a trial in which McKenzie's primary theory of anticompetitive conduct was

24    PeaceHealth's bundled discounting, the jury found in favor of McKenzie, concluding that

25         [3] Abbott filed separate motions to dismiss the Sherman Act claims in both the GSK case
26    and the consolidated direct purchaser case (the "Meijer action").  In the GSK case, Abbott relies
      upon its planned "patent immunity" defense.  In the Meijer action, Abbott takes issue with the
27    alternative pleading that the *Cascade* test can be met here and with allegations that Abbott
      improperly monopolized the boosting market (as well as the boosted market).  Both GSK and the
28    Meijer action plaintiffs are submitting separate memoranda that demonstrate why those motions
      should be denied.

1  PeaceHealth had violated section 2 and Oregon's anti-price discrimination law. *Id.* Both parties

2  appealed. *Id.* at *5. The Ninth Circuit vacated the jury verdict on the monopolization and

3  attempted monopolization claims and the order granting summary judgment in favor of

4  PeaceHealth on the tying claim. *Id.* at *19, 22, 24. It then remanded for further proceedings on all

5  of these claims.[4] *Id.*

6      *Cascade* dealt primarily with McKenzie's bundled discount theory of anticompetitive

7  conduct. It first described the practice at issue: "A bundled discount, however else it might be

8  viewed, is a price discount on a collection of goods." 2008 WL 269506, at * 12. Then, after a

9  lengthy analysis of that practice, it concluded:

10      In summary, we hold the following:  To prove that a bundled discount was

11      exclusionary or predatory for the purposes of a monopolization or attempted

12      monopolization claim under § 2 of the Sherman Act, the plaintiff must establish

13      that, after allocating the discount given by the defendant on the entire bundle of

14      products to the competitive product or products, the defendant sold the

15      competitive product or products below its average variable cost of producing

16      them.

17  *Id.* at *18. The Ninth Circuit did not address PeaceHealth's arguments concerning other theories

18  of anticompetitive conduct that McKenzie had put forward as a basis for liability on its

19  monopolization and attempted monopolization claims.[5] The court also expressly refused to apply

20  _____

21  [4] Initially, the Ninth Circuit also vacated the jury verdict in favor of McKenzie on the Oregon price discrimination claim. On February 1, 2008, the Ninth Circuit amended the opinion filed on September 4, 2007, 502 F.3d 895 (9th Cir. 2007), *as amended by* 2008 WL 269506 (9th

22  Cir. Feb. 1, 2008). In the original opinion, the court held that the price discrimination judgment was subject to the same cost-based test as the bundled discounting claim. 502 F.3d at 922-25. The

23  amended opinion altered that conclusion, finding that the validity of the jury instruction regarding price discrimination "rests upon an unsettled question of Oregon antitrust law," 2008 WL 269506,

24  at *19, and certifying the question to the Oregon Supreme Court. *Id.*; *Cascade Health Solutions v. PeaceHealth*, Nos. 05-35627 et al., --- F.3d ----, 2008 WL 269475 (9th Cir. Feb. 1, 2008) (order

25  certifying question).

    [5] The plaintiff in *Cascade* actually alleged several different types of anticompetitive
26  conduct, only one of which was discount bundling (the others included physician referrals, sole provider status, and various acquisitions). *See McKenzie-Williamette Hosp. v. PeaceHealth*, 2003

27  WL 23537980 (D. Or. Aug. 15, 2003). At trial, the court instructed the jury to consider four types of anticompetitive conduct in support of its attempted monopolization claim (exclusive contracts,

28  pricing practices, physician contract arrangements, and restrictive real estate covenants), but *the plaintiff attributed its damages solely to "exclusive dealing induced by bundled discounts."*

1    this test outside the bundled pricing context. *Id.* at *22 n.27. Significantly, in a portion of its

2    ruling simply ignored by Abbott, the *Cascade* court reversed summary judgment for defendant on

3    plaintiff's tying claims, holding that under a tying theory the pricing scheme could be

4    anticompetitive even if above-cost. *Id.* at *19-22.

5         Thus, *Cascade* teaches that each theory put forward in a Sherman Act case must be

6    analyzed independently based on the facts alleged. As Abbott has admitted and this Court has

7    recognized, none of the plaintiffs is alleging price discounting – just the opposite: plaintiffs here

8    allege Abbott engaged in a massive price increase in order to hinder rivals and harm competition

9    in the boosted PI market. The mere fact that, like PeaceHealth, Abbott is leveraging its power

10   from one market into another does not require application of the below-cost test set forth in

11   *Cascade.* Indeed, tying claims involve exactly the same leveraging of power from one market to

12   another, and the *Cascade* court refused to read below-cost limitations into tying claims. *Cascade's*

13   narrow holding concerning discount bundling simply does not apply to the allegations in these

14   cases.

15   **B.    Because These Cases Involve Abbott's Massive Price Increase – Not Bundled**

16          **Discounting – the Rationale for a Bright Line Rule Set Forth in *Cascade* Does**

17          **Not Apply Here.**

18        Moreover, *Cascade's* holding, applicable to cases in which a plaintiff bases its claim of

19   anticompetitive conduct on bundled price discounting, should not be imported into a case

20   involving exactly the opposite conduct – a price hike. *Cascade* adopted a bright line rule,

21   requiring a plaintiff alleging anticompetitive price discounting to prove a form of below-cost

22   pricing, because price reductions typically benefit consumers. The same concerns and the same

23

24   Request for Judicial Notice, Ex. 6 (Opening Brief of Appellant PeaceHealth, 2005 WL 35117798
     at 53, in *Cascade Health Solutions v. PeaceHealth*, No. 05-35640, 2008 WL 269506 (9th Cir. Feb.
25   1, 2008). On appeal, PeaceHealth argued that the "Other Alleged Anticompetitive Conduct" – the
     physician arrangements and the restrictive covenants – was not anticompetitive under section 2.
26   *Id.* at 21-57. PeaceHealth also argued on appeal that unless its conduct violated section 1 of the
     Sherman Act that conduct could not violate section 2. 2008 WL 269506 at *19 n.22. The Ninth
27   Circuit invited amicus briefing solely on the bundled discount issue. *Cascade Health Solutions v.*
     *PeaceHealth*, 479 F.3d 726, 727 (2007). Its opinion did not address either of the other arguments
28   made by PeaceHealth.

1  rationale are obviously not applicable here, where Abbott has harmed consumers by exponentially

2  increasing their costs.

3      The *Cascade* court made abundantly clear that the desire not to subject price cutting to

4  excessive judicial scrutiny drove its holding.  It acknowledged that "the Supreme Court has

5  instructed that, because of the benefits that flow to consumers from discounted prices, price

6  cutting is a practice the antitrust laws aim to promote." *Cascade*, 2008 WL 269506, at *6.  It

7  quoted *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 223 (1993), in

8  which the Supreme Court set a bright line cost-based test for assessing the legality of discounting

9  of a single product, for the proposition that "[l]ow prices benefit consumers regardless of how

10 those prices are set, and so long as they are above predatory levels, they do not threaten

11 competition." 2008 WL 269506, at *10 (internal quotation marks omitted, alteration in original).

12 It further noted that Supreme Court decisions "show a measured concern to leave unhampered

13 pricing practices that might benefit consumers, absent the clearest showing that an injury to the

14 competitive process will result." *Id.* at *12.

15     The Ninth Circuit's opinion in *Cascade* uses the terms "discount," "discounting," "lower

16 prices," "price cutting," "price competition" and the like *163* times.  Raising prices is the antithesis

17 of price competition.  Yet Abbott's motion is fundamentally an attempt to convince the Court that

18 the antitrust laws are incapable of distinguishing between a 400 percent *increase* in the price of

19 Norvir and a comparable *decrease* in the price of Kaletra.  This is Abbott in Wonderland.

20     The distinction between raising the price of Norvir and reducing the price of Kaletra is in

21 fact a distinction that appears on the face of plaintiffs' complaints.  In the *Safeway* complaint, for

22 example, plaintiffs allege: "Faced with the prospect of new competition to Kaletra, Abbott's

23 boosted PI, Abbott declined to engage in legal and procompetitive approaches to defending

24 Kaletra's market share (*such as reducing Kaletra's price*)."  Safeway Amended Complaint ¶ 22

25 (emphasis added).  Had Abbott lowered the price of Kaletra in December 2003 rather than

26 increasing the price of Norvir, these cases would never have been filed.

27     By its Omnibus motion, Abbott seeks to persuade this Court that its 400 percent price hike

28 is worthy of the same kind of deference as a presumptively pro-consumer price reduction.  It is

1808392

1  not.  In *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992), for example, the

2  Court refused to adopt a series of *per se* rules that would have absolved Kodak of liability prior to

3  meaningful discovery or trial.  Kodak urged the Court to hold that, as a matter of law, there cannot

4  be separate markets for sales and service, *id.* at 463, and that a lack of power in the primary market

5  necessarily precludes power in the aftermarkets, *id.* at 465-66.    Like Abbott here, Kodak

6  contended "that there is no need to examine the facts," citing to case law involving price-cutting in

7  which the Court had affirmed a grant of summary judgment to defendants.  *Id.* at 467-68, 467.

8  The Court distinguished price-cutting cases from the facts presented to it:

9           Nor are we persuaded by Kodak's contention that it is entitled to a legal

10          presumption on the lack of market power because, as in *Matsushita* [*Electric*

11          *Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)], there is a significant

12          risk of deterring procompetitive conduct.  Plaintiffs in *Matsushita* attempted to

13          prove the antitrust conspiracy "through the evidence of rebates and other price-

14          cutting activities." Because cutting prices to increase business is "the very essence

15          of competition," the Court was concerned that mistaken inferences would be

16          "especially costly" and would "chill the very conduct the antitrust laws are

17          designed to protect." But the facts in this case are just the opposite.  The alleged

18          conduct  –  higher  service  prices  and  market  foreclosure  –  is  facially

19          anticompetitive and exactly the harm that antitrust laws aim to prevent.

20  504 U.S. at 478 (internal citations omitted).  Like Kodak, Abbott cannot avoid antitrust scrutiny of

21  its massive price hike and other anticompetitive conduct on the ground that such scrutiny might

22  deter pro-consumer price discounting.  None of Abbott's conduct, alleged by plaintiffs, can be

23  characterized as pro-consumer.[6]

24

25          [6] In any case, plaintiffs' complaints sufficiently state a claim even if *Cascade* applies.  The
     *Cascade* decision came after an appeal from a jury verdict.  Abbott, by contrast, is moving to
26   dismiss antitrust claims based on the pleadings.  As recently stated by the United States Supreme
     Court in *Erickson v. Pardus*, 127 S. Ct. 2197 (2007) (reversing dismissal), Abbott has a very
27   difficult burden:

28          Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement
            of the claim showing that the pleader is entitled to relief."  Specific facts are not
            necessary; the statement need only "'give the defendant fair notice of what the . . .

1    **C.    Abbott's Effort to Apply *Cascade* to This Case Should Be Rejected Because**
2    **This Court and Abbott Have Recognized That Discount Bundling, and Thus**
3    **Implicitly *Cascade* Itself, Have No Relevance to This Case.**

4    Abbott's invocation of *Cascade* is an effort to recycle its argument that, despite its massive

5    price increase on Norvir, this case is about low prices, an argument this Court has rejected several

6    times.   *See* 2004 Denial of Motion to Dismiss (Docket # 63), at 7-8, 9 (describing Abbott's

7    argument).   This Court already has made clear that the law regarding the competitive effects of

8    low-pricing does not apply to the facts alleged in the Norvir cases.   For example, this Court has

9    recognized that:

10   • Plaintiffs' injury is "distinguishable" from the injuries complained of in cases

11   where "the injury was alleged to have arisen from a *decrease* in prices in the

12   relevant market." *Id.* at 9 (emphasis in original).

13   • Plaintiffs allege that they were "injured in the relevant marketplace by having to

14   pay *artificially inflated* prices for Norvir for its use in conjunction with other PIs."

15   2005 Denial of Motion to Dismiss (Docket # 44), at 5-6 (emphasis added).

16   • Plaintiffs in the earlier filed Norvir cases presented evidence sufficient to get

17   before a jury on the question of whether Abbott's inflated price for Norvir harmed

18   competition: "Plaintiffs provide their expert's finding that Defendant's price

19   increase harms HIV patients by creating another barrier to entry that hinders the

20   introduction of new PIs from Defendant's competitors, and, therefore, provide

21   evidence of antitrust injury."   442 F. Supp. 2d at 807 (denying motion for

22   summary judgment).

23

24   _____
     claim is and the grounds upon which it rests.'" [quoting *Bell Atl. Corp. v.*
25   *Twombly*, 127 S. Ct. 1955, 1964 (2007)].

     *Erickson*, 127 S. Ct. at 2200 (alteration in original); *see also Skaff v. Meridien N. Am. Beverly*
26   *Hills, LLC*, 506 F.3d 832 (9th Cir. 2007) (citing *Erickson* and *Twombly*, reversing district court
     decision that the complaint was inadequate).   To survive a motion to dismiss, plaintiffs must allege
27   "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 127 S. Ct. at 1974.
     This Court previously concluded that the Norvir antitrust cases meet this test.   *Cascade* does not
28   alter that result.

1808392                         PLAINTIFF'S OPPOSITION TO ABBOTT'S OMNIBUS MOTION TO DISMISS

1    Tellingly, Abbott itself has acknowledged, repeatedly, that antitrust theories stemming

2    from discounting and low-pricing theories do not apply here.



14    Abbott's own briefs to this Court have reiterated this same point.  Abbott has complained

15    that plaintiffs are not relying on "recognized" or "traditional" theories of anticompetitive conduct,

16    such as predatory pricing.  Request for Judicial Notice, Ex. 2 (Notice of Motion and Renewed

17    Motion of Abbott Laboratories' for Summary Judgment, Jan. 9, 2006) at 16; *see id.*, Ex. 4 (Abbott

18    Laboratories' Opposition to Plaintiffs' Rule 56(f) Motion, July 1, 2005) at 11.  It has characterized

19    plaintiffs' injury as "being forced to pay more because of a price increase." *Id.*, Ex. 2, at 17.  High

20    prices, Abbott argued, are an antitrust problem only if they are preceded by anticompetitive

21    conduct "such as through predatory pricing . . . . But that is not what Plaintiffs are alleging.  They

22    are alleging only that they are paying more because of Abbott's unilateral decision to raise the

23    price of a patented product." *Id.*, Ex. 2 at 18.  Indeed, Abbott has staked its fate in the Norvir

24    litigation on its entitlement, as a patentee, to charge as high a price as it likes. "[S]etting high

25    prices" is how a "monopolist can permissibly benefit from its position." *Id.*, Ex. 5 (Notice of

26    Motion and Motion of Abbott Laboratories' for Summary Judgment, June 1, 2005) at 19 (internal

27

28

1808392

1    quotation marks and citation omitted). It is far too late for Abbott to pretend that the Norvir cases

2    are about price discounting.[7]

3    **II.    THIS COURT'S PRIOR HOLDING THAT PLAINTIFFS HAVE ADEQUATELY**

4    **ALLEGED ANTICOMPETITIVE CONDUCT APPLIES EQUALLY TO THE**

5    **NEWLY-FILED NORVIR CASES.**

6        **A.    The Newly Filed Norvir Cases Adequately Allege Monopoly Leveraging.**

7        This Court repeatedly has ruled that plaintiffs in the earlier-filed Norvir cases have not

8    only pleaded sufficient allegations, but also have presented evidence raising material issues of fact

9    regarding each element of their section 2 claims, including the element of anticompetitive conduct.

10   In its opinions noted below, this Court has found:

11       •    "Plaintiffs' complaint alleges that Defendant has used its monopoly in one market (the

12           booster market) in order to achieve an anticompetitive purpose in a separate market

13           (the boosted market). In *Image Technical Services, Inc. v. Eastman Kodak Co.*, 125

14           F.3d 1195, 1216 (9th Cir. 1997), the court noted that 'a monopolist who acquires a

15           dominant position in one market through patents or copyrights may violate § 2 if the

16           monopolist exploits that dominant position to enhance a monopoly in another market.'

17           ... 'Neither the aims of the intellectual property law, nor the antitrust laws justify

18           allowing a monopolist to rely upon a pretextual business justification to mask

19   ─────────────────

20       [7] Abbott's characterization of plaintiffs' allegations as directed at Abbott's supposed "price discounting" is based on its extraction from the complaints of the statement that "Norvir is sold at

21   a much lower price when used as one component of Abbott's own boosted PI, Kaletra." Motion at 4. It is improper to attempt to segregate plaintiffs' individual allegations from the overall

22   allegations. "[I]t would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect. . . . We are not dealing with a

23   mathematical equation. We are dealing with what has been called the 'synergistic effect' of the mixture of the elements." *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir.

24   1992). In this case, the plaintiffs allege a series of actions, including inducing competitors to rely on Norvir, taking money from its competitors in exchange for licenses, drastically raising the price

25   of Norvir to stifle competition for Kaletra, not changing the price of Kaletra and then misleading the public about the reasons for its actions. Abbott's "arguments unfairly parse" these allegations

26   into allegations of price increases and relative price discounts. *See Visa U.S.A. Inc. v. First Data Corp.*, 2006 WL 1310448, at *11 (N.D. Cal. May 12, 2006) (denying motion for summary

27   judgment). "Parties 'should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of

28   each.'" *Id.* at *11 (citation omitted). "Each claimed fact is not a separate cause of action for antitrust violation, but, taken together the allegations amount to valid claims." *Id.*

1    anticompetitive conduct.' *Id.* at 1219. The successful 'monopoly leveraging theory'

2    relied upon by the plaintiffs in *Image Technical*, [*i*]*d.* at 1208, is the theory Plaintiffs

3    assert in their amended complaint to trigger Sherman Act liability." 2004 Denial of

4    Motion to Dismiss (Docket # 63), at 5-6.

5    •    "Plaintiff has adequately alleged, under the monopoly leveraging theory, which the

6    plaintiffs in *Doe* relied upon and that was recognized by the Ninth Circuit in [*Kodak*],

7    that Defendant's actions trigger Sherman Act liability." 2005 Denial of Motion to

8    Dismiss (Docket # 44), at 7.

9    •    "Plaintiffs are entitled to discovery relating to the issue of whether Defendant's Norvir

10    price increase was a pretext for anti-competitive conduct in the boosted market. . . .

11    *Image Technical* is binding on this Court." *In re Abbott Labs. Norvir Anti-Trust Litig.*,

12    C 04-1511 CW (Docket # 146) and C 04-4203 CW, at 7 (N.D. Cal. Sept. 12, 2005)

13    (Order Granting Plaintiffs' Rule 56(f) Motion and Denying as Premature Defendant's

14    Motion for Summary Judgment) ("Order Granting Rule 56(f) Motion").

15    •    "Plaintiffs allege, relying on the monopoly leveraging theory recognized in *Image*

16    *Technical*, 125 F.3d at 1208, that, while Defendant holds patents in the booster market,

17    Defendant's Norvir price increase constituted impermissible anti-competitive conduct

18    in the boosted market.... Plaintiffs provide evidence that Defendant abused its patent

19    rights to Norvir to maintain its monopoly in the boosted market." 442 F. Supp. 2d at

20    807 (denying defendant's motion for summary judgment).

21    The allegations on which the Court relied are repeated in the newly-filed Norvir cases. For

22    example,

23    •    "Abbott's specific actions in furtherance of its anticompetitive purpose and scheme

24    include leveraging its market power in the market for PI boosters into the market for

25    boosted PIs . . . ." GSK Complaint ¶ 58; Meijer Consolidated Amended Complaint

26    ¶ 18.

27    •    "Abbott's December 3, 2003 price increase was an attempt to leverage its monopoly

28    position in the boosting market in order to disadvantage competitors and maintain its

- 12 -

1      dominant position in the boosted market."    Safeway Complaint ¶ 23; Rite Aid

2      Complaint ¶ 33; *see also* Meijer Consolidated Amended Complaint ¶¶ 24, 25.

3      •   Abbott's "executives formulated an anticompetitive scheme using Abbott's control of

4      Norvir as leverage to maintain or increase Kaletra's dominant market position."  GSK

5      Complaint ¶ 24; *see* Rite Aid Complaint ¶ 21; Safeway Complaint ¶ 22; Meijer

6      Consolidated Amended Complaint ¶ 25.

7      •   "Abbott has leveraged its monopoly position (100% dominance) in the Boosting

8      Market to impede rivals to Abbott's Kaletra product in the Boosted Market."  Meijer

9      Consolidated Amended Complaint ¶ 18.

10     **B.**    ***Kodak* Still Applies to Abbott's Conduct.**

11        In spite of these allegations and the Court's numerous rulings, Abbott tries once again to

12 reargue that *Kodak* has no application to the Norvir cases.  Abbott is mistaken.

13           1.      Plaintiffs Allege Conduct Proscribed by *Kodak.*

14        First, Abbott argues a point it has repeatedly lost in this Court, rehashing its contention that

15 *Kodak* does not apply because *Kodak* is supposedly a refusal to deal case, and Abbott has not

16 refused to deal. As this Court has already held, *Kodak* is not so limited.  *In re Abbott Labs. Norvir*

17 *Anti-Trust Litig.*, 442 F. Supp. 2d at 807.  "Section 2 of the Sherman Act prohibits a monopolist's

18 unilateral action, like Kodak's refusal to deal, if that conduct harms the competitive process in the

19 absence of a legitimate business justification."  *Kodak*, 125 F.3d at 1209.  "[W]e believe the

20 Supreme Court, in *Aspen Skiing*, endorsed a more general application of § 2 principles to refusal

21 to deal cases."  *Id.* at 1211.   The Ninth Circuit approved a jury instruction that is the basis for the

22 liability the Norvir plaintiffs allege: "It is unlawful, however, for a monopolist to engage in

23 conduct, including refusals to deal, *that unnecessarily excludes or handicaps competitors in order*

24 *to maintain a monopoly.*"  *Id.* at 1209 (emphasis in original).  The theory and the instruction refer

25 to refusals to deal simply as an example of the conduct prohibited; they do not indicate that the

26 only kind of exclusionary conduct prohibited is a refusal to deal.

27        Moreover, while Abbott may not have engaged in an outright refusal to deal, there need

28 not be an outright refusal to deal for conduct such as that alleged here to be found exclusionary

1    under Section 2.  For example, *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585

2    (1985), did not involve an absolute refusal to deal. Rather, the defendant ski resort was willing to

3    continue to offer a combined all-mountain ticket including the plaintiff's resort, but only under

4    terms that were considerably less favorable than the plaintiff had received from the defendant in

5    the past. *Id.* at 592.  The plaintiff claimed that the defendant had made the plaintiff "an offer that

6    [it] could not accept." *Id.*  Other courts routinely analyze exclusionary price increases under the

7    test set out in *Aspen Skiing. See, e.g., Metronet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1132

8    (9th Cir. 2004) (evaluating conduct under *Aspen Skiing* even though there was a willingness to

9    provide the product on undesirable terms; "[a]n offer to deal with a competitor only on

10    unreasonable terms and conditions can amount to a practical refusal to deal."); *see also Delaware*

11    *& Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 179-80 (2d Cir. 1990) (conduct need not

12    be an outright refusal to deal in order to find a denial of an essential facility); *Nobody in*

13    *Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F. Supp. 2d 1048, 1112 (D. Colo.

14    2004) (significant price increase constituted a denial of an essential facility).  As these cases show,

15    high prices can constitute unlawful exclusionary conduct akin to a refusal to deal.

16          The newly-filed Norvir cases cite Abbott documents released by *The Wall Street Journal*

17    demonstrating that Abbott understood its price increase as a means of making Norvir essentially

18    inaccessible to a wide array of patients in order to impair the sales of Abbott's rivals in the

19    boosted PI market.  Abbott considered different ways of pulling Norvir from the market in order to

20    decrease demand for its competitors' PIs, including offering only a liquid form of Norvir that

21    Abbott's own executives admit "taste[s] like someone else's vomit," raising the price to an

22    exorbitant level, and discontinuing it altogether.   GSK Complaint ¶¶ 25-28; *see* Rite Aid

23    Complaint ¶¶ 24-25; Meijer Consolidated Amended Complaint ¶¶ 21, 28-30.  The decision to raise

24    the price rather than pull the product or the pill version from the market was based on public

25    relations concerns, specifically, how Abbott could hide its motivations (could it convincingly cite

26    increased demand for Norvir tablets in Africa? GSK Complaint ¶ 27; Rite Aid Complaint ¶ 25;

27    Meijer Consolidated Amended Complaint ¶ 29), "minimize any federal investigations," GSK

28    Complaint ¶ 26; Rite Aid Complaint ¶ 22; Meijer Consolidated Amended Complaint ¶ 26, and

1   avoid the perception that it was a "big, bad, greedy pharmaceutical company" that lacked a

2   commitment to HIV, GSK Complaint ¶ 28; Rite Aid Complaint ¶ 22; Meijer Consolidated

3   Amended Complaint ¶ 26. Abbott intended for its conduct to impair its rivals as if it were a refusal

4   to deal.[8]

5                   2.      Ninth Circuit, Not Federal Circuit, Law Applies Here.

6           Finally, and somewhat ironically in a brief inspired almost entirely by the supposed

7   applicability of a recent Ninth Circuit decision, Abbott argues that *Kodak* has been rejected by the

8   Federal Circuit, whose law, Abbott contends, controls. Abbott has made this argument—which its

9   own argument regarding *Cascade* contradicts—at least four times already, and the Court has

10  properly rejected it each time:

11          Defendant argues that Plaintiffs' pretext argument is irrelevant because the Court

12          is bound, not by *Image Technical,* but by *In re Indep. Servs. Orgs. Antitrust Litig.,*

13          203 F.3d 1322 (Fed. Cir. 2000), in which the Federal Circuit ruled that exercising

14          legitimate patent rights can never support anti-trust liability. That argument is not

15          well-taken; Plaintiffs' claims arise under the Sherman Act, not federal patent law,

16          and Ninth Circuit precedent applies. . . . *Image Technical* is binding on this

17          Court.

18  Order Granting Rule 56(f) Motion, at 7. In its Renewed Motion for Summary Judgment, Abbott

19  seemingly promised to stop making the argument that Federal Circuit law applied. "Thus, as it

20  has argued in the past, Abbott respectfully contends that the Court should follow *Independent*

21  *Services* and reject the Ninth Circuit's approach in *Kodak*. Abbott understands that this Court

22  already rejected that argument when ruling on Plaintiffs' Rule 56(f) motion." Request for Judicial

23  Notice, Ex. 2, at 19 n.2.

24          The patent laws are equally irrelevant to the newly-filed Norvir cases. These plaintiffs

25  allege Sherman Act and state law claims; although some of the complaints use the terms "patent"

26  _____

27      [8] These new allegations also bolster plaintiffs' claim that Abbott lacked valid business
    reasons for its conduct and that its proffered explanations are pretextual. They make even stronger

28  the Court's earlier conclusion that plaintiffs have alleged and put forward evidence of a *Kodak*
    monopoly leveraging claim that rebuts any presumption of legitimacy.

                                              - 15 -

1  or "intellectual property" a few times, it is Abbott which is attempting to inject patent issues into

2  this case through an as-of-yet unasserted defense. But, assertion of a patent law defense does not

3  mean Federal Circuit jurisdiction applies. The Supreme Court and the Federal Circuit have both

4  clearly stated that "a case raising a federal patent-law defense does not, for that reason alone,

5  'arise under' patent law, 'even if the defense is anticipated in the plaintiff's complaint'...."

6  *Leatherman Tool Group Inc. v. Cooper Indus. Inc.*, 131 F.3d 1011, 1013 (Fed. Cir. 1997) (quoting

7  *Christianson v. Colt Indus. Operating Corp*, 486 U.S. 800, 809 (1988)). In *Leatherman Tool*

8  *Group*, the Federal Circuit held that it lacked jurisdiction over an appeal of an injunction entered

9  in a trade dress infringement claim where the defendant had asserted an affirmative defense and

10  counterclaim based on the patent laws. 131 F.3d at 1015.

11  Indeed, the Supreme Court in *Holmes Group, Inc. v. Vornado Air Circulation Systems,*

12  *Inc.*, 535 U.S. 826, 830 (2002) – the case upon which Abbott bases its claim that Federal Circuit

13  law applies here – reached the same conclusion. It held the Federal Circuit lacked jurisdiction

14  over a declaratory judgment action in which the plaintiff pleaded trade dress claims and the

15  defendant pleaded compulsory counterclaims of *patent infringement. Id.*

16  Relying on *Holmes*, the Federal Circuit in *Telecomm Tech. Servs., Inc. v. Siemens Rolm*

17  *Commc'ns, Inc.*, 295 F.3d 1249 (Fed. Cir. 2002), declined jurisdiction to consider a defense to

18  monopolization claims identical to the one Abbott suggests it will raise here. There, plaintiffs,

19  independent service organizations, brought monopolization claims in the Northern District of

20  Georgia, alleging that "by refusing to sell them parts unique to its machines [the defendant] is

21  unlawfully leveraging its market share in the parts foremarket to monopolize the aftermarket of

22  service." *Telecomm Tech. Servs., Inc. v. Siemens Rolm Commc'ns, Inc.*, 150 F. Supp. 2d 1365,

23  1367 (N.D. Ga. 2000). The defendant moved for summary judgment on the antitrust claims. *Id.*

24  The district court initially denied summary judgment, ruling, *inter alia,* that "the fact that

25  intellectual property rights attach to a work will not standing alone permit the right-holder to

26  refuse to deal that good in an aftermarket." *Id.* The defendant moved for reconsideration

27  following the Federal Circuit's ruling in *Independent Services, id.* at 1367-68, which Abbott here

28  attempts to apply. The district court, assuming that the Federal Circuit would have jurisdiction

- 16 -

1  over any appeal in that case, applied the *Independent Services* holding and granted defendant

2  summary judgment. *Id.* at 1368-69, 1373-74.  Plaintiff ISOs appealed to the Federal Circuit,

3  which rejected jurisdiction on the basis that the intervening *Holmes* decision divested it of

4  jurisdiction it purportedly had by virtue of the patent counterclaims.  295 F.3d at 1252.  In the

5  absence of jurisdiction over the patent counterclaims, the Federal Circuit had no other basis for

6  jurisdiction; the court did not retain jurisdiction by virtue of the patent immunity defense to the

7  antitrust claims.  It transferred the case to the Eleventh Circuit. *Id.*  Federal Circuit jurisdiction is

8  similarly lacking here.[9]

9  **III.   THE NEWLY-FILED CASES ALLEGE ADDITIONAL ANTICOMPETITIVE**

10  **CONDUCT THAT INDEPENDENTLY REQUIRES DENIAL OF ABBOTT'S**

11  **MOTION TO DISMISS.**

12  Abbott's motion also should be denied because the new complaints allege facts that give

13  rise to theories of exclusionary conduct not alleged in the earlier cases – none of which can even

14  plausibly be said to require a finding of below-cost pricing.  The newly-filed complaints state

15  

---

16  [9] In any case, GSK's and Meijer's complaints allege that Abbott licensed to GSK and others whatever right it had – illusory, real, big or small – to exclude GSK and other licensees

17  from the boosted market.  GSK Complaint ¶¶ 20-22; Meijer Consolidated Amended Complaint ¶¶ 15, 34-35.  By virtue of the license, Abbott gave up any right it may have had to exclude its

18  competitors from the boosted market, however those rights are defined. *Jacobs v. Nintendo of Am., Inc.,* 370 F.3d 1097, 1101 (Fed. Cir. 2004).  In *Jacobs,* the patent owner settled patent

19  infringement litigation by licensing its patent to the defendant. *Id.* at 1098-99.  Later, the patent holder sued Nintendo, a customer of the licensee, alleging infringement. *Id.* at 1099.  Nintendo

20  argued that the license between the patent owner and the licensee protected not only the licensee but also the licensee's customers for making and selling devices that incorporate the licensed

21  components. *Id.*  Summary judgment for Nintendo was entered and affirmed. *Id.* at 1099, 1102. "For the [patentee] to bar [its licensee's] customer, Nintendo, from using [the licensee's]

22  accelerometers in the products expressly referred to in the settlement agreement [the license], the court concluded, would undermine the provision of the agreement permitting the sale of

23  accelerometers 'for use in tilt-sensitive control boxes.'  The court explained that [the patentee] should not be permitted to do 'through the back door – by suing a customer of [the licensee] –

24  what he cannot do through the front door,' i.e., by suing [the licensee]." *Id.* at 1099; *see also id.* at 1101-02.

25  Here, Abbott expressly granted GSK and others the right to compete in the boosted PI market.  It cannot now argue that it retained the ability to interfere with those rights.  Whatever

26  rights to exclude Abbott may once have had were relinquished with the license and cannot be summoned up by Abbott as immunity from the antitrust laws. *See Anton/Bauer, Inc. v. PAG, Ltd.,*

27  329 F.3d 1343, 1350 (Fed. Cir. 2003) ("[I]t is well settled that all or part of a patentee's right to exclude others from making, using, or selling a patented invention may be waived by granting a

28  license, which may be express or implied.").

1   claims under cases decided by the Supreme Court and other cases in which there is relative
2   uniformity among the Circuits.   Thus, even if *Kodak* were not to apply for one of the various
3   reasons asserted, dismissal of the newly-filed cases would be inappropriate.

4           GSK's, Rite Aid's, and the Meijer Consolidated complaints contain a series of allegations
5   that allow a trier of fact to conclude that, when Abbott quintupled the price of Norvir in 2003, it
6   committed misconduct that was not only anticompetitive under *Kodak* (leveraging with dangerous
7   probability of monopoly, without legitimate business justification), but also was anticompetitive
8   under a number of other independent cognizable antitrust theories, including that Abbott changed
9   a voluntary and profitable course of dealing for the purpose of hindering competition and that
10  Abbott deceived industry participants into adopting its boosting agent as a standard and then
11  refused to offer it on terms upon which the industry had relied.   In support of these additional
12  theories of liability, plaintiffs allege that:

13      • "Abbott's executives were well-aware that Abbott had facilitated the use of Norvir as a
14          booster and caused its competitors to rely on the availability of Norvir -- through
15          Abbott's past course of conduct and formally through licensing its competitors to
16          promote their PIs with Norvir."   Rite Aid Complaint ¶ 21; *see* Meijer Consolidated
17          Amended Complaint ¶ 25; GSK Complaint, ¶¶ 16-20.

18      • "Abbott induced competitors in the boosted market to rely on Norvir."   Rite Aid
19          Complaint ¶ 42; *see also* Meijer Consolidated Amended Complaint ¶¶ 35-36.

20      • "[I]n reliance on the expectation that Abbott would act in good-faith, and because
21          Abbott concealed its strategy to reduce Norvir's availability and/or dramatically raise
22          its prices, GSK and other PI manufacturers materially delayed developing, testing,
23          and/or launching other potential Boosted-PIs that could be effective with substantially
24          less Norvir (and thus be less susceptible to impairment by a Norvir price increase) or
25          could be used with another PI-Boosting drug entirely, *i.e.*, not Norvir.   As a result of
26          Abbott's conduct, no currently available PI has been approved for co-administration
27          with any other PI-Boosting drug besides Norvir."   Meijer Consolidated Amended
28          Complaint ¶ 36.

- "Abbott's exclusionary conduct has unlawfully caused the Boosted Market to standardize on Norvir for boosting purposes and has significantly retarded the advent of alternatives to Norvir in the United States, thereby enabling Abbott to sell Norvir at artificially inflated prices." *Id.* ¶ 38.

- "At the very same time that Abbott was planning to limit Norvir's availability (by either physically removing it from the market or raising its price to make it effectively unavailable), Abbott was approaching BMS, GSK, and other actual and potential Boosted-PI competitors to induce them to take licenses from Abbott...." *Id.* ¶ 34.

- Abbott "chose to profit" by encouraging the development of PIs boosted with Norvir and, thus, sales of Norvir. *See* GSK Complaint ¶ 17.

- This course of dealing culminated in an express license agreement with GSK (and others) granting GSK the right to market PIs to be co-administered with Norvir. GSK Complaint ¶¶ 2, 20-23; *see also* Meijer Consolidated Amended Complaint ¶ 34.

- "Abbott never disclosed to GSK and other licensees and potential licensees that Abbott might either remove Norvir from the market or raise its price to make it financially unavailable to many patients." Meijer Consolidated Amended Complaint ¶ 35.

- "When GSK entered into the Norvir license with Abbott in December 2002, GSK relied on Abbott's good faith not to materially deviate from its prior course of conduct with regard to selling and pricing Norvir." *Id.*

- "Upon entering into the agreement, Abbott was bound to act in good faith to ensure that Norvir remained on the market for co-administration with GSK PIs, as it had done in its previous course of dealings. Without the continued reasonable availability of Norvir, the agreement would be illusory – GSK would have paid Abbott for nothing." GSK Complaint ¶ 23.

- "After December 2003, Abbott's Boosted-PI competitors knew that any price reductions they took could immediately be undercut by further Norvir price *increases.* . . . Consequently, the December 2003 Norvir price increase not only raised the costs of using rivals' products, but also reduced the overall degree of price

- 19 -

1    competition in the Boosted Market, thereby further reducing competitive pressure on

2    Abbott to reduce Kaletra's prices."   Meijer Consolidated Amended Complaint ¶ 40

3    (emphasis in original).

4        The newly-filed complaints allege conduct that is uniformly condemned as anticompetitive

5    regardless of whether plaintiffs can prove monopoly leveraging under *Kodak*.  Abbott misled its

6    competitors into developing PI regimens based on Norvir as a booster, and then refused to make

7    Norvir available to AIDS patients on reasonable terms.   These allegations state a claim for

8    anticompetitive conduct under section 2.  *See Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297

9    (3d Cir. 2007); *United States v. Microsoft Corp.*, 253 F.3d 34, 76-77 (D.C. Cir. 2001); *In re

10   Rambus, Inc.*, No. 9302, 2006 WL 2330117 (F.T.C. Aug. 2, 2006); *In re Dell Computer Corp.*,

11   121 F.T.C. 616 (1996).   Abbott's abandonment of a prior, voluntary, and profitable course of

12   dealing for the purpose of reducing competition makes Abbott's conduct actionable under the

13   *Aspen Skiing* line of cases.[10]  *See Verizon Commc'ns., Inc., v. Law Offices of Curtis V. Trinko,*

14   *LLP*, 540 U.S. 398, 409 (2004); *Aspen Skiing*, 472 U.S. 585; *see, e.g., Tucker v. Apple Computer,*

15   *Inc.*, 493 F. Supp. 2d 1090, 1098-1101, 1101 (N.D. Cal. 2006) ("Plaintiff has alleged facts that, if

16   proven, could establish that Apple was acting with 'anticompetitive malice' rather than

17   'competitive zeal' within the meaning of *Trinko* and *Aspen Skiing*.").  Abbott's motion to dismiss

18   ignores these additional allegations of exclusionary conduct and, therefore, should be denied.

19   **IV.    CONCLUSION**

20       This Court is not being asked on this motion whether Abbott's "behavior has any

21   procompetitive effects and, if so, whether they outweigh the anticompetitive effects."   *See*

22   *Eastman Kodak*, 504 U.S. at 479.  The question posed by Abbott's motion is whether Abbott's

23   conduct "appears always or almost always to enhance competition, and therefore to warrant a legal

24   presumption without any evidence of its actual economic impact."  *Id.*  It does not.  The conduct

25   alleged here may or may not be held to be unlawful after a full airing has occurred – that is not the

26

27

---

28   [10] Abbott itself argued in its Motion for Summary Judgment that the *Aspen Skiing* test applies.  Request for Judicial Notice, Ex. 2, at 15.

1808392          PLAINTIFF'S OPPOSITION TO ABBOTT'S OMNIBUS MOTION TO DISMISS

1  question today – but, it is not exempt from examination as Abbott asks this Court to hold.  This is

2  not a case appropriately disposed of at the pleading stage.

3       For the foregoing reasons, plaintiffs ask this Court to deny Abbott's Motion to Dismiss.

4       Dated:  February 14, 2008        Respectfully submitted,

5                         LIEFF, CABRASER, HEIMANN &
                       BERNSTEIN, LLP
6

7                         By_____
                       Joseph R. Saveri (State Bar No. 130064)

8                         Embarcadero Center West
                       275 Battery Street, 30th Floor

9                         San Francisco, CA 94111-3339
                       Telephone: (415) 956-1000

10                         Facsimile: (415) 956-1008
                       Email: jsaveri@lchb.com

11                         *Local Counsel for Rochester Drug Cooperative,
                       Inc.*
12

13                         IRELL & MANELLA LLP

14                         By_____
                       Alexander Frank Wiles (CA 73596)

15                         Brian Hennigan (CA 86955)
                       Stephanie Kaufman (CA 162644)

16                         Trevor Stockinger (CA 226359)
                       1800 Avenue of the Stars #900

17                         Los Angeles, CA 90067
                       Telephone: (310) 277-1010

18                         Facsimile: (310) 203-7199
                       Email: awiles@irell.com; bhennigan@irell.com

19                         skaufman@irell.com; tstockinger@irell.com

20                         *Counsel for SmithKlineBeecham Corp. d/b/a
                       GlaxoSmithKline.*
21

22

23

24                         **[Additional Signature Block on Next Page]**

25

26

27

28

1808392         PLAINTIFF'S OPPOSITION TO ABBOTT'S OMNIBUS MOTION TO DISMISS

1

2  DILLINGHAM & MURPHY, LLP

3  By _____
   William Francis Murphy
   Email: wfm@dillinghammurphy.com
4  Barbara Lynne Harris Chiang
   Email: bhc@dillinghammurphy.com
5  Edward Eldon Hartley
   Email: eeh@dillinghammurphy.com
6  225 Bush Street, Sixth Floor
   San Francisco, CA 94104-4207
7  Telephone: (415) 397-2700
   Facsimile: (415) 397-3300

8  *Local Counsel for Safeway Inc., et al., and Rite Aid Corp., et al.*

9

10 BERGER & MONTAGUE, P.C.
   Eric L. Cramer, Pro Hac Vice
11 Email: ecramer@bm.net
   Daniel Berger
12 Email: danberger@bm.net
   David F. Sorensen
13 Email: dsorensen@bm.net
   1622 Locust Street
14 Philadelphia, PA 19103
   Telephone: (215) 875-3000
15 Facsimile: (215) 875-4604

16 *Lead Counsel for Rochester Drug Cooperative, Inc.*

17

18 GARWIN GERSTEIN & FISHER, LLP
   Bruce E. Gerstein, Pro Hac Vice
19 Email: bgerstein@garwingerstein.com
   Noah H. Silverman, Pro Hac Vice
20 Email: nsilverman@garwingerstein.com
   1501 Broadway, Suite 1416
21 New York, New York 10036
   Telephone: (212) 398-0055
22 Facsimile: (212) 764-6620

23 *Lead Counsel for Louisiana Wholesale Drug Co., Inc.*

24

25

26

27

28

- 22 -

SPIEGEL LIAO & KAGAY, LLP

Charles M. Kagay (State Bar No. 73377)
Email: cmk@slksf.com
Wayne M. Liao (State Bar No. 66591)
Email: wml@slksf.com
388 Market Street, Suite 900
San Francisco, California 94111
Telephone: (415) 956-5959
Facsimile: (415) 962-1431

*Local Counsel for Plaintiff Louisiana Wholesale
Drug, Co. Inc.*


KAPLAN FOX & KILSHEIMER LLP

Laurence D. King (SBN 206423)
Email: lking@kaplanfox.com
Linda M. Fong (SBN 124232)
Email: lfong@kaplanfox.com
350 Sansome Street, Suite 400
San Francisco, CA 94104
Telephone: (415) 772-4700
Facsimile: (415) 772-4707

Robert N. Kaplan, Pro Hac Vice
Email: rkaplan@kaplanfox.com
Linda P. Nussbaum, Pro Hac Vice
Email: lnussbaum@kaplanfox.com
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714

*Lead Counsel for Meijer, Inc. and Meijer
Distribution, Inc.*


**Additional Counsel for Plaintiffs (Client Not
Specified):**


ODOM & DES ROCHES, LLP
John Gregory Odom, Pro Hac Vice
Email: greg@odrlaw.com
Stuart E. Des Roches, Pro Hac Vice
Email: stuart@odrlaw.com
John Alden Meade, Pro Hac Vice
Email: jmeade@odrlaw.com.
Suite 2020, Poydras Center
650 Poydras Street
New Orleans, LA 70130
Telephone: (504) 522-0077
Facsimile: (504) 522-0078

- 23 -

PERCY SMITH & FOOTE, LLP
David P. Smith, Pro Hac Vice
Email: dpsmith@psfllp.com
W. Ross Foote, Pro Hac Vice
Email: rfoote@psfllp.com
720 Murray Street
P.O. Box 1632
Alexandria, LA 71309
Telephone: (318) 445-4480
Facsimile: (318) 487-1741


KOZYAK TROPIN & THROCKMORTON
Tucker Ronzetti, Pro Hac Vice
Email: tr@kttlaw.com
Adam Moskowitz, Pro Hac Vice
Email: amm@kttlaw.com
2800 Wachovia Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131-2335
Telephone: (305) 372-1800
Telecopier: (305) 372-3508


AUBERTINE DRAPER ROSE, LLP
Andrew E. Aubertine, Pro Hac Vice
Email: aa@adr-portland.com
1211 SW Sixth Avenue
Portland, Oregon 97204
Telephone: (503) 221-4570
Facsimile: (503) 221-4590


LAW OFFICES OF JOSHUA P. DAVIS
Joshua P. Davis (State Bar No. 193254)
Email: davisj@usfca.edu
437A Valley Street
San Francisco, CA 94131
Telephone: (415) 422-6223


VANEK, VICKERS & MASINI, P.C.
Joseph M. Vanek, Pro Hac Vice
Email: jvanek@vaneklaw.com
David P. Germaine, Pro Hac Vice
Email: dgermaine@vaneklaw.com
111 South Wacker Drive, Suite 4050
Chicago, IL 60606
Telephone: (312) 224-1500
Facsimile: (312) 224-1510

1

2

3

4

SPERLING & SLATER
Paul E. Slater, Pro Hac Vice
Email: pes@sperling-law.com
55 West Monroe Street, Suite 3200
Chicago, Illinois 60603
Telephone: (312) 641-3200
Facsimile: (312) 641-6492

5

6

7

8

9

KENNY NACHWALTER, PA
Lauren C. Ravkind
Scott Eliot Perwin
Email: sperwin@kennynachwalter.com
201 S. Biscayne Blvd.
1100 Miami Center
Miami, Florida 33131
Telephone: (512) 480-802

10

11

12

13

ARNOLD & PORTER
Kenneth A. Letzler, Pro Hac Vice
Email: Kenneth_Letzler@aporter.com
555 Twelfth Street, NW
Washington, DC 20004-1206
Telephone: (202) 942-5000
Facsimile: (202) 942-5999

14

15

16

17

18

19

HANGLEY ARONCHICK SEGAL & PUDLIN
Steve D. Shadowen
Email: sshadowen@hangley.com
Monica L. Rebuck
Email: mrebuck@hangley.com
30 North Third Street, Suite 700
Harrisburg, PA 17101-1701
Telephone:  (717) 364-1007
Facsimile: (717) 362-1020

20

21

22

23

24

25

26

27

28

1808392

PLAINTIFF'S OPPOSITION TO ABBOTT'S OMNIBUS MOTION TO DISMISS