# EXHIBIT 2

Michael A. Sweet (SBN: 184345)
George C. Lombardi (*Admitted Pro Hac Vice*)
James F. Hurst (*Admitted Pro Hac Vice*)
David J. Doyle (*Admitted Pro Hac Vice*)
Samuel S. Park (*Admitted Pro Hac Vice*)
WINSTON & STRAWN LLP
101 California Street, Suite 3900
San Francisco, CA 94111-5894
Telephone:    415-591-1000
Facsimile:    415-591-1400
Email:  msweet@winston.com;
glombardi@winston.com; jhurst@winston.com;
ddoyle@winston.com; spark@winston.com

Attorneys for Defendant
ABBOTT LABORATORIES

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| IN RE ABBOTT LABS NORVIR ANTITRUST LITIGATION | Case Nos. C-04-1511 CW and C-04-4203 CW |
| This Document Relates To: All Actions | **NOTICE OF MOTION AND RENEWED MOTION OF ABBOTT LABORATORIES' FOR SUMMARY JUDGMENT** |
| | **DATE:    March 24, 2006** |
| | **TIME:    10:00 a.m.** |
| | **DEPT:    2** |
| | **The Honorable Judge Wilken** |

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1  directly contradicts the notion that Norvir's price increase made those competing drugs "too

2  expensive." Under these circumstances, there is no basis to conclude that Abbott has monopoly

3  power or is dangerously close to obtaining monopoly power.

4           In granting Plaintiffs' Rule 56(f) motion, this Court noted that "a market share as low

5  as forty-four percent is sufficient to establish a triable issue of fact regarding market power for an

6  attempted monopolization claim." *In re Abbott Labs. Norvir Anti-Trust Litig.*, Nos. C 04-1511 CW,

7  C 04-4203 CW, 2005 U.S. Dist. LEXIS 24238, *7 (N.D. Cal. Sept. 12, 2005) (citing *Rebel Oil*, 51

8  F.3d at 1438). As the Court noted, the Ninth Circuit has held that the "minimum showing of market

9  share required in an *attempt case* is a lower quantum than the minimum showing required in an

10  actual monopolization case." *Rebel Oil*, 51 F.3d at 1438 (emphasis added).

11           But in *Rebel Oil*, the defendant's market share had *increased* due to its alleged

12  monopolistic strategies*, unlike here where Abbott's market share has decreased* since the alleged

13  monopolistic pricing decision. The Ninth Circuit noted that, during the relevant period, the

14  defendant had "forced 37 competitors out of the Las Vegas gasoline market" and drove the

15  plaintiffs' market share from "30 percent in 1982 to less than 10% in 1990." *Id.* at 143. Here, in

16  sharp contrast, Abbott's market share has dropped from 77% to about 47% in just three years

17  because new, powerful competitors are rapidly taking market share. (Devlin Decl. ¶ 21). That drop

18  promises to continue as new competitors hit the market. (*Id.* ¶ 26).

19           Moreover, the Ninth Circuit in *Rebel Oil* held only that the defendant's "market share

20  of 44 percent is sufficient as a matter of law to support a finding of market power, *if* entry barriers

21  are high and competitors are unable to expand their output in response to supracompetitive pricing."

22  *Rebel Oil*, 51 F.3d at 1438 (emphasis added). Here, Plaintiffs have never alleged – and have no facts

23  to prove – that there are barriers to entry in the Boosted Market, that Abbott is charging

24  supracompetitive prices, or that competitors have been unable to expand their output in response to

25  Abbott's re-pricing of Norvir.

26           Indeed, despite getting several additional months to obtain evidence on the issue of

27  monopoly power, Plaintiffs have failed to uncover any facts remotely suggesting that there is a

28  triable issue of fact. Far from establishing barriers to entry, the undisputed facts show that one new

NOT OF MOT. & RENEWED MOT. OF ABBOTT LABORATORIES FOR SUMMARY JUDGMENT

competitor recently has entered the Boosted Market, and at least two others are on the way. (Devlin Decl. ¶ 26). Rather than destroying competition, Norvir is doing just the opposite. Because of its boosting ability, Norvir is paving the way for competitors to develop new AIDS medications that could not succeed without Norvir's boost. As Abbott's former marketing director explained, there will be a "whole new class of [AIDS] drugs" coming to market, and all of them will be "boosted with 100 milligrams of Norvir." (Park Decl. Ex. H (J. Leal Dep. (10/14/05) at 36:7-13)). Moreover, Abbott's competitors have not "lack[ed] the ability to expand their output to challenge [Abbott's] high prices." *Kodak*, 125 F.3d at 1208. To the contrary, competitors have expanded their output and succeeded in stealing market share away from Kaletra while, at the same time, raising the prices of their own PIs. (Devlin Decl. ¶¶ 23-24).

In the end, Kaletra's falling market share, which now stands at 47% – in combination with competitors' ability to enter the Boosted Market, raise their prices, increase their output and steal market share – irrefutably establishes that Abbott does not have monopoly power or a dangerous possibility of obtaining monopoly power in the Boosted Market.

### 2. Kaletra's Falling Market Share Establishes A Lack Of Anticompetitive Conduct.

Even if it had monopoly power – which it clearly does not – Abbott has not engaged in "anticompetitive conduct" as a matter of law. Anticompetitive conduct is "behavior that not only 1) tends to impair opportunities of rivals, but also 2) either does not further competition on the merits or does so in an unnecessarily restrictive way." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 605 (1985). A critical factor in this analysis is whether the conduct is justified by a "normal business purpose," which would not be present when a company abandons short-term profits in the interest of restricting competition. *Id.* at 608.

Market realities preclude any such showing in this case. Plaintiffs have no evidence whatsoever that Abbott's price increase "impair[ed] opportunities of rivals" and did so "in an unnecessarily restrictive way." *Id.* On the contrary, competitive opportunities hardly have been impaired considering that no competitor has left the market, competitors' market shares have dramatically increased (despite the fact that they increased their prices), and a brand new PI just hit the market. That is the opposite of impaired opportunities and restricted competition. Moreover,

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

Abbott's "normal business purpose" for a price increase is readily apparent – increasing its profits – which is the goal of every publicly traded company in the United States.

And even if its competitors were losing market share to Kaletra (which they are not) Abbott still would be entitled to summary judgment because Plaintiffs' theory of "anticompetitive conduct" is wholly illogical. Plaintiffs are not relying on any recognized anticompetitive conduct, such as predatory pricing or pricing agreements. Instead, they have created the unprecedented and unsupported theory that Abbott engaged in anticompetitive conduct by charging "too much" for a patented product.

This is nonsense. A patent creates "the right to exclude others from profiting by the patented invention." *Schering-Plough Corp. v. FTC*, 402 F.3d 1056, 1065 (11th Cir. 2005) (quoting *Dawson Chem. Co. v. Rohm & Haas Co.*, 448 U.S. 176, 215 (1980)). Yet, Plaintiffs want this Court to conclude just the opposite – that Abbott had a duty keep Norvir's price low so that competitors could profit from that invention's ability to improve their products. Of course, if they felt it was necessary to remain competitive, Abbott's competitors easily could charge less than $20 and $30 per day for their products or, at a minimum, refrain from increasing their prices. Nonetheless, Plaintiffs contend that it was somehow "anticompetitive" for Abbott to decline to give its competitors a free ride on Norvir's old price of $1.71 per day.

Common sense alone refutes that theory. It obviously is not "anticompetitive" for a monopolist (such as a patent owner) to charge prices that they believe are fair, even if they qualify as "monopoly prices." As the Supreme Court has explained:

> The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system. The opportunity to charge monopoly prices—at least for a short period—is what attracts "business acumen" in the first place; it induces risk taking that produces innovation and economic growth.

*Verizon*, 540 U.S. at 407. Nor is it "anticompetitive" for a company to decline to voluntarily help its competitors through low prices for a patented product. Standard "antitrust principles" simply impose "no duty to aid competitors." *Id.*

**NOT OF MOT. & RENEWED MOT. OF ABBOTT LABORATORIES FOR SUMMARY JUDGMENT**

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

Under these circumstances – particularly where the Norvir price increase was followed by an *increase* in both competitors' market shares *and* their prices – there is no possible basis for concluding that Abbott's decision to raise Norvir's price was "anticompetitive."

### 3. Kaletra's Falling Market Share Establishes A Lack Of Antitrust Injury.

Market realities also prove that Plaintiffs have not suffered any "antitrust injury." Antitrust injury is not merely an "injury causally linked to an illegal presence in the market." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). Rather, "[t]o show antitrust injury, a plaintiff must prove that his loss flows from an anticompetitive aspect or effect of the defendant's behavior." *Rebel Oil*, 51 F.3d at 1433. If the alleged injury "flows" from conduct that is either "beneficial or neutral to competition, there is no antitrust injury, even if the defendant's conduct is illegal *per se*." *Id.*

Thus, even if Plaintiffs have shown a valid antitrust violation (which they have not), this Court still must dismiss their claim because they have suffered no antitrust injury. Plaintiffs – both consumers and third-party insurers – are alleging injury based on their being forced to pay more for Norvir simply because Abbott has pricing power through its patents, not because Abbott restricted competition. That, however, is a complaint about a price increase, not a complaint about an alleged "antitrust injury." When faced with this very same issue, the Seventh Circuit held that "a consumer may suffer antitrust injury when higher prices result from some unlawful monopolistic conduct," but that paying more money simply because of a price increase would not qualify as an "antitrust injury." *Endsley v. City of Chicago*, 230 F.3d 276, 283 (7th Cir. 2000). Because Plaintiffs are alleging the very same thing – being forced to pay more because of a price increase (not because the elimination of competition has enabled Abbott to charge higher prices) – they cannot establish that they suffered an "antitrust injury" as a matter of law.

This is simple common sense. Paying more because of a patent owner's pricing power is simply not an "antitrust" injury. Recently, the Second Circuit rejected a similarly flawed theory, holding that the plaintiffs failed to "allege facts sufficient to prove that [they] suffered antitrust injury." *In re Tamoxifen Citrate Antitrust Litig.*, 429 F.3d 370, 403 (2d Cir. 2005). In that case, class action consumers brought antitrust claims alleging, among other things, that they had

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

suffered injury by paying an "artificially high price" for a cancer drug, Tamoxifen, when defendants Zeneca and Barr Labs settled a patent infringement action. *Id.* at 380-81. The Second Circuit explained, however, that any alleged injury suffered by the consumers did not result from the alleged anticompetitive conduct (the agreement between Zeneca and Barr) but "from Zeneca's valid patent and from the inability of other generic manufacturers to establish that the patent was either invalid or not infringed." *Id.* at 403. Accordingly, the court held that their injuries, if any, were not "the type the antitrust laws were intended to prevent." *Id.*

Similarly, Plaintiffs' injuries here, if any, for paying an allegedly inflated price for Norvir are not the type the antitrust laws were intended to prevent. Although Plaintiffs allege that they are forced into a "Hobson's Choice," neither of their choices would result in an antitrust injury. First, paying a high price for Norvir, by itself, clearly does not cause an antitrust injury. *Id.* If a higher price is possible only because the defendant already eliminated competition – such as through predatory pricing – then paying more might amount to an antitrust injury. But that is not what Plaintiffs are alleging. They are alleging only that they are paying more because of Abbott's unilateral decision to raise the price of a patented product. *Id.*

Second, even if Plaintiffs *had* been forced to purchase Kaletra (which they have not alleged), that supposed "injury" is not the result of any loss in competition. Consumers are not forced to purchase Kaletra because other PIs have been pulled from the market or are unavailable as a result of Abbott's actions. *Id.* Thus, Plaintiffs' failure to even allege that they suffered an antitrust injury compels summary judgment in Abbott's favor.

## B. Abbott's Patents Provide Immunity From Plaintiffs' Antitrust Claims.

In addition to the market realities discussed above, Abbott's patents independently defeat Plaintiffs' case. A patent, of course, is a government-sanctioned monopoly. "Engrafted into patent law is the notion that a patent grant bestows 'the right to exclude others from profiting by the patented invention.'" *Schering-Plough*, 402 F.3d at 1065.

Thus, an antitrust action requires proof that the patentee engaged in conduct "beyond the limits of what Congress intended to give in the patent laws." *Atari Games Corp. v. Nintendo of Am. Inc.*, 897 F.2d 1572, 1576 (Fed. Cir. 1990). As the Ninth Circuit has explained, patent holders

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1    are allowed to operate free from antitrust liability "as far as the patent laws go." *Kodak*, 125 F.3d at

2    1215. Accordingly, "where a patent has been lawfully acquired, subsequent conduct permissible

3    under the patent laws cannot trigger any liability under the antitrust laws." *Id.*; *see also In re*

4    *Independent Servs. Orgs. Antitrust Litig.*, 203 F.3d 1322, 1327-28 (Fed. Cir. 2000) (holding that a

5    patentee's conduct within the scope of its patents is "free from liability under the antitrust laws").

6            Here, there is no question that Abbott's decision to raise Norvir's price was conduct

7    "permissible under the patent laws." First, because Abbott has patent rights to *both* of Plaintiffs'

8    defined markets, it cannot be liable for monopolizing or attempting to monopolize *either* of them.

9    Second, even if this Court somehow were to conclude that Abbott's patents do not cover the Boosted

10   Market – even though Plaintiffs never have contested this issue – Abbott still is entitled to a

11   summary judgment, because its pricing decision was not a pretext to monopolize the Boosted

12   Market, but rather a perfectly lawful attempt to receive what it believes is a fair return on Norvir. [2]

13   **1.    Under the Ninth Circuit's Holding In *Kodak*, Abbott Is Entitled To Summary**

14   **Judgment Because Its Patents Cover *Both* Alleged Markets.**

15           Abbott is entitled to summary judgment on Plaintiffs' Sherman Act claim because its

16   patents cover both of Plaintiffs' alleged markets. As this Court previously held, the antitrust laws

17   are implicated only when a patent owner "extends its monopoly beyond the scope of the patent."

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

---

[2]       Plaintiffs essentially have conceded that Abbott prevails as a matter of law under the Federal Circuit's decision in *Independent Services*, which rejected *Kodak's* oft-criticized monopoly-leveraging theory. Abbott continues to maintain that Federal Circuit law controls "whether or not the patentee enjoys antitrust immunity under the patent laws." *Unitherm Food Sys. v. Swift-Eckrich, Inc.*, 375 F.3d 1341, 1355 (Fed. Cir. 2004). The Ninth Circuit has never expressly addressed this choice-of-law issue, and there is no reason to believe that the Ninth Circuit will decline to follow the Federal Circuit's thorough and well-reasoned analysis of that issue in *Unitherm*, where the Court held that all circuits must follow Federal Circuit law on patent-immunity issues. Thus, as it has argued in the past, Abbott respectfully contends that the Court should follow *Independent Services* and reject the Ninth Circuit's approach in *Kodak*. Abbott understands that this Court already rejected this argument when ruling on Plaintiffs' Rule 56(f) motion. Abbott respectfully asks, however, that the Court reconsider that decision. While it is true that the *Kodak* court applied Ninth Circuit law, nobody had even suggested in that case that Federal Circuit law applies. Thus, the Ninth Circuit did not address the issue. Moreover, *Kodak* (1997) was decided before both *Independent Services* (2000) and *Unitherm* (2004) and, therefore, there was no possible way for the Ninth Circuit to have considered whether it was bound to follow *Independent Services*. Respectfully, this Court cannot be not bound to follow *Kodak* when the Ninth Circuit never resolved a critical threshold issue that remains a completely open issue in this circuit, *i.e.*, whether Federal Circuit law controls all patent-immunity questions.

1  (10/21/04 Doe Order at 4). Here, however, Abbott is accused of "monopolizing" a market over

2  which it *has* patent protection.

3          Plaintiffs are alleging that a price increase on a patented product (Norvir) was an

4  attempt to monopolize another *patented* combination market (for Norvir plus another protease

5  inhibitor). This is nothing like *Kodak*, where the plaintiffs alleged that a refusal to sell a patented

6  product (photocopier parts) was an attempt to monopolize an *unpatented* service (repairing

7  photocopiers). *Kodak*, 125 F.3d at 1217. In other words, unlike here, the *Kodak* defendant had

8  patent rights over only *one* of the relevant markets. *Id.* Abbott, in contrast, has numerous patents

9  that cover Norvir *and* Norvir's use as a booster with another PI.

10         Determining whether any alleged impact on the Boosted Market is beyond the scope

11 of Abbott's patents depends on the proper construction of those patents. That issue is perfectly

12 suited for summary judgment because "claim construction is a matter of law" and, thus, it is not

13 open to any possible factual dispute. *Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d

14 1354, 1359 (Fed. Cir. 2004). The "construction of a patent, including terms of art within its claims,"

15 is a matter of law "exclusively within the province of the court." *Markman v. Westview Instruments*,

16 517 U.S. 370, 372 (1996); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc).

17         Abbott's Norvir patents plainly cover the Boosted Market. The '157 patent, for

18 example, claims a "method for improving" the efficacy of another protease inhibitor by

19 administering a "therapeutically effective amount of a combination of said drug . . . and ritonavir,"

20 which is Norvir's active ingredient. (Park Decl., Ex. C, at Col. 13, lines 42-48). Abbott is aware of

21 no conceivable dispute about the meaning of this simple language, which plainly covers the co-

22 administration of Norvir with any other PI (including those made by competitors). This is *precisely*

23 how Plaintiffs define the Boosted Market. (Doe Am. Compl. ¶¶ 14, 27; SEIU Compl. ¶¶ 28-29).

24 There is simply no question that Abbott's patents cover that entire market, and Plaintiffs never have

25 contended otherwise.

26         When denying Abbott's motions to dismiss, this Court declined to address the scope

27 of Abbott's booster patents, stating that it was "not willing, at this early juncture in the litigation, to

28 rule that [Abbott] can patent a procedure in which HIV patients take a drug manufactured and sold

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

have failed to allege that Defendant's business practices were fraudulent in any way. Plaintiffs' complaint does not allege any facts that could support a fraud claim." (10/21/04 Doe Order at 12). Thus, Plaintiffs cannot recover under any of the unfair competition prongs set forth in section 17200.

## 2. Plaintiffs Cannot Recover On Their Claim For Unjust Enrichment (Count III).

Plaintiffs cannot recover on their unjust enrichment claim for precisely the same reason they cannot recover under section 17200 – Abbott's conduct was perfectly proper. To state a claim for unjust enrichment, a plaintiff must show that "the defendant received unjust benefit at the expense of the plaintiff." *Sebastian Int'l, Inc. v. Russolillo*, 186 F. Supp. 2d 1055, 1074 (C.D. Cal. 2000). In doing so, the plaintiff must show that the acquisition of property was the result of wrongful conduct. *Cruz v. United States*, 219 F. Supp. 2d 1027, 1042 (N.D. Cal. 2002). The wrongful conduct may include "fraud, accident, mistake, undue influence, the violation of a trust or other wrongful act." *In re National Mortg. Equity Corp. Mortg. Pool Certificates Securities Litig.*, 636 F. Supp. 1138, 1173 (C.D. Cal. 1986).

Here, Plaintiffs rely completely on their allegations of antitrust violations to establish a claim of unjust enrichment. This is flawed. It is fundamental that when there is no unlawful conduct or "wrongful retention," the defendant cannot be unjustly enriched. *Weststeyn Dairy 2 v. Eades Commodities Co.*, 280 F. Supp. 2d 1044, 1084 (E.D. Cal. 2003) (denying finding of unjust enrichment). Therefore, Plaintiffs cannot possibly prove their claim for unjust enrichment, and Abbott is entitled to judgment as a matter of law.

Dated: January 9, 2006                    WINSTON & STRAWN LLP


                                          By:     /s/ Samuel S. Park
                                                  Samuel S. Park (Admitted *Pro Hac Vice*)

                                                  One of Attorneys for Defendant
                                                  ABBOTT LABORATORIES

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

EXHIBIT 3

1  Thomas C. Mavrakakis (SBN 177927)
   Michael A. Sweet (SBN 184345)
2  George C. Lombardi (*Admitted Pro Hac Vice*)
   James F. Hurst (*Admitted Pro Hac Vice*)
3  David J. Doyle (*Admitted Pro Hac Vice*)
   Samuel S. Park (*Admitted Pro Hac Vice*)
4  WINSTON & STRAWN LLP
   101 California Street, Suite 3900
5  San Francisco, CA  94111-5894
   Telephone:    415-591-1000
6  Facsimile:    415-591-1400
   Email:  tmavrakakis@winston.com,
7  msweet@winston.com; glombardi@winston.com;
   jhurst@winston.com; ddoyle@winston.com;
8  spark@winston.com

9  Attorneys for Defendant
   ABBOTT LABORATORIES

10

UNITED STATES DISTRICT COURT

11

NORTHERN DISTRICT OF CALIFORNIA

12

OAKLAND DIVISION

13

14

15  IN RE ABBOTT LABS NORVIR        )   Case No. C-04-1511 CW
    ANTITRUST LITIGATION            )
16                                  )   **REPLY BRIEF IN SUPPORT OF ABBOTT
                                    )   LABORATORIES' RENEWED MOTION
17                                  )   FOR SUMMARY JUDGMENT**
                                    )
18                                  )   **DATE:      April 7, 2006**
                                    )   **TIME:      10:00 a.m.**
19                                  )   **DEPT:      2**
                                    )
20                                  )   **The Honorable Judge Wilken**
                                    )
21  _____  )

22

23

24

25

26

27

28

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1    Finally, Plaintiffs fail to raise any genuine dispute about Abbott's legitimate business

2    justification for increasing Norvir's price, which by itself defeats their *Kodak* claim.  All of Abbott's

3    decision-makers testified that they increased Norvir's price not to attempt to monopolize the Boosted

4    Market, but to obtain fair value for Norvir's boosting ability.  That decision resulted in an increase

5    from the lowest-priced HIV drug in history at $1.71 a day to $8.57 a day for the typical patient in a

6    market populated with $20 and $30 drugs.  After extensive discovery into Abbott's intent, Plaintiffs

7    have failed to cite any contrary evidence about Abbott's legitimate business justification for raising

8    Norvir's price.

## II.    ARGUMENT

### A.    Market Realities Defeat Plaintiffs' Monopoly Leveraging Claim.

11    Plaintiffs' efforts to avoid the market realities fail because their new market

12    definitions: (1) fail to state a claim for monopoly leveraging; and (2) make no sense, particularly

13    because they completely contradict their liability theory.

### 1.    Under Their New Market Definitions, Plaintiffs No Longer Allege Two "Separate" Markets And, Thus, They Have No Monopoly Leveraging Claim.

16    In their zeal to avoid Abbott's plummeting market share from 77% to 47%, Plaintiffs

17    have changed their market definitions in a way that completely eliminates their cause of action.  Two

18    years ago when they filed suit, Plaintiffs defined the "Booster Market" and "Boosted Market" as

19    "separate relevant product markets" (Doe ¶ 38; SEIU ¶ 40) – one "market for Norvir" and a second

20    "market for PIs only when prescribed together with Norvir as a booster."  (Doe ¶ 14; SEIU ¶ 15;

21    *accord* 9/12/05 Order at 2:8-12 (Court using same definition)).  Norvir obviously is *not* part of the

22    Boosted Market under Plaintiffs' definition because doctors do not prescribe Norvir "together with

23    Norvir as a booster."

24    Now, in an effort to inflate Abbott's market share, Plaintiffs argue that Norvir *is* part

25    of the Boosted Market.  This increases Abbott's market share by *13%* to their current claim of *88.3%*

26    in July 2003, compared to their original claim that "in June of 2003, Abbott had a *75%* share of the

27    … Boosted Market."  (Wiebe Sec. Decl., Ex. A at 23:5-6; Doe ¶ 17; SEIU ¶ 18).  The Court should

28    preclude Plaintiffs from changing their market definitions at this late date, nearly two years after

*Winston & Strawn LLP*
*101 California Street*
*San Francisco, CA 94111-5894*

**REPLY BRIEF IN SUPPORT OF ABBOTT LABORATORIES' RENEWED MOTION FOR SUMMARY JUDGMENT**

1    they filed their complaint, in response to a summary judgment motion. *See Western Parcel Express*

2    *v. UPS*, 65 F. Supp. 2d 1052 (N.D. Cal. 1998) (noting that an effort "to redefine and narrow" a

3    "relevant market may be procedurally improper" at the summary judgment stage).

4            Moreover, by changing their market definitions, Plaintiffs no longer are pursuing the

5    monopoly-leveraging theory approved by the Ninth Circuit in *Kodak*. In that case, Kodak used its

6    patent monopoly on copier parts to "create a *second* monopoly" over the unpatented market for

7    servicing copy machines, which the Court noted "had been proven to be *separate markets*." *Image*

8    *Technical Services v. Eastman Kodak*, 125 F.3d 1195, 1202, 1217 (9th Cir. 1997) (emphasis added).

9    Without a *patented* market that is "*separate*" from an *unpatented* market, there can be no monopoly

10   leveraging under *Kodak*. Indeed, regardless of the context of the claim, the fundamental premise of

11   "monopoly leveraging" is that there are two markets, where the defendant improperly leverages its

12   monopoly in one market to attempt to monopolize "a *defined second market, distinct from the first*

13   *(monopoly) market*." *Catlin v. Washington Energy Co., 791 F.2d 1343, 1348-49* (9th Cir. 1986)

14   (emphasis added); *accord Cost Mgmt. Servs. v. Washington Natural Gas Co.*, 99 F.3d 937, 951 (9th

15   Cir. 1996) (monopoly leveraging requires a "two-market situation" where a defendant "attempt[s] to

16   use monopoly power in one market to monopolize another market").

17           Here, Plaintiffs no longer are alleging the existence of a second "separate" and

18   "distinct" unpatented market. Instead, they say that competitive PIs are "not substitutes" for Kaletra

19   "without the inclusion of Norvir." (Pls' Opp. at 2). They thus contend that "Abbott has two

20   products in the Boosted Market, Kaletra and Norvir." (*Id.* at 10). Because they now have morphed

21   their original two markets into a single market for a combination regimen (PI plus booster), there no

22   longer is a "second" and "distinct" Booster Market for Norvir alone. Obviously, the exact same

23   Norvir prescriptions to the exact same patients cannot be counted twice to magically create two

24   markets. Without two "distinct" markets, Plaintiffs have no claim for monopoly leveraging.

25       **2.      Even If *Kodak* Somehow Could Apply To A Single Market Case, Abbott's**

26               **Falling Market Share Refutes Plaintiffs' Monopolization Claims.**

27           The reason Plaintiffs have abandoned their original two-market theory is clear: They

28   have no response to the reality that Abbott's rapidly falling market share refutes three separate

**Winston & Strawn LLP**
**101 California Street**
**San Francisco, CA 94111-5894**

1   elements of their antitrust claim: (a) monopoly power, (b) anticompetitive conduct, and (c) antitrust

2   injury.

3          **a.     Plaintiffs Have Not Established And Cannot Establish That Abbott Has**

4           **"Monopoly Power" In The Boosted Market.**

5       To prevail on their claim, Plaintiffs must show that Abbott either has "monopoly"

6   power in the Boosted Market (monopolization) or at least a dangerous probability of obtaining such

7   power (attempted monopolization). Plaintiffs contend that they have made that showing through

8   both direct and circumstantial evidence. They have done neither.

9         **i.     Plaintiffs Have Offered No Direct Evidence Of Monopoly Power.**

10       Plaintiffs clearly have not provided "direct evidence" of monopoly power, which "is

11   only rarely available" and is considered "difficult" and, indeed, virtually "impossible" to provide.

12   *Heerwaken v. Clear Channel Communications*, 435 F.3d 219, 227 (2nd. Cir. 2006); *Harrison Aire,*

13   *Inc. v. Aerostar Intern., Inc.*, 423 F.3d 374, 380 (3d Cir. 2005). Direct evidence requires proof that

14   the defendant restricted output to produce "supracompetitive prices." *Rebel Oil Co. v. Atlantic*

15   *Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995). Establishing that the resulting prices were

16   "supracompetitive" requires evidence of the defendant's "costs" to show an "abnormally high price-

17   cost margin." *Geneva Pharm. Technology Corp. v. Barr Labs.*, 386 F.3d 485, 500 (2d Cir. 2004).

18   And even after that showing, a plaintiff still fails to provide "direct evidence of monopoly power"

19   without an "accompanying showing of restricted output." *Forsyth v. Humana*, 114 F.3d 1467, 1476

20   (9th Cir. 1997).

21       Here, Plaintiffs have made no effort to show *either* "supracompetitive prices" *or*

22   "restricted output." Far from asserting that Abbott is charging "supracompetitive prices" in the

23   Boosted Market, Plaintiffs contend just the opposite – that Kaletra's price is too low compared to the

24   cost of competitive PIs coupled with Norvir. (Pls' Opp. at 1). And they have not offered one stitch

25   of evidence relating to restricted output in the Boosted Market. Nor does any such evidence exist.

26       Plaintiffs cannot overcome their utter lack of evidence by citing *Confederated Tribes*

27   *of Siletz Indians of Or. v. Weyerhaeuser Co.*, 411 F.3d 1030, 1034 (9th Cir. 2005), where the Court

28   found that the plaintiff *did* present "direct evidence of the injurious exercise" of market power by

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1  Kaletra's falling market share.  (*Id.*).  That subsequent analysis turned out to be exactly right

2  because, in fact, Norvir's price increase had no such impact.  (Wiebe First Decl., Ex. R).

### III.    CONCLUSION

4          For the foregoing reasons, Abbott respectfully requests that the Court grant its

5  renewed motion for summary judgment.

7  Dated: March 21, 2006              WINSTON & STRAWN LLP

9                                     By:    /s/ James F. Hurst
10                                            James F. Hurst (Admitted *Pro Hac Vice*)
                                              One of Attorneys for Defendant
11                                            ABBOTT LABORATORIES

**REPLY BRIEF IN SUPPORT OF ABBOTT LABORATORIES' RENEWED MOTION FOR SUMMARY JUDGMENT**

EXHIBIT 4

MICHAEL A. SWEET (SBN: 184345)
GEORGE C. LOMBARDI (*Admitted Pro Hac Vice*)
JAMES F. HURST (*Admitted Pro Hac Vice*)
DAVID J. DOYLE (*Admitted Pro Hac Vice*)
SAMUEL S. PARK (*Admitted Pro Hac Vice*)
WINSTON & STRAWN LLP
101 California Street, Suite 3900
San Francisco, California 94111-5894
Telephone:    415.591.1000
Facsimile:    415.591.1400
Email: msweet@winston.com;
glombardi@winston.com; jhurst@winston.com;
ddoyle@winston.com; spark@winston.com

Attorneys for Defendant
ABBOTT LABORATORIES

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| IN RE ABBOTT LABS NORVIR ANTITRUST LITIGATION | **Case Nos. C-04-1511 CW and C-04-4203 CW** |
| This Document Relates To: All Actions | **ABBOTT LABORATORIES' OPPOSITION TO PLAINTIFFS' RULE 56(f) MOTION** |
| | **The Honorable Judge Claudia Wilken** |

*Winston & Strawn LLP*
*101 California Street*
*San Francisco, CA 94111-5894*

ABBOTT'S OPPOSITION TO PLAINTIFFS' RULE 56(f) MOTION

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1   offer no statement that such facts actually exist, and they provide no explanation as to how the

2   sought-after facts are "essential" to their opposition. This is just a general request to take discovery

3   in the hopes it will turn up something useful, which is precluded by Rule 56(f).

4   　　　Moreover, as part of an effort to compromise on this issue, Abbott offered to make

5   Devlin available for a deposition nearly a month ago. Yet Plaintiffs have done nothing to notice or

6   schedule his deposition. In addition to the fact that Devlin's deposition is not necessary – as he

7   primarily summarized third-party market information that has been produced to Plaintiffs (and

8   Plaintiffs can have their own experts perform this same analysis) – Plaintiffs should not be granted a

9   continuance to take Devlin's deposition because they already have had ample opportunity to do so.

10   *See Laser Indus. Ltd. v. Reliant Tech., Inc.*, No. C 96-00390, 1998 U.S. Dist. LEXIS 23494, *37

11   (N.D. Cal. Sept. 3, 1998) (Wilken, J.) (noting that "[a] request for discovery may be denied if the

12   party has already had ample opportunity to conduct discovery").

13   **2.**　　**Plaintiffs' Are Not Entitled To Their Proposed Discovery Relating To Abbott's**
14   **Motive For Raising Norvir's Price.**

15   　　　In the "Predatory or Anticompetitive Conduct" section of their supporting

16   declaration, Plaintiffs next assert that they should be allowed to depose six people regarding

17   Abbott's motives for raising Norvir's price, even though *all six* witnesses already have been deposed

18   on that very issue and even though Plaintiffs have offered no reason to believe that these employees

19   would give different answers when questioned by Plaintiffs' counsel. (Stocker Declaration ¶ 34).

20   Nevertheless, according to Plaintiffs, such duplicative discovery "will likely create a genuine issue

21   of material fact as to whether Abbott possessed specific intent to and actually engaged in predatory

22   or anticompetitive conduct." (*Id.*).

23   　　　First of all, "specific intent" is utterly irrelevant to Abbott's summary judgment

24   motion. When judging whether a party engaged in anticompetitive conduct,

25   　　　the nature and consequences of a particular *practice are the vital*
26   　　　*consideration, not the purpose or intent. Qualifying anticompetitive*
　　　　*conduct must always be established first by objective facts about the*
27   　　　*relevant market and the defendant, quite apart from any manifestation of*
　　　　*subjective intent.*

28

1   PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW, Vol. III, ¶ 651 at 74 (2d ed. 2000)

2   (emphasis added).

3           Instead of citing any law on this issue, Plaintiffs take out of context Abbott's

4   statement that a "normal business purpose" for disputed conduct can be important to determining

5   whether it qualifies as anticompetitive conduct.  That is true, but it does not mean that an inquiry into

6   subjective intent is proper.  Rather, a finding of anticompetitive conduct is generally inappropriate

7   when the "*objective facts*" make a "normal business purpose" apparent (*id.*), such as here where

8   raising profits was the readily apparent purpose of Abbott's decision to raise the price of a patented

9   product.

10          Moreover, Abbott's key point – which Plaintiffs conveniently miss – is that raising

11  the price on a patented product can *never* qualify as "anticompetitive conduct" as a matter of law.

12  Specifically, Plaintiffs are not asserting that Abbott engaged in any traditional category of

13  anticompetitive conduct, such predatory pricing or pricing agreements.  Instead, they are pursuing

14  the absolutely unprecedented theory that Abbott is charging "too much" for a patented product.  That

15  theory is utter nonsense because, far from qualifying as anticompetitive conduct, a patent creates

16  "the *right* to exclude others from profiting by the patented invention." *Schering-Plough Corp. v.*

17  *FTC*, 402 F.3d 1056, 1065 (11th Cir. 2005) (emphasis added) (quoting *Dawson Chem. Co. v. Rohm*

18  *& Haas Co.*, 448 U.S. 176, 215 (1980)).  The "mere possession of monopoly power, and the

19  concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the

20  free market system" *Verizon Comm. Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407

21  (2004).

22          In fact, to moot any possible issue over Plaintiffs' attempt to pursue this completely

23  unnecessary discovery, Abbott will *stipulate* – solely for purposes of its pending motion – that a

24  factual issue exists regarding its subjective intent for raising Norvir's price.  Because of that

25  stipulation, granting Plaintiffs the continuance they seek would serve absolutely no purpose.  By

26  definition, their proposed discovery cannot be "essential" to their opposition because Abbott is

27  willing to concede, for purposes of its summary judgment motion, precisely what Plaintiffs would

28  hope to prove through further discovery – that a fact issue exists relating to Abbott's motives for

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1    raising Norvir's price.[2]

2    **3.    Plaintiffs' Are Not Entitled To Their Proposed Discovery Relating To The**
         **"Validity and Enforceability" of Abbott's Patents.**
3

4         With respect to Abbott's patent argument, Plaintiffs argue for the first time that they

5    should be entitled to take broad, unspecified discovery into the validity and enforceability of

6    Abbott's patents. This request is wholly improper on multiple levels.

7         First and most obviously, Plaintiffs make no effort whatsoever to satisfy Rule 56(f)

8    and, in fact, do not even mention this issue in their supporting declaration. That alone defeats their

9    request. And far from identifying any "specific facts" or offering any reason to believe that such

10   facts actually exist, Plaintiffs freely concede that they want to take this discovery to "determin[e]

11   *whether* to attack the validity of Abbott's patents." (Plaintiffs Mem. at 13) (emphasis added). This

12   is the definition of a fishing expedition and is absolutely contrary to Rule 56(f), which, as noted, is

13   not designed to allow parties to go "shopping for a case." *Gemisys Corp.*, 186 F.R.D. at 566.

14        Second, Plaintiffs have failed explain how the validity and/or enforceability of

15   Abbott's patents is material to Abbott's summary judgment motion. Abbott's motion addresses the

16   cause of action actually set forth in Plaintiffs' complaint – raising Norvir's price to attempt to

17   "monopolize" the Boosted Market – which has nothing whatsoever to do with wrongly enforcing an

18   invalid or unenforceable patent. As the Federal Circuit has explained, "[i]n the absence of any

19   indication of illegal tying, fraud in the Patent and Trademark Office, or sham litigation, the patent

20   holder may enforce the statutory right to exclude others from making, using, or selling the claimed

21   invention free from liability under the antitrust laws." *In re Independent Serv. Org. Antitrust Litig.*,

22   203 F.3d 1322, 1327 (Fed. Cir. 2000).

23

24

---

25   [2]    To avoid any confusion, Abbott is offering this stipulation *only* because its intent is
     completely immaterial to its summary judgment motion. Nevertheless, all of Abbott's documents
26   and depositions make it crystal clear that it raised Norvir's price due to the dramatic change in the
     drug's role in HIV therapy from a stand-alone protease inhibitor (1200 mg per day) to a low-dose
27   booster (typically 100 mg per day). This is confirmed – not undermined – by the document that
     Plaintiffs trumpet. That document repeatedly discusses Norvir's changing role, emphasizes that
28   competitors should not be given a free ride through "*inexpensive* access to Norvir," and concludes
     that Abbott needed to "reposition[]" the drug as a "unique low dose boosting agent." (Plaintiffs'
     Mem. at 12).

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

IV.   **CONCLUSION**

For the foregoing reasons, Abbott Laboratories respectfully requests that the Court deny Plaintiffs' Rule 56(f) motion and adopt the following schedule for Abbott's summary judgment motion: Plaintiffs shall file and serve their response to Abbott's summary judgment motion by August 5, 2005; Abbott shall file and serve any reply in support of its motion by August 19, 2005; and a hearing date should follow shortly thereafter, subject to the Court's schedule.

Dated: July 1, 2005

WINSTON & STRAWN LLP

By: _____
Michael A. Sweet (SBN 184345)
Attorneys for Defendant
ABBOTT LABORATORIES

# EXHIBIT 5

1 Michael A. Sweet (SBN: 184345)
George C. Lombardi (*Admitted Pro Hac Vice*)
2 James F. Hurst (*Admitted Pro Hac Vice*)
David J. Doyle (*Admitted Pro Hac Vice*)
3 Samuel S. Park (*Admitted Pro Hac Vice*)
WINSTON & STRAWN LLP
4 101 California Street, Suite 3900
San Francisco, CA 94111-5894
5 Telephone:   415-591-1000
Facsimile:   415-591-1400
6 Email: msweet@winston.com;
glombardi@winston.com; jhurst@winston.com;
7 ddoyle@winston.com; spark@winston.com

8 Attorneys for Defendant
ABBOTT LABORATORIES

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

9

## UNITED STATES DISTRICT COURT

10

## NORTHERN DISTRICT OF CALIFORNIA

11

## OAKLAND DIVISION

12

13

| | |
|---|---|
| IN RE ABBOTT LABS NORVIR ANTITRUST LITIGATION | **Case Nos. C-04-1511 CW and C-04-4203 CW** |
| This Document Relates To: All Actions | **NOTICE OF MOTION AND MOTION OF ABBOTT LABORATORIES' FOR SUMMARY JUDGMENT** |
| | **DATE:    July 8, 2005** |
| | **TIME:    10:00 a.m.** |
| | **DEPT:    2** |
| | **The Honorable Judge Wilken** |

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

The Federal Circuit affirmed and also expressly rejected *Kodak*'s leveraging theory, stating: "We decline to follow *[Kodak]*." *Independent Services*, 203 F.3d at 1327. The Federal Circuit held that absent "illegal tying, fraud in the Patent and Trademark Office, or sham litigation," none of which have been alleged here, a patentee is unconditionally entitled to exercise its statutory patent rights "free from liability under the antitrust laws." *Id.* The Court thus rejected the antitrust claim, noting that "a patent may confer the right to exclude competition altogether in more than one antitrust market." *Id.* And since Xerox's "refusal to sell its patented parts" fell within "the scope of [its] patent grant," Xerox was immune from antitrust liability "even though [its] refusal to sell or license [its] patented invention may have an anticompetitive effect" in a separate market. *Id.* at 1327-28.

This Court is bound by *Independent Services* because "Federal Circuit law determines whether or not the patentee enjoys antitrust immunity under the patent laws, while regional circuit law determines the other elements of the antitrust claim." *Unitherm Food Systems, Inc. v. Swift-Eckrich, Inc.*, 375 F.3d 1341, 1355 n.3 (Fed. Cir. 2004), *cert. granted in part on other grounds*, 125 S. Ct. 1396 (2005). In fact, it has long been the law that "Federal Circuit law governs all antitrust claims premised on the abuse of a patent right" (*id.* at 1355), which is precisely what Plaintiffs allege here. And as the Federal Circuit recently confirmed, "the determination of *which* actions can cause a patentee . . . to lose the general protection of the patent law and risk liability for damages is clearly an issue unique to patent law – and therefore inappropriate for resolution under the potentially varying interpretations of the regional circuits." *Id.* at 1357 (emphasis in original).

Under controlling Federal Circuit law, Plaintiffs' antitrust claim fails because it simply does not matter whether Norvir's price increase impacted other markets, including the alleged Boosted Market. The only question is whether a price increase falls within the scope of Abbott's rights under the Norvir patents, and it obviously does. Raising the price of a patented product is exactly what a patent allows.

There is no dispute about this fact. "The power over price that patent rights confer is lawful." *Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 265 (7th Cir. 1984). "The owner of a patented article can, of course, charge such price as he may choose . . . ." *Monsanto Co. v.*

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

· 18

*McFarling*, 302 F.3d 1291, 1299 (Fed. Cir. 2002). Thus, it is beyond dispute that "setting high prices in the original 'monopoly' market" is among the "ways that a monopolist can permissibly benefit from its position." *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 548-49 (9th Cir. 1991). As one court reviewing allegations concerning the Norvir price increase similarly noted, "[c]harging a high price is not beyond the scope of any patent and Plaintiff has not cited a single case so holding." (Sweet Declaration, Exhibit A, at 2).

Not only do the Norvir patents authorize an allegedly high price, but they actually entitle Abbott to charge an *infinite* price for Norvir by removing it from the marketplace altogether. A patentee is "under no obligation to sell or license its patented" invention and, thus, does "not violate the antitrust laws by refusing to do so." *Independent Services*, 203 F.3d at 1328. As the *Gingreau* court similarly noted, "Abbott could, in fact, cease selling Norvir altogether and be within its rights." (Sweet Declaration, Exhibit A, at 2). Plainly, if Abbott has the right to remove Norvir from the marketplace, it also has the right to raise Norvir's price. *See also Zenith Laboratories, Inc. v. Carter-Wallace Inc.*, 530 F.2d 508, 513, n.9 (3d Cir. 1976) ("a patentee is privileged to withhold [its invention] from sale at any price, or to offer it for sale at any price he wishes, however low or high").

In the end, Abbott is entitled to profit from its invention by raising Norvir's price. Because a price increase is one of Abbott's core rights under its Norvir patents, *Independent Services* confirms that Abbott is immune from antitrust liability *regardless* of any alleged impact on other markets. For this reason alone, Abbott is entitled to summary judgment.

**2.      Even If The Court Were To Follow *Kodak*, Abbott Still Is Entitled To Summary Judgment Because Its Patents Cover *Both* Alleged Markets.**

Even if this Court were to follow *Kodak,* Abbott still is entitled to summary judgment. As this Court previously held, a patent owner loses immunity only if it "extends its monopoly beyond the scope of the patent." (10/21/04 Doe Order at 4). Here, however, Abbott is accused of "monopolizing" a market over which it *has* patent protection.

Plaintiffs merely are alleging that a price increase on a patented product (Norvir) constituted an attempt to monopolize another *patented* combination (Norvir plus another protease

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1    inhibitor). This is nothing like *Kodak*, where the plaintiffs alleged that a refusal to sell a patented

2    product (photocopier parts) was an attempt to monopolize an *unpatented* service (repairing

3    photocopiers). In other words, unlike here, the *Kodak* defendant had patent rights over only *one* of

4    the relevant markets.

5          Determining whether any alleged impact on the Boosted Market is beyond the scope

6    of Abbott's patents depends on the proper construction of those patents. That issue is perfectly

7    suited for summary judgment because "claim construction is a matter of law" and, thus, it is not

8    open to any possible factual dispute. *Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d

9    1354, 1359 (Fed. Cir. 2004). The "construction of a patent, including terms of art within its claims,"

10   is a matter of law "exclusively within the province of the court." *Markman v. Westview Instruments*,

11   517 U.S. 370, 372 (1996).

12         Abbott's booster patents plainly cover the Boosted Market. The '157 patent, for

13   example, claims a "method for improving" the efficacy of protease inhibitors by administering a

14   "therapeutically effective amount of a combination of said drug . . . and ritonavir," which is Norvir's

15   active ingredient. (Sweet Declaration, Exhibit C, at Col. 13, lines 42-48). Abbott is aware of no

16   conceivable dispute about the meaning of this simple language, which plainly covers the co-

17   administration of Norvir with another protease inhibitor. This is *precisely* how Plaintiffs define the

18   Boosted Market. (Doe Am. Compl. ¶¶ 14, 27). There is simply no question that Abbott's patents

19   cover that purported market, and Plaintiffs never have contended otherwise.

20         When denying Abbott's motions to dismiss, this Court declined to address the scope

21   of Abbott's booster patents, stating that it was "not willing, at this early juncture in the litigation, to

22   rule that [Abbott] can patent a procedure in which HIV patients take a drug manufactured and sold

23   by a third party along with Defendant's own." (3/02/05 Service Employees Order at 7). To address

24   the Court's concern, Abbott has provided the Declaration of Gerald J. Mossinghoff, who is a former

25   Commissioner of Patents. As Mr. Mossinghoff explains, parties commonly obtain patents relating to

26   an improvement over another party's product. In fact, such patents are specifically permitted by the

27   United States Patent Code, which allows inventors to patent "any new and useful process . . . *or any*

28   *new and useful improvement thereof*." (Mossinghoff Declaration ¶ 13; 35 U.S.C. § 101 (emphasis

**NOT OF MOT. & MOT. OF ABBOTT LABORATORIES
FOR SUMMARY JUDGMENT**

1   (E.D. Cal. 2003) (denying finding of unjust enrichment and imposition of constructive trust).

2   Therefore, Plaintiffs cannot possibly prove their claim for unjust enrichment, and Abbott is entitled

3   to judgment as a matter of law.

4

5   Dated: June 1, 2005                              WINSTON & STRAWN LLP

6

7                                                    By:

8                                                        Michael A. Sweet (SBN 184345)

9                                                    Attorneys for Defendant
                                                     ABBOTT LABORATORIES

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOT OF MOT. & MOT. OF ABBOTT LABORATORIES
FOR SUMMARY JUDGMENT

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

EXHIBIT 6

CASE NO.: 05-35640

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

McKENZIE-WILLAMETTE HOSPITAL,

Plaintiff-Appellee,

v.

PEACEHEALTH,

Defendant-Appellant.

F I L E D

SEP 2 6 2005

CATHY A. CATTERSON, CLERK
U.S. COURT OF APPEALS

APPEAL FROM UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
No. CV-02-06032-HA

## OPENING BRIEF OF APPELLANT PEACEHEALTH

M. Laurence Popofsky (Cal. Bar No. 33946)
Heather N. Leal (Cal. Bar No. 184232)
Adam J. Gromfin (Cal. Bar No. 226983)
HELLER EHRMAN LLP
333 Bush Street
San Francisco, CA  94104
Telephone:  (415) 772-6000
Facsimile:  (415) 772-6268

James H. Sneed (D.C. Bar No. 194803)
Linda M. Holleran (D.C. Bar No. 472355)
McDERMOTT, WILL & EMERY
600 Thirteenth Street N.W.
Washington, D.C.  20005
Telephone:  (202) 756-8000
Facsimile:  (202) 756-8855

Peter H. Glade (Or. Bar. No. 79048)
MARKOWITZ, HERBOLD, GLADE &
    MEHLHAF, P.C.
1211 S.W. Fifth Avenue
Suite 3000 Pacwest Center
Portland, OR  97204
Telephone:  (503) 295-3085
Facsimile:  (503) 323-9105

Attorneys for Appellant PeaceHealth

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellant PeaceHealth makes the following disclosure:  PeaceHealth is a Washington State nonprofit corporation that does not have a parent corporation.  No publicly owned company has any ownership interest in PeaceHealth.

DATED this 26th day of September, 2005.

HELLER EHRMAN LLP

By  *M. Laurence Popofsky (MP)*
M. Laurence Popofsky
Attorneys for Appellant PeaceHealth

i

## STATEMENT REGARDING ORAL ARGUMENT

PeaceHealth requests that the Court schedule this appeal for oral argument, and that it allocate 30 minutes to each side's presentation. This appeal presents a number of important antitrust issues, including whether a Sherman Act Section 1 verdict finding that alleged exclusive deals are not unreasonable restraints of trade precludes a finding that these same deals are predatory or anticompetitive for purposes of a Sherman Act Section 2 attempted monopolization offense, whether alleged exclusive deals that foreclose no more than 15% of the market can support a Section 2 attempt offense, and whether the Third Circuit's vacuous *LePage's* standard for evaluating bundled discounts (adopted by the district court here) is or should be the law of bundled discounting in the Ninth Circuit. Given the significance of these legal issues (and others), PeaceHealth believes that oral argument would be beneficial to the Court.

# TABLE OF CONTENTS

**Page**

I.    JURISDICTIONAL STATEMENT ...................................................... 1

    A.    The Basis for the District Court's Jurisdiction ......................... 1

    B.    The Basis for this Court's Jurisdiction .................................... 1

    C.    Timeliness of the Appeal ......................................................... 1

II.   STATEMENT OF ISSUES ................................................................ 1

III.  STATEMENT OF THE CASE ........................................................... 5

IV.   STATEMENT OF FACTS ................................................................. 8

    A.    Summary and Overview ........................................................... 8

    B.    Market Participants .................................................................. 9

        1.    McKenzie ...................................................................... 9

        2.    PeaceHealth ............................................................... 10

        3.    Insurers/Health Plans ................................................ 10

    C.    PeaceHealth's Allegedly Wrongful Conduct ......................... 11

        1.    The Preferred Provider Plans ..................................... 12

        2.    Pricing Under the Preferred Plans ............................. 16

    D.    McKenzie's Alleged Damages ............................................... 17

V.    SUMMARY OF ARGUMENT ........................................................ 19

VI.   STANDARD OF REVIEW ............................................................. 20

VII.  ARGUMENT .................................................................................. 21

    A.    PeaceHealth Is Entitled to Judgment as a Matter of Law,
        Because Its Conduct Was Not Anticompetitive. ................... 21

1.    Exclusive Dealing.............................................................. 23

2.    Bundled Discounting ........................................................ 37

3.    Other Alleged Anticompetitive Conduct........................................ 53

VIII.  CONCLUSION ....................................................................... 57

CERTIFICATE OF COMPLIANCE PURSUANT TO FED. R. APP.
    P. 32(a)(7)(C) FOR CASE NUMBER 05-35640 ................................. 58

STATEMENT OF RELATED CASES ....................................................... 59

# TABLE OF AUTHORITIES

**Page**

## Cases

*Advanced Health-Care Servs. v. Radford Cmty. Hosp.*,
  910 F.2d 139 (4th Cir. 1990)................................................................22

*Advo, Inc. v. Philadelphia Newspapers, Inc.*,
  51 F.3d 1191 (3d Cir. 1995)................................................................32

*American Booksellers Ass'n, Inc. v. Barnes & Noble, Inc.*,
  135 F. Supp. 2d 1031 (N.D. Cal. 2001)................................................30

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
  472 U.S. 585 (1985)..............................................................22, 55

*Atlantic Richfield Co. v. USA Petroleum Co.*,
  495 U.S. 328 (1990) ............................................................48

*Barr Labs., Inc. v. Abbott Labs.*,
  978 F.2d 98 (3d Cir. 1992)................................................................28

*Barry Wright Corp. v. ITT Grinnell Corp.*,
  724 F.2d 227 (1st Cir. 1983)........................................................*passim*

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
  509 U.S. 209 (1993)........................................................*passim*

*Caballero v. City of Concord*,
  956 F.2d 204 (9th Cir. 1992)................................................................45

*Calculators Hawaii, Inc. v. Brandt, Inc.*,
  724 F.2d 1332 (9th Cir. 1983)................................................................24

*California Computer Prods., Inc. v. International Bus. Machs. Corp.*,
  613 F.2d 727 (9th Cir. 1979)............................................................24, 56

*Cargill, Inc. v. Monfort of Colorado, Inc.*,
  479 U.S. 104 (1986) ............................................................48

*City of Anaheim v. Southern Cal. Edison*,
  955 F.2d 1373 (9th Cir. 1992)................................................................56

*Concord Boat Corp. v. Brunswick Corp.,*
    207 F.3d 1039 (8th Cir. 2000)........................................................30

*Cooter & Gell v. Hartmarx Corp.,*
    496 U.S. 384 (1990).................................................................21

*Costa v. Desert Palace, Inc.,*
    299 F.3d 838 (9th Cir. 2002)........................................................21

*Duran v. City of Maywood,*
    221 F.3d 1127 (9th Cir. 2000)........................................................21

*Eastman Kodak Co. v. Image Technical Servs., Inc.,*
    504 U.S. 451 (1992).................................................................21

*F.T.C. v. Indiana Federation of Dentists,*
    476 U.S. 447 (1986).................................................................31

*Foremost Pro Color, Inc. v. Eastman Kodak Co.,*
    703 F.2d 534 (9th Cir. 1983)........................................................24

*General Indus. Corp. v. Hartz Mountain Corp.,*
    810 F.2d 795 (8th Cir. 1987)........................................................22

*Gilbrook v. City of Westminster,*
    177 F.3d 839 (9th Cir. 1999)........................................................20

*Indep. Entertainment Group, Inc. v. Nat'l Basketball Ass'n,*
    853 F. Supp. 333 (C.D. Cal. 1994) ..................................................55

*International Travel Arrangers, Inc. v. NWA, Inc.,*
    991 F.2d 1389 (8th Cir. 1993)........................................................51

*J.B.D.L. Corp. v. Wyeth-Ayerst Labs., Inc.,*
    2005 WL 1396940 (S.D. Ohio 2005)..................................................43

*Janes v. Wal-Mart Stores, Inc.,*
    279 F.3d 883 (9th Cir. 2002)........................................................20

*Johnson v. Paradise Valley Unified School District,*
    251 F.3d 1222 (9th Cir. 2001)........................................................20

*Ladd v. Hikes,*
    639 P.2d 1307 (Or. App. 1982)......................................................55

*LePage's, Inc. v. 3M,*
    324 F.3d 141 (3d Cir. 2003)...................................................*passim*

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986)...............................................................*passim*

*MCI Communications Corp. v. AT&T Co.,*
    708 F.2d 1081 (7th Cir. 1983)....................................................45

*Menasha Corp. v. News America Marketing In-Store, Inc.,*
    354 F.3d 661 (7th Cir. 2004).......................................................31

*Morgan v. Ponder,*
    892 F.2d 1355 (8th Cir. 1989)....................................................51

*Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue
    Shield,*
    883 F.2d 1101 (1st Cir. 1989).....................................................32

*Omega Environmental, Inc. v. Gilbarco Inc.,*
    127 F.3d 1157 (9th Cir. 1997)................................................*passim*

*Ortho Diagnostic Systems, Inc. v. Abbott Laboratories, Inc.,*
    920 F. Supp. 455 (S.D.N.Y. 1996).........................................*passim*

*Paddock Publ'ns, Inc. v. Chicago Tribune Co.,*
    103 F.3d 42 (7th Cir. 1996).........................................................37

*Paladin Assocs. v. Montana Power Co.,*
    328 F.3d 1145 (9th Cir. 2003)....................................................56

*Pool Water Prods. v. Olin Corp.,*
    258 F.3d 1024 (9th Cir. 2001)................................................7, 51

*Rebel Oil Co. v. Atlantic Richfield Co.,*
    146 F.3d 1088 (9th Cir. 1998)..........................................8, 21, 51

*Redmond Ready-Mix, Inc. v. Coats,*
    582 P.2d 1340 (Or. 1978).............................................................7

*Satellite Television & Associated Resources, Inc. v. Continental Cablevision,*
 714 F.2d 351 (4th Cir. 1983)................................................................28, 29

*SCFC ILC, Inc. v. Visa USA, Inc.,*
 36 F.3d 958 (10th Cir. 1994)..............................................................30, 31

*SmileCare Dental Group v. Delta Dental Plan,*
 88 F.3d 780 (9th Cir. 1996)................................................................20, 21

*SmithKline Corp. v. Eli & Lilly Co.,*
 427 F. Supp. 1089 (E.D. Penn. 1976)........................................................47

*SmithKline Corp. v. Eli Lilly and Co.,*
 575 F.2d 1056 (3d Cir. 1978)..............................................................38, 40

*Spectrum Sports, Inc. v. McQuillan,*
 506 U.S. 447 (1993)..........................................................................21, 25

*Stearns Airport Equip. Co. v. FMC Corp.,*
 170 F.3d 518 (5th Cir. 1999)....................................................................22

*Swenson v. Potter,*
 271 F.3d 1184 (9th Cir. 2001)..................................................................20

*Swinton v. Potomac Corp.,*
 270 F.3d 794 (9th Cir. 2001)....................................................................44

*Tampa Electric Co. v. Nashville Coal Co.,*
 365 U.S. 320 (1961)........................................................................passim

*Thompson Everett, Inc. v. National Cable Advert., L.P.,*
 57 F.3d 1317 (4th Cir. 1995)....................................................................36

*Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.,*
 676 F.2d 1291 (9th Cir. 1982)..................................................................28

*United States v. Dentsply Int'l, Inc.,*
 399 F.3d 181 (3d Cir. 2005)..............................................................26, 37

*United States v. Microsoft Corp.,*
 253 F.3d 34 (D.C. Cir. 2001)..............................................................25, 31

*United States v. Rahm,*
    993 F.2d 1405 (9th Cir. 1993)..................................................................21

*United States v. Women's Hosp. Found.,*
    1996-2 Trade Cas. (CCH) ¶ 71,561 (M.D.La. Sept. 11, 1996).....................55

*Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko* LLP,
    540 U.S. 398 (2004)................................................................3, 49, 50

*Western Parcel Express v. United Parcel Serv. of Am.,*
    190 F.3d 974 (9th Cir. 1999)................................................................2, 27

*William Inglis & Sons Baking Co. v. Continental Baking Co.,*
    942 F.2d 1332 (9th Cir. 1991)................................................................26, 27

*Williams v. I.B. Fischer Nevada,*
    999 F.2d 445 (9th Cir. 1993)..................................................................24

*Yamaha Store of Bend, Inc. v. Yamaha Motor Corp.,*
    798 P.2d 656 (Or. 1990)........................................................................7

## Statutes

Or. Rev. Stat. 646.040 ....................................................................................5

15 U.S.C. § 2 ..................................................................................................1

28 U.S.C. § 1291 ............................................................................................1

28 U.S.C. § 1331 ............................................................................................1

28 U.S.C. § 1337(a) ........................................................................................1

## Other Authorities

P. Areeda & H. Hovenkamp, *Antitrust Law,*
    Vol. III ¶ 626b (2d ed. 2002) ...............................................................22
    Vol. III ¶ 651c (2d ed. 2002)................................................................22
    Vol. III ¶ 749 (2005 Supp.)................................................................39, 48
    Vol. X ¶ 1758f (2d ed. 2004)..............................................................48

Vol. XI ¶ 1800c4 (2d ed. 2005) ................................................ 31
Vol. XI ¶ 1821c (2d ed. 2005) ................................................ 28

Brief for the United States as Amicus Curiae,
*3M Co. v. LePage's Inc.*, 2004 WL 1205191 (U.S. May 28,
2004) (No. 02-1865) .......................................................... *passim*

Dennis W. Carlton, *A General Analysis of Exclusionary Conduct and*
*Refusal to Deal — Why Aspen and Kodak are Misguided,*
68 Antitrust L.J. 659, 664 (2001) ......................................... 52

Daniel A. Crane, *Multiproduct Discounting: A Myth of Nonprice*
*Predation,*
72 U. Chi. L. Rev 27 (Winter 2005) .................................... *passim*

Frank H. Easterbrook, *On Identifying Exclusionary Conduct,*
61 Notre Dame L. Rev. 972 (1986) ....................................... 3

Frank H. Easterbrook, *When Is It Worthwhile to Use Courts to Search*
*for Exclusionary Conduct?,*
2003 Colum. Bus. L. Rev. 345 (2003) ................................... 32

Thomas A. Lambert, *Evaluating Bundled Discounts,*
89 Minn. Law Rev. 1688 (June 2005)  .................... 47, 48, 51, 52

FTC Staff Letter to the Attorney General of Montana Regarding
"Any-Willing-Provider" Laws, (Feb. 4, 1993), *reprinted in*
John J. Miles, *Health Care & Antitrust Law: Principles and*
*Practice,* (2003) ............................................................... 33

Timothy J. Muris, *Antitrust Law: Economics and Bundled Discounts,*
submitted on behalf of the United States Telecom Association
in response to the Antitrust Modernization Commission's
Request for Public Comments (June 2005)  ......................... *passim*

Daniel L. Rubinfeld,
*3M's Bundled Rebates: An Economic Perspective,*
72 U. Chi. L. Rev. 243 (Winter 2005) ................................. 43

United States Dep't of Justice and Federal Trade Comm'n, Statements
of Antitrust Enforcement Policy in Health Care,
4 Trade Reg. Rep. (CCH) ¶ 13,153 (1996) ...................... 54, 55

Werden, Gregory J., Senior Economic Counsel of the Department of
     Justice, Antitrust Division, *The "No Economic Sense" Test for
     Exclusionary Conduct*,
          ___ Antitrust L.J. ___ (forthcoming 2005)....................................................22

# I.    JURISDICTIONAL STATEMENT

## A.    The Basis for the District Court's Jurisdiction

The district court had subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337(a), because plaintiffs brought claims under the Sherman Act.

## B.    The Basis for this Court's Jurisdiction

This Court has jurisdiction under 28 U.S.C. § 1291, because PeaceHealth appeals from the jury verdict and final judgment of the district court.  ER.680-85 (Verdict); ER.824-28 (Judgment).[1]

## C.    Timeliness of the Appeal

The district court entered final judgment on May 2, 2005.  ER.824-28 (Judgment).  PeaceHealth timely noticed this appeal on May 27, 2005.  ER.829-31 (Not. of Appeal).

# II.    STATEMENT OF ISSUES

PeaceHealth appeals from a jury verdict in favor of plaintiff McKenzie-Willamette Hospital ("McKenzie") on a claim of attempted monopolization under Section 2 of the Sherman Act, 15 U.S.C. § 2.  The gravamen of McKenzie's claim is that PeaceHealth — its only hospital competitor — entered into so-called exclusive contracts with two commercial health insurance companies or payors,

---

[1]    The "Excerpts of Record" are referenced as follows:  "ER.Page."  The reporter's transcript is referenced as follows:  "ER.Page (Volume RT Page:Line)." "PX" and "DX" refer to plaintiff's and defendant's exhibits, respectively.

which precluded McKenzie from competing for up to 15% of commercially

insured patients in plaintiff's alleged relevant market.  Plaintiff's theory is that

PeaceHealth induced these so-called "exclusives" by offering across-the-board

discounts on PeaceHealth's hospital services, including on services that McKenzie

did not provide.

Exclusive dealing that does not substantially foreclose competition is not

condemned by the antitrust laws.  *See Omega Environmental, Inc. v. Gilbarco Inc.*,

127 F.3d 1157, 1162 (9th Cir. 1997) (*"Gilbarco"*).  That is because, as then-Judge

Breyer explained in *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227 (1st

Cir. 1983) (*"Barry Wright"*), "[V]irtually *every* contract to buy "forecloses" or

"excludes" alternative sellers from *some* portion of the market, namely the portion

consisting of what was bought."  *Id.* at 236 (emphasis in original).  Absent

substantial, durable foreclosure, exclusive dealing not only is not actionable, it is

procompetitive.  *See Western Parcel Express v. United Parcel Serv. of Am.*, 190

F.3d 974, 976 (9th Cir. 1999) (*"Western Parcel"*); *Gilbarco*, 127 F.3d at 1162-65.

Price discounts also are almost always procompetitive and "afford

substantial benefits to consumers."  *Ortho Diagnostic Systems, Inc. v. Abbott

Laboratories, Inc.*, 920 F. Supp. 455, 469-70 (S.D.N.Y. 1996) (*"Ortho"*).  That is

why, in the context of single product discounts, the Supreme Court has held that

discounts must be below "an appropriate measure" of *the defendant's* costs to

2

create antitrust liability. *See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222 (1993) ("*Brooke Group*"). This bright-line rule ensures that equally efficient competitors will not be driven out of business by a defendant's below-cost price cuts simply because they do not possess the financial reserves necessary to sustain below-cost pricing. It also ensures that competitors who are less efficient or are simply unwilling to reduce margins to compete cannot use the courts to support their pricing structure while harming the welfare of purchasers who benefit from lower prices.

The law imposes a heavy burden of proof on a Section 2 complainant, because conduct that consists of nothing more than vigorous competition by a large market player looks very much like conduct that could be predatory. *See* Frank H. Easterbrook, *On Identifying Exclusionary Conduct*, 61 Notre Dame L. Rev. 972, 979 (1986). The danger of mistaking one for the other has prompted the Supreme Court to caution against expansion of liability for unilateral conduct under Section 2. *See Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko LLP*, 540 U.S. 398, 414 (2004) ("*Trinko*") ("The cost of false positives counsels against an undue expansion of § 2 liability."). Here, the jury condemned price discounts resulting in preferred contracts that ex ante could, and viewed after the fact did, foreclose no more than 15% of the relevant market. More generally (and with particular reference to the concerns of rising health care costs), the verdict is

3

essentially an indictment of preferred provider plans — a nationally ubiquitous form of health insurance that materially benefits consumers. In fact, the contracts at issue in this case — including their price structure — *were requested by the insurers*, not PeaceHealth, as an alternative to full participation by McKenzie, and chosen by those same insurers because the contracts benefited *their* competition for patient subscribers.

PeaceHealth thus appeals, raising the following issues:

A.    Whether PeaceHealth is entitled to judgment as a matter of law, because its pricing practices and resulting contracts were lawful under *Gilbarco* and *Brooke Group*, and none of the other conduct challenged by McKenzie was actionable under Section 2 of the Sherman Act.

B.    Whether PeaceHealth is entitled to judgment as a matter of law or a new trial, because the jury instructions on bundled discounting, taken directly from the Third Circuit's decision in *LePage's, Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003), *cert. denied,* 124 S. Ct. 2932 (June 30, 2004) ("*LePage's*"), were prejudicially erroneous.

C.    Whether PeaceHealth is entitled to judgment as a matter of law, because, even under the jury instructions on bundled discounting given by the lower court, there is insubstantial evidence to support the verdict.

## III.   STATEMENT OF THE CASE

This action commenced on January 28, 2002.  ER.1-13 (Compl.).  On March

11, 2003, McKenzie filed an amended complaint alleging seven claims for relief:

five under the federal antitrust laws — tying, exclusive dealing, monopolization,

attempted monopolization, and conspiracy to monopolize; and two under Oregon

state law — price discrimination under Or. Rev. Stat. 646.040 and tortious

interference with a prospective economic advantage.  ER.23-28 (First Am. Compl.

¶¶ 32-71).  Following discovery, PeaceHealth unsuccessfully moved for summary

judgment on each of the grounds addressed here.  ER.34-51 (Mot'n S.J. at 28-30,

35-41, 43-47, 49-51); ER.65-76,79-81 (S.J. Order at 14-25, 28-30).[2]

At the time of trial in October 2003, the district court allowed McKenzie —

over PeaceHealth's objection — to add new allegations, including those related to

bundled discounting under Section 2 (one of the subjects of this appeal).  ER.98-99

(Am. Pretrial Order at 16-17); ER.654,664-65 (Jury Instr. at 33, 43-44); ER.333-

34,339-40 (14RT38:19-39:04,48:12-49:03); ER.615-16 (Def.'s Jury Instr. Objs. at

4-5).

---

[2]     The district court *granted* summary judgment on McKenzie's tying claim
because "[p]laintiff fail[ed] to sufficiently establish the existence of the requisite
coercive element."  ER.64-65 (S.J. Order at 13-14).  The court also ruled that
certain other allegedly anticompetitive PeaceHealth activities (e.g., acquisitions of
hospital facilities) were "insufficient to independently support a monopolization
claim," ER.72,76-77 (S.J. Order at 21, 25-26), or were immune from liability under
the *Noerr-Pennington* doctrine, ER.81-82 (S.J. Order at 30-31).

The jury found *for* PeaceHealth on McKenzie's claims of exclusive dealing under Section 1 of the Sherman Act, and monopolization and conspiracy to monopolize under Section 2 of the Sherman Act, ER.681-83 (Verdict ¶¶ 3, 9, 12), but *against* PeaceHealth on claims of attempted monopolization under Section 2 of the Sherman Act, price discrimination under Oregon's mini-"Robinson-Patman" statute, and wrongful interference with prospective business relations (a state law tort), ER.681-82,684-85 (Verdict ¶¶ 6-8, 15-22). The jury also found a relevant market for primary and secondary acute care hospital services ("primary and secondary ACHS") in Lane County, Oregon. ER.680 (Verdict ¶¶ 1-2). It awarded McKenzie $5.4 million in antitrust damages before trebling, resulting in a judgment of $16.2 million. ER.682 (Verdict ¶ 8); ER.826 (Judgment at 3).

On October 20, 2003, PeaceHealth moved for judgment as a matter of law ("JMOL"), arguing, *inter alia*, that McKenzie had failed to prove any violation of Section 2 or state law. ER.274-85,289-90 (Mot'n for Directed Verdict at 15-26,30-31). PeaceHealth orally renewed its motion on October 24, 2003. ER.325-26 (13ART7:10-8:07). The trial court denied PeaceHealth's motions. ER.326 (13ART8:08-12); ER.348 (14RT69:09-12). On December 8, 2003, PeaceHealth again renewed its motion for JMOL and moved, alternatively, for a new trial. ER.702-49 (Renewed JMOL & Mem. in Supp. at 1-3,7-32,35-39,43-49,51-52); ER.686-701 (New Trial Mot'n & Mem. in Supp. at 1-4,11-13,15-18). The district

6

court denied PeaceHealth's renewed JMOL and new trial motions in their entirety. ER.823 (JMOL Order at 18); ER.805 (New Trial Order at 20).

At the same time, McKenzie moved for injunctive relief, seeking, *inter alia*, to "[p]rohibit [PeaceHealth] from bundling price discounts." ER.751 (Pl.'s Mot'n for Perm. Injunctive Relief at 2). Three large health insurance companies (Regence, Providence and PacificSource) — two of whose contracts were at issue — then intervened in the injunctive relief proceedings in order to *object* to McKenzie's request. ER.770-71 (Mar. 15, 2004 Minute Order Granting Mot'n to Intervene by the Regence Group).

After the parties settled the injunctive relief claim, the district court entered final judgment on May 2, 2005. ER.824-28 (Judgment). PeaceHealth filed a timely notice of appeal on May 27, 2005. ER.829-31 (Not. of Appeal).

The only claims on appeal by PeaceHealth are McKenzie's attempted monopolization, price discrimination, and tortious interference claims.[3]

---

[3]    The price discrimination claim stands or falls with plaintiff's federal antitrust claims. *See Redmond Ready-Mix, Inc. v. Coats*, 582 P.2d 1340, 1346 (Or. 1978) (*en banc*) (stating that Oregon plaintiffs seeking to establish price discrimination must meet the "same requirements" established by federal law for Robinson-Patman Act violations); *Yamaha Store of Bend, Inc. v. Yamaha Motor Corp.*, 798 P.2d 656, 659 n.6 (Or. 1990) (citations omitted) ("Federal cases interpreting the Robinson-Patman Act are persuasive authority in interpreting Oregon's Anti-Price Discrimination Law."), *modified by reh'g on other grounds*, 806 P.2d 123 (Or. 1991). Predatory price discrimination under the Robinson-Patman Act is governed by *Brooke Group*, discussed *infra* Part VII.A.2.c.i. *See also Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1035 (9th Cir. 2001) ("*Pool*

## IV.   STATEMENT OF FACTS

### A.    Summary and Overview

This case involves the market for primary and secondary ACHS in Lane County, Oregon.  ER.680 (Verdict ¶¶ 1-2).[4]  Thus, the facts pertinent to this appeal are those that relate to PeaceHealth's alleged attempt to monopolize this market.

There are three primary players in the market for primary and secondary ACHS:  hospitals, such as PeaceHealth and McKenzie, that provide primary and secondary ACHS to patients and sell primary and secondary ACHS to insurers; commercial health insurance companies or payors that attempt to buy primary and secondary ACHS from hospitals on the best possible terms, since they compete

---

*Water Products*"); *Rebel Oil Co. v. Atlantic Richfield Co.*, 146 F.3d 1088, 1092 (9th Cir. 1998) ("*Rebel Oil*") ("[o]nly below-cost prices should suffice for recovery for price discrimination").  There is no reason why Oregon would or should adopt a different standard for price discrimination claims than that of the Supreme Court and the Ninth Circuit.

The state tort has been abandoned by plaintiff in favor of its antitrust remedies.  ER.822-23 (JMOL Order at 17-18) (plaintiff elected its antitrust remedies).  Moreover, plaintiff's failure to respond to PeaceHealth's Renewed JMOL on this issue means that the issue has been waived.  Additionally, the parties agree that tortious interference under Oregon state law requires "a complementary finding of violation of the antitrust laws." ER.766 (Pl.'s Resp. to Renewed JMOL at 49) (citing *Willamette Dental Group v. Oregon Dental Service Corp.*, 130 Or. App. 487, 498 (1994), *rev. denied*, 320 Or. 508, 882 P.2d 637 (1995)).  Thus, this Court's reversal as a matter of law with respect to the attempted monopolization verdict would be fatal to plaintiff's tortious interference claim, irrespective of the waiver issue.

[4]    For purposes of this appeal, PeaceHealth does not contest the jury's finding of this as the relevant market.

with other insurers to provide insurance services to patients or their employers; and patients, who buy health insurance (often, through their employers) from insurers or payors and primary and secondary ACHS from hospitals.

Private health insurance plans come in several varieties, three of which are relevant to this case. HMOs require each patient to select a primary care physician who coordinates all aspects of that patient's care. ER.114-15 (3ART57:19-58:06); ER.133 (3BRT22:15-24). Preferred provider plans ("PPPs") give patients financial incentives to obtain healthcare from a limited panel of doctors and/or hospitals. ER.91 (Agr. Facts ¶ 56).[5] Participating plans ("PARs") are standard indemnity plans under which an insurer pays a certain percentage of billed services (e.g., 80%) with the patient paying the remainder (e.g., 20%). ER.116 (3ART63:06-14).

## B.    Market Participants

### 1.    McKenzie

McKenzie operates a 114-bed community hospital in Lane County, Oregon providing primary and secondary ACHS. ER.85 (Agr. Facts ¶¶ 1-2). McKenzie does not provide tertiary cardiovascular hospital services or tertiary neonatal hospital services (collectively, "tertiary ACHS"). ER.85 (Agr. Facts ¶ 3). Historically, McKenzie was an equal provider in HMO plans. *See, e.g.,* ER.159-60 (5ART24:23-25:20). However, McKenzie also has participated in preferred

---

[5]    The Agreed Facts are located in the Amended Pretrial Order, at pages 3-13. ER.85-95.

provider plans, and it is or has been the sole Lane County preferred provider on
health plans offered by Regence Blue Cross Blue Shield of Oregon ("Regence"),
Managed Healthcare Northwest, PacifiCare, PacificSource, ODS, and McKenzie
Health Care.  ER.92,94 (Agr. Facts ¶¶ 71-72, 93).

### 2.    PeaceHealth

PeaceHealth is a non-profit healthcare organization that operates three
hospitals in Lane County, including a 432-bed full service ACHS facility known as
Sacred Heart Hospital.  ER.86 (Agr. Facts ¶¶ 10-12).  Sacred Heart provides both
primary and secondary ACHS and tertiary ACHS to patients.  ER.85-86 (Agr.
Facts ¶¶ 2, 4, 12).  Although PeaceHealth participated in HMO plans with
McKenzie, in the mid-1980s and early 1990s it began contracting on a preferred
provider basis with Regence and Providence, respectively.  ER.91,93 (Agr. Facts
¶¶ 62, 76).  At the time of trial, Regence was the only payor offering a PPP plan in
Lane County that included PeaceHealth but not McKenzie.  ER.91 (Agr. Facts
¶ 64).

### 3.    Insurers/Health Plans

There are 28 health care insurers[6] offering over 45 different health plans to

_____

[6]      Technically speaking, Regence is an insurer and Providence is a payor (or,
more precisely, a health services contractor) that "rents" panels of doctors,
hospitals, and other health care providers to insurance companies and other third
parties.  ER.127-29 (3BRT11:05-10,13:17-14:10).  For present purposes, the
distinction is meaningless, and hence, we use the term "insurer" to refer to both.

Lane County employers and residents. ER.90 (Agr. Facts ¶ 54). Only two of those plans are materially at issue in this case: contracts between PeaceHealth, on the one hand, and Regence and Providence Health Plan ("Providence"), on the other hand.

Together, the patients enrolled in the Regence PPP and Providence Preferred constituted no more than 15% of the commercially insured lives in Lane County. ER.306-08 (11BRT25:15-27:08). (The commercially insured data do not include patients insured by Medicare or Medicaid. ER.306-07 (11BRT25:15-26:18).) Measured as a percentage of the total population, PeaceHealth's contracts did not exceed 10%. ER.307-08 (11BRT26:24-27:02).

## C.   PeaceHealth's Allegedly Wrongful Conduct

The district court instructed the jury to consider four types of anticompetitive conduct alleged by McKenzie in support of its attempted monopolization claim: (a) exclusive contracts; (b) pricing practices (predatory and/or bundled discounts); (c) physician contract arrangements; and (d) restrictive real estate covenants. ER.655 (Jury Instr. at 34); ER.334-35 (14RT39:19-40:05). However, McKenzie attributed damages solely to PeaceHealth's preferred provider contracts with Regence and Providence, allegedly induced by its bundled pricing practices. ER.682,684 (Verdict ¶ 8, 17); ER.217-20 (8ART70:08-73:01); ER.238 (8BRT91:08-19); ER.757-58 (Pl.'s Resp. to Mot'n for New Trial at 13-14);

11

ER.765 (Pl.'s Opp'n to JMOL at 46).[7]  We address here the facts relevant to those

contracts.  The facts relevant to the remaining claims are discussed in connection

with the legal analysis, *infra* Part VII.A.3.

### 1.    The Preferred Provider Plans

McKenzie claimed that, starting in 2000, it began to experience a significant

decline in its commercially insured admissions as a consequence of diminished

consumer interest in HMO plans.  ER.92 (Agr. Facts ¶ 66); ER.762 (Pl.'s Resp. to

Renewed JMOL Mot'n at 7).  The greater popularity of the Regence and

Providence preferred provider health plans (in which McKenzie did not

participate), and the decline of HMOs (in which McKenzie was an equal provider)

reduced McKenzie's commercially insured patient base to the point where, it

claimed, it could no longer meet payroll.  ER.152-53 (4ART28:24-29:01).

Notwithstanding this assertion, in January 2003, McKenzie signed a letter of

intent to become affiliated with Triad Hospitals, Inc. ("Triad").  ER.85 (Agr. Facts

¶ 5).  Triad is the third largest for-profit hospital chain in the country, *id.*, and had

---

[7]    Although McKenzie also claimed that PeaceHealth's preferred provider
contracts with two self-insured health plans violated Section 2, those contracts
were essentially one-off, short-term contracts covering a de minimis share of the
patient pool.  ER.96 (Am. Pretrial Order at 14); ER.91,94 (Agr. Facts ¶¶ 55, 88-92)
(contracts covered less than 1% to approximately 2% of patients).  These contracts,
as noted, were omitted from McKenzie's damages calculations, which were based
solely on McKenzie's exclusion from the Regence and Providence preferred
provider contracts.  *See* discussion *infra* Part IV.D.  Thus, these self-insured plans
may be ignored.

agreed to contribute $85 million toward construction of a new hospital, ER.208

(7BRT45:17-23); ER.316 (12ART11:13-17).  Six months later, the Attorney

General of Oregon approved the affiliation, and Triad "announced its desire to

acquire, through a newly formed LLC, assets of McKenzie[], to build a new

hospital and establish tertiary cardiovascular service in competition with

PeaceHealth."  ER.85-86 (Agr. Facts ¶¶ 5-7).  That LLC, "McKenzie-Willamette

Regional Medical Center Associates," intervened in post-trial proceedings as "the

entity that now owns and has been operating the plaintiff hospital since October

2003."  ER.781 (Holden Decl. in Supp. of Mot'n to Intervene ¶ 3); ER.785 (LLC's

Mem. in Supp. of Req. for Injunctive Relief at 1 n.1).  Thus, far from shutting its

doors, McKenzie remains a vibrant competitor in the relevant market.

### a.    The Regence PPP

McKenzie formally requested to participate in the Regence PPP for the first

time in mid-2001.  ER.92 (Agr. Facts ¶ 67).  It offered to give Regence a 10%

discount off of its PAR (or "standard") rates.  ER.119 (3ART85:01-25); ER.762

(Pl.'s Resp. to Renewed JMOL Mot'n at 7).  Had this proposal been accepted,

McKenzie would have been reimbursed under the PPP at approximately the same

rates it was then receiving from Regence under its HMO contract.[8]  ER.350

---

[8]    All references to "discounts" are discounts from chargemaster-based rates,
which are the functional equivalent of "list prices."  ER.112-13 (3ART28:25-
29:21).  There was evidence at trial that PeaceHealth's chargemaster rates are

13

(PX49); ER.119 (3ART85:01-25).  McKenzie claims that its prices (as proposed and in existing contracts) were lower than PeaceHealth's for what McKenzie characterized as the "same" primary and secondary ACHS.  ER.118 (3ART73:01-21); ER.213-16 (8ART64:09-67:13); ER.762-63 (Pl.'s Resp. to Renewed JMOL Mot'n at 7-8 & n.8).  In other words, all things being equal, it claimed that Regence should have preferred McKenzie's lower cost services.  Nonetheless, Regence never gave McKenzie a counter-offer, and never chose to include McKenzie in the PPP.  ER.92 (Agr. Facts ¶ 69); ER.119-21 (3ART85:02-87:03).

McKenzie asserted that this was because, upon learning of McKenzie's desire to be included in the PPP, PeaceHealth "changed its pricing principles to ensure that [McKenzie] remained fenced out [of the Regence PPP] and made its offer contingent upon sole preferred status."  ER.762 (Pl.'s Resp. to Renewed JMOL Mot'n at 7).  But that is simply a conclusion.  The undisputed facts are that, upon receiving McKenzie's formal request, Regence solicited *two* proposals from PeaceHealth:  one under which PeaceHealth would remain the sole preferred provider, and one under which McKenzie would be added as a provider.  ER.298-99 (11ART83:10-21,107:14-24).  It also is undisputed that PeaceHealth responded with an 85% effective reimbursement rate contract assuming continued

---

higher than McKenzie's.  ER.118 (3ART73:01-21); ER.320-21 (12BRT23:16-24:19) (neonatal charges higher).  Therefore, we assume throughout that McKenzie was the lower-priced provider, although not more efficient.

"exclusivity" (or, more precisely, as the PPP's sole preferred provider), or a 90%

effective reimbursement rate contract if McKenzie were added to the panel.

ER.185-86 (6ART59:15-60:10); ER.295-97,299-301 (11ART80:08-82:02,107:14-

109:03). The difference between the two — i.e., the amount attributable to the

increased volume anticipated from the "exclusive" contract was 5%. *See, e.g.,*

ER.365 (PX68 at 1); ER.295-96,300 (11ART80:08-81:24,108:18-24). This

discount was offered on all of the hospital services PeaceHealth provides: i.e., on

both primary and secondary ACHS and on tertiary ACHS. *See, e.g.,* ER.351

(PX55 at 1); ER.357 (PX62 at 1); ER.363 (PX63); ER.374-75 (PX70 at 1-2);

ER.377-78 (PX80).[9]

Ultimately, Regence chose not to include McKenzie in its PPP, because

Regence concluded that McKenzie's inclusion would not be revenue neutral *for

Regence.* ER.356 (PX60); ER.364 (PX66); ER.163-66 (5ART36:09-39:05).

Although McKenzie inquired about the possibility of forgoing copayments to make

choosing between Sacred Heart and McKenzie revenue neutral to Regence-insured

patients, Regence rebuffed this alternative proposal, as well. ER.204-05

(7BRT24:07-25:03).

---

[9]     The Regence PPP contracts themselves are obscure as to whether the
discounts at issue apply to all services, or solely to primary and secondary ACHS.
*See* ER.407-47 (DX527) (base contract); ER.448-98 (DX528) (2000 amendment
and contract summary); ER.499-554 (DX529) (2001 amendment); ER.555-84
(DX530) (2002 amendment). However, the net effect on pricing under the
contracts was an across-the-board 5% discount.

### b.    Providence Preferred

Prior to 2002, McKenzie also did not participate in Providence Preferred —

a fact that entered into McKenzie's damages calculation. *See* discussion *infra*

Part IV.D.  However, the first time McKenzie formally requested admission to the

Providence Preferred panel in 2001, it was admitted.  ER.92-93 (Agr. Facts ¶¶ 67,

81); ER.122-23 (3ART95:12-96:15).  PeaceHealth's reimbursement rates were

then increased by 3% over what they would have been had PeaceHealth continued

as the sole preferred provider. *See* ER.385,391 (PX99 at 7,13) (base contract with

automatic renewal provision reflecting 90% effective reimbursement rate); ER.404

(PX366 at 2) (2002 amendment reflecting 93% effective reimbursement rate);

ER.406 (PX379) (2002 contract summary reflecting same); ER.135-38

(3BRT54:13-55:12,57:25-58:08); *see also* ER.177-78 (5BRT72:22-73:08) (2001

effective reimbursement rate was 90%).  Dr. Whitelaw (plaintiff's expert)

understandably characterized that increase as "relatively modest."  ER.231-32

(8BRT56:20-57:06).  Nonetheless, at trial, McKenzie complained about the way

that these negotiations occurred, asserting that PeaceHealth's pricing with respect

to other products reflected an anticompetitive intent.

### 2.    Pricing Under the Preferred Plans

In addition to claiming that PeaceHealth's contracts with Regence and

Providence (pre-2002) were unlawfully "exclusive," McKenzie also claimed that

PeaceHealth predatorily priced certain key services below PeaceHealth's own costs

16

in an effort to drive McKenzie out of business.

Health care services are divided into standard categories (developed by Medicare) for pricing purposes. These categories are known as "DRGs" or "diagnosis-related groups." *See* ER.106-08 (2BRT86:10-88:02). There are approximately 470 DRGs on PeaceHealth's chargemaster. *See* ER.312 (11BRT43:03-05). Although PeaceHealth priced its DRGs *above-cost* across all of its commercial insurance contracts, *see* ER.95 (Agr. Facts ¶ 98), several DRGs, accounting for less than 1% of PeaceHealth's net commercial revenues, turned out to be priced below PeaceHealth's average variable cost in four contracts in the year 2000 (the first year of the damages period), *see* ER.95 (Agr. Facts ¶¶ 95-97). Additionally, PeaceHealth admitted that, from 1999-2001, it was not reimbursed by payors to cover its average *total* cost on eight DRGs over the course of seven contracts. ER.95 (Agr. Facts ¶ 95). There was no evidence that its overall reimbursement rates from Regence or Providence were ever below-cost, however calculated.[10]

### D.    McKenzie's Alleged Damages

McKenzie's damages were based entirely on its "foreclosure" from patients

_____

[10]    It is worth noting that pricing in this market is something of an art: It requires predictions about future volume as well as the mix of reimbursement that will be made in the future. Healthcare providers cannot know with precision the extent to which their services will be utilized in any given contract year, nor can they predict changes in technology, pharmacology, or other components of treatment, all of which may mean that prices are set too low from time to time.

17

enrolled in PeaceHealth's preferred provider plans with Regence and Providence. *See* ER.682,684 (Verdict ¶ 8, 17); ER.217-20 (8ART70:08-73:01); ER.238 (8BRT91:08-19); ER.757-58 (Pl.'s Resp. to Mot'n for New Trial at 13-14); ER.765 (Pl.'s Opp'n to JMOL at 46). The calculation worked as follows: McKenzie's expert, Dr. Whitelaw, first determined the number of patients who would have purchased services from McKenzie "but for" the Regence PPP and Providence Preferred by multiplying the actual number of enrollees in those plans by 25% (McKenzie's share of the primary and secondary ACHS market in Lane County). ER.217-18 (8ART70:08-71:06); ER.224-26 (8BRT23:14-25:13). He then multiplied the number of "but for" patients by McKenzie's reimbursement rates. ER.218 (8ART71:07-09). For enrollees in the Regence PPP, the damages period used by Dr. Whitelaw was February 2000 to October 1, 2003 (shortly before trial). ER.219-20 (8ART72:20-73:06). For enrollees in Providence Preferred, the damages period was February 2000 to January 2, 2002, when McKenzie began participating in Providence Preferred. *Id.*; ER.233-35 (8BRT63:09-65:01). Dr. Whitelaw's calculation yielded a dollar amount — $5.4 million — representing forgone revenue. ER.219-20 (8ART72:20-73:01). This was the damage amount awarded by the jury, which resulted in a judgment for the trebled amount of $16.2 million. ER.682 (Verdict ¶ 8); ER.826 (Judgment at 3).

18

## V.    SUMMARY OF ARGUMENT

PeaceHealth submits:

A.    Under the circumstances of this case, where the potential foreclosure of alleged exclusive deals is known and limited, a Section 1 verdict finding that those deals are not unreasonable restraints of trade means that they cannot be predatory or anticompetitive for purposes of a Section 2 attempted monopolization offense. Thus, the verdict *for* PeaceHealth under Section 1 means that exclusive dealing cannot support the Section 2 attempt verdict against PeaceHealth.

B.    Short-term preferred provider contracts that foreclose no more than 15% of the market cannot support an attempt offense under Section 2 as a matter of law, whether viewed in traditional numeric terms or in conjunction with their manifest procompetitive effects.

C.    Bundled discounts that induce preferred provider contracts are subject to the same standards for assessing unlawful foreclosure as the resulting contracts themselves.

D.    To the extent that *LePage's* holds that bundled pricing can be condemned without any price-cost analysis, it should not be followed by this Court. At the very least, the jury instruction, which mirrors language from *LePage's*, was prejudicial error and requires reversal.

E.    Moreover, bundled discounts cannot be condemned as predatory or

19

anticompetitive acts unless they result in prices that are below-cost either for the bundle as a whole or on an attributed basis. There was no evidence here of any such below-cost pricing.

F.    PeaceHealth's physician arrangements and its restrictive covenant in a land sale contract cannot support the verdict, because they are not anticompetitive and did not contribute to McKenzie's damages in any event.

## VI.   STANDARD OF REVIEW

The standard of review for a jury verdict in a civil case is whether it is supported by substantial evidence. *See Swenson v. Potter*, 271 F.3d 1184, 1190 (9th Cir. 2001). Substantial evidence is such relevant evidence as reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence. *See Johnson v. Paradise Valley Unified School District*, 251 F.3d 1222, 1227 (9th Cir. 2001). The court of appeals will not weigh the evidence or assess the credibility of witnesses in determining whether there is substantial evidence. *See Gilbrook v. City of Westminster*, 177 F.3d 839, 856 (9th Cir. 1999).

However, this Court reviews *de novo* the district court's denial of PeaceHealth's JMOL. *See, e.g., Janes v. Wal-Mart Stores, Inc.*, 279 F.3d 883, 886 (9th Cir. 2002). Questions of law underlying the jury verdict — including whether conduct is anticompetitive — also are reviewed *de novo. See, e.g., SmileCare*

20

*Dental Group v. Delta Dental Plan*, 88 F.3d 780, 783 (9th Cir. 1996).

Jury instructions are reviewed for abuse of discretion, "but whether an instruction misstates the law is a legal issue reviewed de novo." *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 858 (9th Cir. 2002) (*en banc*), *aff'd* 539 U.S. 90 (June 9, 2003). The Court must determine whether the instructions, considered as a whole, fairly and adequately covered the issues presented, correctly stated the law, and were not misleading. *See, e.g., Duran v. City of Maywood*, 221 F.3d 1127, 1130 (9th Cir. 2000). A district court abuses its discretion when it bases its instructions on an erroneous view of the law. *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990), *superseded by rule on other grounds*; *United States v. Rahm*, 993 F.2d 1405, 1410 (9th Cir. 1993).

## VII. ARGUMENT

### A. PeaceHealth Is Entitled to Judgment as a Matter of Law, Because Its Conduct Was Not Anticompetitive.

Attempted monopolization is (1) the use of predatory or anticompetitive conduct with (2) a specific intent to control price or destroy competition and (3) a dangerous probability of achieving monopoly power. *See Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993) ("*Spectrum Sports*"); *Rebel Oil*, 51 F.3d at 1433; *see generally Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 482-483 (1992) (quoting *United States v. Griffith*, 334 U.S. 100, 107 (1948)) (defining monopolization). This appeal focuses on the first prong of the attempted

monopolization test, i.e., anticompetitive conduct.

"Exclusionary" or anticompetitive conduct proscribed by Section 2 of the Sherman Act is defined broadly as "'behavior that not only (1) tends to impair the opportunities of rivals, but also (2) either does not further competition on the merits or does so in an unnecessarily restrictive way.'" *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 n.32 (1985) ("*Aspen*") (quoting III Phillip Areeda & Donald Turner, *Antitrust Law*, ¶ 626b, at 78 (1978)).[11] More recent cases define conduct as exclusionary if it would not make business or economic sense for the defendant apart from its tendency to reduce or eliminate competition. *See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588-89 (1986) ("*Matsushita*"); *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 524 & n.3 (5th Cir. 1999); *Advanced Health-Care Servs. v. Radford Cmty. Hosp.*, 910 F.2d 139, 148 (4th Cir. 1990); *General Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 803 (8th Cir. 1987). *See also* Senior Economic Counsel of the Department of Justice, Antitrust Division, Gregory J. Werden, *The "No Economic Sense" Test for Exclusionary Conduct*, ___ Antitrust L.J. ___ (forthcoming 2005) (attached at Addendum pp. A-55 to A-73).

McKenzie advanced two primary theories of anticompetitive conduct for its

---

[11]    The quoted material is currently found in III Areeda & Hovenkamp, ¶ 651c, at 79 (2d ed. 2002). For convenience, henceforth, we cite all volumes of the *Antitrust Law* treatise as "Areeda."

claim that the Regence PPP and Providence Preferred were unlawful attempts to monopolize under Section 2. First, McKenzie argued that these contracts were "exclusive deals" foreclosing McKenzie from commercially insured patients in the relevant market. Second, McKenzie argued that the contracts constituted "bundled discounting," proscribed by the Third Circuit in *LePage's*. While these claims are inextricably related — after all, the pricing allegedly induced the contracts — we address these arguments in turn.

### 1. Exclusive Dealing

#### a. The Section 1 Verdict Controls the Outcome under Section 2.

The jury found for PeaceHealth on McKenzie's Section 1 claims. The first question presented is whether that finding — i.e., that the exclusive contracts that were the focus of the Section 1 claims were not "unreasonable restraints of trade" — negates the possibility of finding that these self-same contracts were "predatory or anticompetitive" for purposes of PeaceHealth's "attempt" offense under Section 2. The answer is that, here, the Section 1 verdict controls.

In *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 335 (1961) ("*Tampa Electric*"), addressing a challenge to exclusive contracts, the Supreme Court said that it did not "need [to] discuss the respondents' further contention that the contract also violates § 1 and § 2 of the Sherman Act, for if it does not fall within the broader proscription of § 3 of the Clayton Act it follows that it is not

23

forbidden by those of the former." Following that decision, the Ninth Circuit

repeatedly has held that conduct that does not violate Section 1 cannot violate

Section 2. *See, e.g., Calculators Hawaii, Inc. v. Brandt, Inc.*, 724 F.2d 1332, 1339

(9th Cir. 1983) (refusal to deal that did not violate Section 1 also did not violate

Section 2 because Section 2 measures individual conduct "against the same

'reasonableness' standard governing concerted and contractual activity under

§ 1"); *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 543 (9th Cir.

1983) (holding that because conduct alleged in support of Section 1 tying claim

was not anticompetitive, it was of no assistance to plaintiff's Section 2 claims for

monopolization and attempted monopolization), *questioned on other grounds in*

*Chroma Lighting v. GTE Prods. Corp.*, 111 F.3d 653, 657-58 (9th Cir. 1997); *cf.*

*Williams v. I.B. Fischer Nevada*, 999 F.2d 445, 448 (9th Cir. 1993) ("As the no-

switching agreement [between franchisor and franchisee] is not anticompetitive

and thus does not establish a Section 1 claim, it cannot form the basis of a section 2

claim.").[12]

   That rule makes particularly good sense in an attempt to monopolize case

such as this one. The antitrust concern in an attempt case is that competitors may

be excluded from such a substantial share of the market that the result will be

---

[12]    *But see California Computer Prods., Inc. v. International Bus. Machs.
Corp.*, 613 F.2d 727, 737 (9th Cir. 1979) ("*Cal-Comp*") (suggesting that conduct
that does not violate Section 1 may nonetheless constitute an attempt to
monopolize under Section 2).

successful monopolization. Indeed, without a "dangerous probability" of that occurring, there can be no offense. *See Spectrum Sports*, 506 U.S. at 456. Here, the extent of the potential foreclosure necessarily was limited by the preferred provider contracts that were the alleged object of the predatory scheme, as well as the source of actual damages attributed to it. And, as described above, those contracts foreclosed at most 15% of the total available commercially insured patients in Lane County, leaving fully 85% unquestionably contestable. Thus, when the jury concluded that there was insufficient foreclosure to create an unreasonable restraint of trade under Section 1, it necessarily concluded that the conditions for an attempt to monopolize under Section 2 were not met.

The same is not necessarily true of a claim of monopoly maintenance — a claim brought *unsuccessfully* by McKenzie here. Where exclusive contracts are employed by a monopolist, some courts have held that different standards under Sections 1 and 2 may be applicable and that a successful defense of the former does not control the latter.[13] However, in the attempt context where the extent of

---

[13]    *See, e.g., LePage's*, 324 F.3d at 157 n.10 ("The jury's finding against LePage's on its exclusive dealing claim under § 1 of the Sherman Act . . . does not preclude the application of evidence of 3M's exclusive dealing to support LePage's § 2 claim."); *United States v. Microsoft Corp.*, 253 F.3d 34, 70 (D.C. Cir. 2001) ("*Microsoft*") (concluding that Microsoft's exclusive distribution arrangements for its Internet Explorer browser violated Section 2, "even though the contracts foreclose[d] less than the roughly 40% or 50% share usually required in order to establish a § 1 violation"); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 197 (3d Cir. 2005) ("*Dentsply*") (finding of no liability under Clayton Act Section 3 did

potential and actual foreclosure is known, such an outcome is unacceptable lest it result in competitors — even large ones that have not monopolized the market — being deterred from entering into exclusive contracts. This is because exclusives have such important procompetitive benefits that they are generally viewed as attributes of an efficient marketplace serving buyer, seller, and consumer interests. Indeed, that is the precise concern here: preferred provider plans as a form of cost control will have to be jettisoned by PeaceHealth even though their successful negotiation does not support a monopolization charge.

Thus, *Tampa Electric* and Ninth Circuit precedent — plus common sense — dictate that under the circumstances presented here, conduct underlying an attempt offense should not be judged differently under Sections 1 and 2. For this reason alone, exclusive dealing cannot, as a matter of law, support the attempted monopolization verdict, and the judgment must be reversed.[14]

---

not preclude finding of liability on Sherman Act Section 2 exclusive dealing claim) (citing *LePage's*, 324 F.3d at 157 n.10).

[14]    Reversal follows, of course, because the only damages claimed by McKenzie were based on its exclusion from the Regence PPP and Providence Preferred. And, as discussed *infra* Part VII.A.2, PeaceHealth's bundled discounts were merely an inducement for the contracts. They have no distinct anticompetitive effect, nor separate damages. Other types of conduct alleged to be anticompetitive, *see infra* Part VII.A.3, similarly are not the bases for McKenzie's damages. Thus, if PeaceHealth's "exclusive contracts" are not unlawful, then there are no damages, and *regardless of what the court does with respect to the other kinds of anticompetitive conduct alleged*, reversal is required. *See generally William Inglis & Sons Baking Co. v. Continental Baking Co.*, 942 F.2d 1332, 1340-41, 1345 (9th Cir. 1991) (reversing, under federal standards, denial of JNOV on

### b.     No "Substantial Foreclosure"

Even if this Court determines that it is permissible to judge PeaceHealth's exclusive contracts under a different "Section 2" standard, there must still be evidence of substantial foreclosure sufficient to qualify as anticompetitive conduct under *Spectrum Sports*. Antitrust's main objection to exclusive dealing is "its tendency to 'foreclose' existing competitors or new entrants from competition in the covered portion of the relevant market during the term of the agreement." *Gilbarco*, 127 F.3d at 1162. Absent proof that the foreclosure from such contracts is substantial and durable, the conduct is not only not actionable, but is considered procompetitive. *See Tampa Elec.*, 365 U.S. at 327; *Western Parcel*, 190 F.3d at 976; *Gilbarco*, 127 F.3d at 1162-65; *Barry Wright*, 724 F.2d at 236-238 (Breyer, J.).

### i.     Quantitative Foreclosure

No court has ever held that a would-be monopolist may be liable if it engages in any exclusive deal, however insignificant. Thus, the foreclosure analysis must still be the touchstone of the exclusive dealing inquiry in an attempted monopolization case. And, in this regard, McKenzie failed to prove the requisite substantial market foreclosure to support a Section 2 verdict.

It is generally recognized that foreclosure of less than 20% of a market is not

---

state unfair practices claim to the extent damages unsupported), *vacated in part on other grounds*, 981 F.2d 1023 (9th Cir. 1992).

anticompetitive under the antitrust laws. *See generally* XI *Areeda* ¶ 1821c at 176 ("foreclosure percentages of less than 30% would seem to be harmless to competition"). Indeed, the lowest foreclosure that this Court has found to trigger antitrust liability since the Supreme Court's 1961 decision in *Tampa Electric* is 24%. *See Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*, 676 F.2d 1291 (9th Cir. 1982) (holding that exclusive dealing contracts violated Sections 1 and 2 of the Sherman Act). Moreover, this Circuit has validated much larger foreclosures. *See, e.g., Gilbarco,* 127 F.3d at 1160, 1162-63, 1167 n.13 (holding that exclusive distribution contracts covering 38% of the market did not violate Sections 1 and 2).

PeaceHealth's preferred provider contracts "foreclosed" McKenzie from only 15% of the insureds in the relevant market. ER.227-28 (8BRT27:05-28:05); ER.306-08 (11BRT25:15-27:08). *See* discussion *supra* Part IV.B.3. In other words, 85% of the commercially insured market remained unambiguously "up for grabs." Assuming it was an equally efficient competitor, there is no reason McKenzie could not have replaced the insureds foreclosed by PeaceHealth with other insureds, and McKenzie proffered none at trial. Thus, as a matter of law, the 15% foreclosure is insufficient to create liability. *See Gilbarco*, 127 F.3d at 1162-63; *Barr Labs., Inc. v. Abbott Labs.*, 978 F.2d 98, 110, 111 (3rd Cir. 1992) (no violation of Section 1 or 2 caused by 15% foreclosure); *Satellite Television &*

28

*Associated Resources, Inc. v. Continental Cablevision*, 714 F.2d 351, 357-58 (4th Cir. 1983) (8% foreclosure for 14 months violates neither Section 1 nor 2), *cert. denied* 465 U.S. 1027 (1984).[15]

That hospital margins may be small — as McKenzie's expert, Dr. Whitelaw, testified, *see* ER.229-30 (8BRT33:11-34:07) — does not render the maximum 15% foreclosure here "substantial" under Section 2. Indeed, it is tautological to say that small margins mean that any revenue loss will have an impact. Standing alone, such testimony scarcely informs whether the loss is a consequence of anticompetitive acts, rather than exactly the kind of behavior the antitrust laws are designed to encourage. For that, a meaningful foreclosure showing would have to have been made, including substantial proofs that the minimal 15% foreclosure drove McKenzie below efficient scale and that McKenzie was an equally efficient competitor in the first place. *See* note 20 *infra*. The absence of such proof reflects its improbability given the exclusive dealing precedents since *Tampa Electric*.

---

[15]    Even the 15% figure overstates the exclusionary effect of the contracts. It is undisputed that, patients — who are the ultimate consumers of healthcare — remained free to seek treatment at either hospital, albeit at higher personal expense if they chose McKenzie. ER.91 (Agr. Facts ¶ 65). It is similarly undisputed that, in addition to their preferred provider products, both Regence and Providence offered several other insurance products in the relevant market, in which McKenzie participated. *See, e.g.*, ER.92 (Agr. Facts ¶¶ 71-72); ER.130-32,134,139-40 (3BRT19:13-21:12,28:09-15,65:10-66:20); ER.159-60,171 (5ART24:23-25:20,64:07-14). In short, McKenzie was not excluded from either patients or commercial insurance products other than the two preferred provider plans themselves, which, while popular with employers and consumers, covered only a small portion of the market.

29

Accordingly, Dr. Whitelaw's testimony in this respect does not constitute substantial evidence of anything — and certainly not evidence of substantial foreclosure.[16]

In fact, Dr. Whitelaw has got the economics of the industry exactly backward. In a small margin industry, economies of scale are particularly important to ensure provision of services. The implication of Dr. Whitelaw's test, if credited legally, would be that in a market with the kinds of characteristics presented here, preferred provider arrangements would be entirely *verboten* even though they offer lower transaction costs for all contracting parties and, ultimately, lower costs for the consumer.

### ii.    Qualitative Foreclosure

Numbers aside, the procompetitive benefits of the kinds of preferred provider contracts challenged by McKenzie necessarily outweigh any anticompetitive effects from 15% market foreclosure. Exclusive dealing is

---

[16]    *See Brooke Group*, 509 U.S. at 242 ("[e]xpert testimony is useful as a guide to interpreting market facts, but it is not a substitute for them"); *Matsushita*, 475 U.S. at 594 n.19 ("[E]xpert opinion evidence . . . has little probative value in comparison with the economic factors"); *American Booksellers Ass'n, Inc. v. Barnes & Noble, Inc.*, 135 F. Supp. 2d 1031, 1041 -1042 (N.D. Cal. 2001) (finding that model lacking "real-world evidence" could not support verdict that discounts caused injury); *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1055-1057 (8th Cir. 2000) (finding that expert opinion could not support jury verdict because it was speculative and failed to separate lawful from unlawful conduct); *SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 968-969 (10th Cir. 1994) ("*SCFC*") (reversing jury verdict after finding that expert testimony in support of plaintiff's claim was "tendentious and conclusory").

analyzed under the rule of reason under both Sections 1 and 2. *See* XI Areeda ¶ 1800c4 at 18 ("exclusive dealing has always been considered a rule of reason offense"), ¶ 1820b at 162-67. This means that the "inquiry must focus on the likelihood that the challenged restraint will result in reduced output and higher prices in some relevant market . . . *without compensating efficiency advantages.*" *Id.* ¶ 1820b at 166 (emphasis added); *see Microsoft*, 253 F.3d at 59 (holding that Section 2 cases always involve a rule of reason inquiry). While the rule of reason inquiry can be fact intensive, where only one conclusion is economically sensible, the inquiry can be resolved as a matter of law. *See, e.g., F.T.C. v. Indiana Federation of Dentists*, 476 U.S. 447, 459, 465-466 (1986) (reversing Court of Appeals' judgment after applying rule of reason as matter of law); *SCFC*, 36 F.3d at 972 (reversing jury verdict after applying rule of reason as a matter of law).

Properly analyzed, the contracts at issue here are simply a species of volume discounts: PeaceHealth offered lower prices to Regence and Providence in exchange for the assurance of higher patient volume through preferred provider plans designed and requested *by large and sophisticated insurers.*[17] Preferred

---

[17]    It would be economically irrational for the insurers to request a bundle from PeaceHealth that ultimately would destroy McKenzie, with the predictable result that the insurers would face a monopoly provider in all product lines in the future. *See, e.g., Menasha Corp. v. News America Marketing In-Store, Inc.*, 354 F.3d 661, 663 (7th Cir. 2004) (Easterbrook, J.) ("Why would these entities shoot themselves in the feet by signing (retailers) or favoring (manufacturers) exclusive contracts that entrench [the defendant] as a monopolist that then can apply the squeeze?");

31

provider plans are efficiency-enhancing on their face — lower prices in exchange

for higher volume — and make perfect business sense apart from their tendency to

exclude competitors. For that reason alone, they should not be condemned as

anticompetitive. To conclude otherwise places courts squarely in the domain of

regulating medical costs, "'an area of great complexity where more than solely

economic values are at stake.'" *Ocean State Physicians Health Plan, Inc. v. Blue*

*Cross & Blue Shield*, 883 F.2d 1101, 1111 (1st Cir. 1989) (quoting *Kartell v. Blue*

*Shield*, 749 F.2d 922, 931 (1st Cir. 1984), *cert. denied*, 471 U.S. 1029 (1985)). *See*

*generally* Frank H. Easterbrook, *When Is It Worthwhile to Use Courts to Search*

*for Exclusionary Conduct?*, 2003 Colum. Bus. L. Rev. 345 (2003). Given that

what is really going on is that insurers — who for antitrust purposes, are the

surrogate consumers of hospitals' services — are bargaining for the best, i.e., the

lowest, prices they can get, the resulting contracts should not be undone by the

---

*Advo, Inc. v. Philadelphia Newspapers, Inc.*, 51 F.3d 1191, 1204 (3d Cir. 1995)
(plaintiffs' predation theory was implausible because it assumed that major
retailers would enter into agreements that would eliminate competition and permit
the defendant "to sock it to them down the road"); Daniel A. Crane, *Multiproduct
Discounting: A Myth of Nonprice Predation*, 72 U. Chi. L. Rev 27, 44 (Winter
2005) ("Crane") (although customers "generally like price discounting," they
"prefer not to pay lower short-run prices if this will drive some firm out of the
market and permit the remaining firm to institute long-run monopolistic prices").
If that were the anticipated outcome, then the economically rational course would
have been for the insurers simply to put out to bid only their non-exclusive
preferred plans. *Accord* ER.168,172-73 (5ART48:07-18,70:25-71:12) (Regence
prefers a two-hospital community because competition leads to lower rates; thus,
Regence has no motive or incentive to do anything that would harm McKenzie
competitively).

32

Sherman Act, absent some particularly compelling showing of foreclosure. *See* ER.769 (Regence's Mem. in Supp. of Mot'n to Intervene at 6); ER.773 (Regence's Opp'n to Prop. Perm. Inj. at 2).

The FTC staff has argued that limited provider panel plans benefit consumers because they reduce costs and expand *consumers'* choices in the provision of health care services. *See* FTC Staff Letter to the Attorney General of Montana Regarding "Any-Willing-Provider" Laws, at 2 (Feb. 4, 1993) ("FTC Staff Ltr."), *reprinted in* John J. Miles, *Health Care & Antitrust Law: Principles and Practice*, at App. D36 (2003) (attached at Addendum pp. A-19 to A-25). As explained by FTC staff, hospitals, which compete for the business of patients, are likely to perceive a number of advantages to limited or exclusive panel arrangements:  the ability to save money by spreading fixed costs over a larger volume of sales; facilitation of business planning; reduction of transaction costs by reducing the number of third-party insurers with whom the hospital deals; and reduction in marketing costs. *See id.* at 5.  Meanwhile, third-party insurers benefit from competition among health care providers for these contracts.  Advantages to payors include lower costs for services; reduced administrative costs by reducing the number of providers with whom the payor deals; lower transaction costs associated with claims audits and utilization review; and increased competitiveness *vis-à-vis* other payors. *See id.*  Last, but most important of all, consumers, in turn,

benefit from lower premiums and lower deductibles. *See id.* at 5-6. In commenting on Montana's "any willing provider" law, which required preferred provider organizations "to enter a contract with any provider willing to meet the terms the [organization] sets," *id.* at 1, FTC staff concluded that the law could "discourage competition among providers, in turn raising prices to consumers and unnecessarily restricting consumer choice in pre-paid health care programs, without providing any substantial public benefit." *Id.* at 7.

Paralleling the views of the FTC, the largest health care insurance companies in the relevant market strongly affirmed the procompetitive effects of preferred provider plans induced by bundled discounting. Indeed, Regence, Providence, and PacificSource actually intervened in post-trial injunctive relief proceedings in order to *object* to (among other things) McKenzie's request for an injunction "[p]rohibiting [PeaceHealth] from bundling price discounts." ER.751 (McKenzie's Mem. in Supp. of Mot'n for Permanent Injunctive Relief at 2); *see also* ER.770-71 (Mar. 15, 2004 Minute Order Granting Mot'n to Intervene by the Regence Group).

Regence emphasized that it offered PeaceHealth preferred status so that it could obtain lower prices for hospital services, which it then passes on to consumers. ER.780 (Regence's Reply in Opp'n to Motion for Permanent Injunction at 7). Indeed, Regence explained that many consumers

> seek lower cost health care coverage and are willing to sacrifice some choice as to which provider or hospital they can use. Regence is able to charge lower premiums for its limited choice products because the healthcare providers (including hospitals) who are on the "preferred panels" are willing to give greater discounts to Regence because they anticipate that the preferred plan will steer patients to them.

*Id.* Rather than fostering competition, in Regence's view, a prohibition on volume-driven bundled discounts and resulting contracts would harm the public by increasing the cost (and, thus, price) of health care insurance in Lane County. ER.773 (Regence's Opp'n to Proposed Permanent Injunction at 2).

Providence and PacificSource concurred, arguing that the prohibition on bundling sought by McKenzie was an attempt to *restrict competition* "as between hospitals and purchasers of hospital services, under the guise of promoting competition between the hospitals themselves." ER.775 (Providence Mem. Opposing Terms of Proposed Permanent Injunction at 2); *see also* ER.777-78 (PacificSource's Mem. in Supp. of Opp'n to Certain Provisions in McKenzie-Willamette's Proposed Injunction at 2-3). Indeed, PacificSource, whose pricing practices were not at issue, explained that the cost of hospital services to *patients* would rise if it were no longer able to offer patient volume to PeaceHealth in exchange for price discounts:

> Since PeaceHealth offers certain tertiary services that McKenzie-Willamette does not, PeaceHealth would continuously be vulnerable to [attacks] by McKenzie-Willamette. Thus, the proposed prohibition would have a considerable chilling effect regarding any agreements that PeaceHealth could make with PacificSource. While this might

35

benefit McKenzie-Willamette, it would not benefit PacificSource's policyholders, or the marketplace in general.

ER.784 (PacificSource's Reply to McKenzie-Willamette's Response to Intervenors' Memoranda at 2).[18]

### c.   Limited Duration

PeaceHealth's Regence PPP contracts were generally one-year contracts, which automatically renewed annually. They were terminable by either PeaceHealth or Regence without cause upon 90 days written notice prior to the contract renewal date. ER.419 (DX527 at 13); ER.183-84 (6ART27:25-28:18). Similarly, by the year 2000 (the first year of the damages period), PeaceHealth's Providence contracts were one-year contracts, terminable without cause upon 60-days written notice by either side. ER.93 (Agr. Facts ¶ 80); ER.592 (DX532 at 8); ER.146 (3BRT74:06-13). Short-term exclusive contracts are almost uniformly recognized as lawful for want of the capacity to foreclose absent special circumstances not present here. *See, e.g., Gilbarco,* 127 F.3d at 1163-64 (agreement with one-year term not unlawful); *Thompson Everett, Inc. v. National Cable Advert., L.P.,* 57 F.3d 1317, 1326 (4th Cir. 1995) (exclusive contracts "of

---

[18]   These memoranda by interested insurers essentially summarized the undisputed evidence Regence and Providence employees offered at trial. *See* ER.158,161-62,165-67,169-70 (5ART19:10-15,26:14-27:25,38:25-39:05,61:02-62:16) (the PPP has enabled Regence to offer lower premiums to employers and consumers); ER.609-11 (DX546 at 4-6); ER.141-45,147-48 (3BRT69:05-73:20,77:24-78:06) (providers are willing to give a discount for patient steering under the PPO, because additional volume reduces their per unit cost of service).

short duration, usually terminable after a year" not unlawful).  This is because at

each annual contract "opening," the competition can make a new offer.  This is

"competition-for-the-contract" which is "a form of competition that antitrust laws

protect rather than proscribe, and it is common." *Paddock Publ'ns, Inc. v. Chicago*

*Tribune Co.*, 103 F.3d 42, 45 (7th Cir. 1996).  *Compare Dentsply*, 399 F.3d at 193

(treating "at-will" serial sales like written exclusive contracts because their

"economic elements" render them similarly effective).

*    *    *

In sum, the evidence in the record is insubstantial as a matter of law to

establish that the preferred provider agreements between Regence and Providence,

on the one hand, and PeaceHealth on the other, constitute exclusive dealing of the

kind that might violate Section 2.  The agreements are relatively porous,

short-term, do not substantially foreclose McKenzie from the commercially

insured patient population, and most importantly, allow consumers to pay the

lowest prices possible for medical care from Sacred Heart.

### 2.    Bundled Discounting

The second of McKenzie's theories of anticompetitive conduct was cast in

the now popular language of "bundled discounting."  Until recently, bundled

discounting, while widespread as a business practice, had received relatively little

37

judicial and scholarly scrutiny.[19] The simplest form of a bundled discount is the

"package discount," in which a seller sells multiple goods together for a lower

price than it charges for the goods purchased separately.  As noted by the United

States in its brief in *LePage's*, only two reported cases in the last 30 years

previously focused on such practices, doubtless because discounts are generally

desirable for consumers.  *See SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056

(3d Cir. 1978) ("*SmithKline*") and *Ortho Diagnostic Systems, Inc. v. Abbott*

*Laboratories*, Inc., 920 F. Supp. 455 (S.D.N.Y. 1996) ("*Ortho*").  *See also* Brief

for the United States as Amicus Curiae, *3M Co. v. LePage's Inc.*, 2004 WL

1205191 (U.S. May 28, 2004) (No. 02-1865) ("U.S. Brief"), at *12 n.9 (attached at

Addendum pp. A-6 to A-18).  Those cases do not treat bundled discounts as

anticompetitive in and of themselves.  Rather, they suggested that bundled

discounting might be a mechanism or technique used to achieve an exclusionary

effect, i.e., to exclude an equally efficient competitor from access to consumers.[20]

---

[19]    *See generally* Former Chairman of the Federal Trade Commission, now
Professor Timothy J. Muris, *Antitrust Law: Economics and Bundled Discounts*,
submitted on behalf of the United States Telecom Association in response to the
Antitrust Modernization Commission's Request for Public Comments (July 15,
2005) at 2-5 (attached at Addendum pp. A-26 to A-54) ("Muris"); Crane, *supra*, at
28-29.

[20]    Exclusion of less efficient competitors is of no concern.  *See Barry Wright*,
724 F.2d 227, 232 (1st Cir. 1983) (a price is not predatory if it does not have "a
tendency to exclude or eliminate equally efficient competitors"); *Ortho*, 920 F.
Supp. at 469 ("only price cutting that threatens equally or more efficient firms is
condemned under Section 2"); Muris, *supra*, at 11 (a rule protecting higher cost

Accordingly, bundled discounts can have no antitrust significance unless they foreclose competition from a meaningful portion of the market.

### a.    Insubstantial Foreclosure in the Relevant Market

If this Court agrees that the Regence PPP and Providence Preferred cannot be condemned as exclusive deals, because, among other things, they do not substantially foreclose McKenzie from the commercially insured patient population, then they also cannot be condemned as bundled discounting, regardless of what standard is used to evaluate the bundles. That is because, where, as here, the proposed bundled discount is offered to induce an *express* exclusive deal of quantifiable dimension ex ante — i.e., the Regence PPP and Providence Preferred *contracts* — and the deals are actually consummated, there can be no concern regarding the anticompetitive effects of bundled pricing *greater than the anticompetitive effects of the exclusive deals themselves*. As discussed previously, the "exclusives" resulted in no more than 15% "foreclosure," and that quantum of foreclosure is insufficient to harm competition as a matter of law. *See* Part VII.A.1.b, *supra*.

Here, the bundled discounts are simply alleged to be a means to a known

---

competitors is "unjustifiabl[e]"); U.S. Brief at 11 n.8 ("the societal benefits of preserving higher-cost — less efficient — competitors are questionable"). The key to the equally efficient competitor inquiry is "not necessarily whether a *particular* plaintiff was equally efficient, but whether the challenged bundling practices would have excluded a[] [hypothetical] equally efficient rival, without reasonable justification." III Areeda ¶ 749 at 247 (2005 Supp.) (emphasis added).

end. If the end, itself, is wholly lawful, there can be nothing untoward about the device. In *LePage's, SmithKline,* and *Ortho,* the discounts offered by the defendants were available on ostensibly limitless purchases of the defendants' products.[21] Although they, too, were a means to exclusivity, there was no upper bound on the quantity of sales that might be or indeed were foreclosed to competitors — so long as buyers continued to demand ever increasing volumes of defendants' products, those products would be supplied by defendants with potentially harmful effects on competition (assuming the competitors were equally efficient). The same is not true of PeaceHealth's bundled discounts. There was an upper bound on the number of patient lives covered by the discounts (and, therefore, "foreclosed" to McKenzie), as reflected in the exclusive contracts embodying those discounts. In short, PeaceHealth's Regence PPP and Providence Preferred contracts, ex ante as well as ex post, limit the anticompetitive potential of its bundled discounts, and therefore, require rejection of any Section 2 claim based thereon.

Nonetheless, we turn now to an analysis of the *LePage's*-based standard that shaped the jury instruction below and enabled the alleged bundles in this case (discounts on primary and secondary ACHS plus tertiary ACHS) to be considered

---

[21]    For this reason, among others, these cases are all factually distinguishable from this one. This alone suggests that the trial court's adoption of a *LePage's*-based rule (discussed *infra* Part VII.A.2.b) was in error.

an independent predatory or anticompetitive act, apart from the exclusive contracts that were their result. We then close our discussion of bundling by addressing the antitrust concerns such pricing practices have sometimes been said to raise, as well as two cost-based tests — either of which, if adopted here, would result in judgment as a matter of law for PeaceHealth, or at the least, remand for a new trial under fundamentally different jury instructions.

### b.      The Trial Court's *LePage's*-Based Test

McKenzie successfully argued to the district court that the standard for bundled discounting in the Ninth Circuit should be derived from the Third Circuit's *en banc* opinion in *LePage's*. Specifically, the court instructed the jury that

> [b]undled pricing occurs when price discounts are offered for purchasing an entire line of services exclusively from one supplier. Bundled price discounts may be anti-competitive if they are offered by a monopolist and substantially foreclose portions of the market to a competitor who does not provide an equally diverse group of services and who *therefore* cannot make a comparable offer.

ER.654 (Jury Instr. at 33) (emphasis added); ER.333-34 (14RT38:22-39:04) (emphasis added). Indeed, the jury instruction in this case was an almost verbatim reproduction of the Third Circuit's statement of what, in its view, is the vice of bundled discounting — a statement which the trial court apparently read as the controlling legal standard in bundled pricing cases. *Compare LePage's*, 324 F.3d at 155, *with* ER.654 (Jury Instr. at 33) *and* ER.333-34 (14RT38:22-39:04).

41

*LePage's* focuses on the extent to which the discounter bundles products not sold by rivals, and condemns such bundles as exclusionary conduct *without consideration of price-cost relationships*.  The trial court in *LePage's* did not require LePage's to prove that it could not meet 3M's aggregated discounts without pricing below-cost, nor did the court require LePage's to demonstrate that it produced the competitive product as efficiently as 3M.  *LePage's*, 324 F.3d at 175, 177 (dissent).  Instead, the trial court upheld condemnation of 3M's discount bundle simply because it made it more difficult for LePage's to compete, given its more limited product range.  *Id.* at 159-63.[22]

---

[22]    This reading — which focuses on the inexorability of the single product plaintiff's inability to compete ("and who *therefore* cannot make a comparable offer") — is how commentators, as well as counsel for McKenzie, have understood *LePage's*.  *See, e.g.*, Muris, *supra*, at 10; Crane, *supra*, at 28; ER.245 (9ART28:03-09).

Moreover, the history of this case makes clear that the jury was permitted to find illegality based on nothing more than the existence of across-the-board discounts.  Bundled pricing did not appear as a claim or theory of liability in the case until the Third Circuit rendered its *en banc* opinion in *LePage's* — an event that occurred just as this case was being briefed on summary judgment.  As a result, there was no evidence offered by any expert regarding the consequence of PeaceHealth's supposed package price offer.  McKenzie's counsel nonetheless successfully argued to the court that the absence of such evidence was of no moment since, he said, "the rule on bundling does not require an expert's opinion, because I believe it to be under LePage [sic] a rule of law that need not be supported by facts *other than the facts that indeed they were providing across-the-board discounts*."  ER.182 (6ART10:12-16) (emphasis added).  That argument, of course, then became the applicable rule of law in the case when the court thereafter instructed the jury that, assuming foreclosure, it could return a verdict for the plaintiff simply because it "did not provide an equally diverse group of services" and "therefore could not make a comparable offer."

But, *LePage's* was improperly decided and should be afforded no precedential value because it offers no coherent price-cost analysis suggesting that the discounts effectively compelled exclusivity. The Solicitor General stated as much in its brief to the Supreme Court on 3M's certiorari petition, explaining that *LePage's* "provided few useful landmarks on how Section 2 should apply as a general matter in future cases involving bundled rebates." U.S. Brief, 2004 WL 1205191, at *16.[23] This is also the view of antitrust scholars who have sought to divine from *LePage's* a rule that would relate meaningfully to the price-cost relationships necessary for assessing exclusionary behavior.[24] Indeed, a district court in the Sixth Circuit has expressly declined to follow *LePage's* as improperly decided. *See J.B.D.L. Corp. v. Wyeth-Ayerst Labs., Inc.*, 2005 WL 1396940, at *15 (S.D. Ohio 2005) (granting summary judgment for defendant on bundled pricing claim and declining to follow *LePage's*).

---

[23]    The Government went on to state, "[T]he court of appeals' failure to identify the specific factors that made 3M's bundled discount anticompetitive may lead to challenges to procompetitive programs and prospectively chill the adoption of such programs." U.S. Brief, 2004 WL 1205191, at *18.

[24]    *See, e.g.*, Muris, *supra*, at 9 ("[T]he Third Circuit failed to articulate clearly what aspects of 3M's bundled rebates constituted exclusionary conduct."); Daniel L. Rubinfeld, *3M's Bundled Rebates: An Economic Perspective*, 72 U. Chi. L. Rev. 243, 264 (Winter 2005) (the *LePage's* decision "lacks a clear, coherent economic rationale and leaves unclear when package pricing . . . will or should be condemned under the antitrust laws"); Crane, *supra*, at 43 ("The *LePage's* decision regrettably condemns as anticompetitive above-cost discounting without offering any clear guidance on when mixed bundling will be deemed illegal.").

The standard adopted by the district court here suffers from the same problems as the *LePage's* decision from whence it comes. It allows a jury to draw the line between protected and unprotected discount programs without consideration of costs and competitive efficiencies. It draws from the *structure* of the market — a larger competitor with more products and a smaller competitor with fewer products — the conclusion ("therefore") that the smaller competitor cannot compete, but offers no meaningful guidance for giving the "therefore" economic content. The critical bundling instruction allows a jury to condemn price-cutting even when (a) it produces savings for consumers; and (b) an equally efficient firm *could* match the discount without selling at a loss. In other words, the jury instruction allows the very "false positives" antitrust rules are meant to guard against. *See, e.g., Barry Wright*, 724 F.2d at 235-36. Lacking a bright-line test for determining whether a proposed bundle will be deemed anticompetitive, insurers and health care providers are chilled from aggressive competition.

If this Court agrees that the standard for evaluating bundled discounting in the Ninth Circuit is something other than the *LePage's*-based instruction given here, then minimally, the lower court's statement of the law was erroneous, and this Court must reverse and remand for a new trial.[25]

---

[25]     Jury instruction errors in civil cases require reversal unless the error is more probably than not harmless. *See Swinton v. Potomac Corp.*, 270 F.3d 794, 805 (9th Cir. 2001), *cert. denied*, 535 U.S. 1018 (Apr. 22, 2002) ("*Swinton*"). Here the

Alternatively, even if this Court accepts the *LePage's* instruction as an appropriate statement of the law for a Section 2 monopoly maintenance claim (which was the claim at issue in *LePage's* itself), the instruction nonetheless was legally erroneous for the attempted monopolization claim from which PeaceHealth appeals, and there is insubstantial evidence to support the verdict against PeaceHealth under that instruction. For both those reasons, reversal is required.

As explained above, the district court initially instructed the jury on the bundled pricing theory in the context of McKenzie's monopolization claim: "Bundled price discounts may be anti-competitive if they are offered by a monopolist and substantially foreclose portions of the market to a [single product] competitor. . . ." ER.654 (Jury Instr. at 33); ER.333-34 (14RT38:24-39:04). The court then simply adopted the identical instruction for the attempted monopolization count: "[T]he governing concepts regarding . . . bundling also

---

error was necessarily material both since it failed to enumerate the specific price-cost proof that should have been required, and because the court itself focused the jury only on the relative breadths of PeaceHealth's and McKenzie's service offerings. *See MCI Communications Corp. v. AT&T Co.*, 708 F.2d 1081, 1111 (7th Cir. 1983) (trial court's failure to instruct on proper cost measure in a predatory pricing case was error). Additionally, since the Regence PPP and Providence Preferred were the exclusive predicates for the plaintiff's damages, the court's jury instruction error cannot have been harmless. *See Swinton*, 270 F.3d at 802 ("In evaluating jury instructions, prejudicial error results when, looking to the instructions as a whole, the substance of the applicable law was (not) fairly and correctly covered.") (internal citation and quotation marks omitted). Thus, the instructional error requires reversal. (The remedy is remand for a new trial. *See Caballero v. City of Concord*, 956 F.2d 204, 207 (9th Cir. 1992).)

apply to a finding of exclusive or restrictive conduct for purposes of an attempt to monopolize claim." ER.656 (Jury Instr. at 35); ER.335 (14RT40:15-18). But, in the attempt context, where the defendant has been exonerated of "monopolization," as PeaceHealth was here, the instruction requires a finding that is logically impossible. That is because a precondition to holding for McKenzie on the attempted monopolization claim was a finding that PeaceHealth was a "monopolist" of the market for primary and secondary ACHS — *i.e.*, that the objective of the attempt offense had already been accomplished. This error requires reversal and remand for a new trial.

In all events, of course, and as explained above, there was no substantial evidence to support a finding of "substantial foreclosure," which is unquestionably an element of the challenged instruction. *See* discussion *supra* Part IV.B.3 (the bundled discounts affected, at most, 15% of commercially insured lives in the relevant market). PeaceHealth therefore is entitled to judgment as a matter of law on the attempted monopolization claim.

### c.    Alternative Standards

If a *LePage's*-based instruction was error, what might the district court have instructed as the basis for a jury finding here that the bundled discounts were illegal assuming substantial foreclosure? The answer is that the issue could not have gone to the jury at all under a "proper" bundling instruction.

46

The courts that have considered the legality of bundled discounts have recognized that where a defendant offers bundles in which each product in the bundle is sold above its cost, the total discount on the bundle can be so high that an equally efficient competitor selling only one of the bundled products cannot lower its price for that product enough to meet the aggregate reduction and still sell at a profitable (i.e., above-cost) level. *See* U.S. Brief, 2004 WL 1205191, at *12-13; *see also SmithKline*, 427 F. Supp. at 1108; *Ortho*, 920 F. Supp. at 467; *LePage's*, 324 F.3d 155-157. That possibility has prompted a wide-ranging academic search for a test defining when bundled discounts might be condemned under Section 2 standards. Of the many tests that have been suggested in the academic literature on bundling in the wake of *LePage's*,[26] there are only two that require the kind of price-cost analysis mandated by the Supreme Court's jurisprudence over the past two decades. Analysis of them demonstrates why — apart from the plaintiff's failure to show substantial foreclosure — the bundling claim cannot be sustained on appeal.

The first approach derives from *Brooke Group* and examines whether the products in the bundle, when considered in the aggregate, are priced above-cost. Although this test was developed in the context of single product discounting, its proponents argue that it is appropriate to extend it to the multi-product context,

---

[26]    *See, e.g.*, Thomas A. Lambert, *Evaluating Bundled Discounts*, 89 Minn. Law Rev. 1688, 1703 (June 2005) ("Lambert"); Crane, *supra*, at 43.

"because any attempt to condemn some above-cost bundled discounts . . . would involve a measure of uncertainty that would discourage proconsumer, nonexclusionary discounts." Lambert, *supra*, at 1703. The second test, based on *Ortho*, is a full-attribution price-cost test, in which the entire discount is attributed to the competitive product alone. If the discounted price of the product still meets or exceeds the defendant's cost of producing that product, then an equally efficient competitor obviously could match it, and no further antitrust inquiry need be made. If the fully attributed price is below-cost, then the plaintiff must demonstrate that it is at least as efficient a producer of the competitive product as the defendant.

### i.    Test 1 — Modified *Brooke Group* Test

Recent scholarship has suggested that bundled discounts should be illegal only where a bundle is priced below the aggregate cost of the products comprising the bundle. *See, e.g.*, Muris, *supra*, at 21-27; Crane, *supra*, at 29. *See also* X Areeda ¶ 1758f at 334 (bundled discounts are procompetitive "so long as the package price exceeds the total relevant cost of the package"); III Areeda ¶ 749. This test draws, of course, from the Supreme Court's familiar pronouncements in *Brooke Group*. In *Brooke Group* — to say nothing of *Matsushita, Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104 (1986), and *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328 (1990) ("*ARCO*"), before it — the Court rejected the idea that above-cost price discounts can ever be illegal, stating unequivocally that

"a plaintiff seeking to establish competitive injury resulting from a rival's low prices must prove that the prices complained of are below an appropriate measure of its rival's costs."  509 U.S. at 222.

There are two closely-related reasons for *Brooke Group's* bright-line test: first, encouraging aggressive competition is the whole point of antitrust because it leads to expanded output, better prices and greater innovation.  That is no less true where one competitor enjoys a dominant market position or is, even, a monopolist.  *See, e.g., Trinko*, 540 U.S. at 407-08.  Since price is the primary engine of economic rivalry, punishing any firm for competing "too hard" is presumptively counterproductive absent proof that its prices make no economic sense other than as an act of predation — i.e., are below-cost.

That fact, in turn, leads to the second critical reason for *Brooke Group's* bright-line test:  clarity and administrability.  In *Barry Wright*, then-Judge Breyer acknowledged the possibility that a price not strictly below marginal or average variable cost, nonetheless, could be used as a mechanism of predation. 724 F.2d at 233-34.  However, he further observed that it is beyond the competence of courts to make that type of fine-tuned assessment.  That being so, he concluded that the risks of "false positives" (and the resultant chilling effect on procompetitive conduct) made such an imprecise standard unworkable.  The Supreme Court subsequently agreed.  After having noted in *Matsushita* that "cutting prices in order

49

to increase business often is the very essence of competition," 475 U.S. at 594, the Court held in *Brooke Group* that attempting to regulate above-cost prices was "beyond the practical ability of a judicial tribunal to control without courting intolerable risks of chilling legitimate price-cutting." 509 U.S. at 223. *See also Trinko*, 540 U.S. at 414 (quoting *Matsushita,* 475 U.S. at 594, and *Brooke Group*, 509 U.S. at 223).

The modified *Brooke Group* test unadorned by attribution (see discussion *infra* Part VII.A.2.c.ii) ensures at least generally that Section 2 is not employed to protect firms against their own inefficiency. Equally important, the test is both administrable (because it is bright-line and focused on the *defendant's* costs) and carries a low risk of false positives. *See Brooke Group*, 509 U.S. at 222-23; *Matsushita*, 475 U.S. at 594; *Trinko*, 540 U.S. at 414. Additionally, the test is consistent with the way businesses function — by comparing their *own* prices to their *own* costs without the conceptual reconfiguration necessitated by attribution.[27]

McKenzie's bundled discounting claim fails as a matter of law under the modified *Brooke Group* test, for the same reason its predatory pricing claim fails: to wit, there is not substantial evidence that PeaceHealth priced its services below

---

[27]    For these reasons, former FTC Chair Timothy Muris endorsed as "sound antitrust policy" application to bundled discounts of a modified *Brooke Group* test in his recent response to the Antitrust Modernization Commission's Request for Public Comments. *See* Muris, *supra*, at 21, 22, 25-26.

its costs.  *See* discussion *supra* Part IV.C.2.[28]

### ii.    Test 2 — Full Attribution Price-Cost Analysis

Some commentators argue that a straight application of *Brooke Group* in the

bundled discounting context leaves open the possibility that an equally efficient

competitor with fewer product offerings may be driven out of business by forcing

losses (pricing below marginal cost) that the competitor cannot afford.  Judge

Kaplan's full attribution price-cost test, set forth in *Ortho* and described *supra* Part

VII.A.2.c, addresses this concern.

This test is also facially objective and administrable, at least in the simple

case in which only two or three goods are bundled, inasmuch as it requires

consideration of the defendant's own price-cost ratios.  It is admittedly less so,

however, where multiple products in which a defendant has monopoly power are

bundled together with competitive products (a possibility some commentators

suggested existed in *LePage's*).  *See, e.g.*, Lambert, *supra*, at 1729-1730.

---

[28]    Since the undisputed evidence was that across all commercial contracts,
payors reimbursed PeaceHealth at a level above its average variable costs,
McKenzie's predatory pricing claim founders on *Brooke Group*.  *See* ER.95 (Agr.
Facts ¶ 98); *Brooke Group*, 509 U.S. at 222-23; *see also International Travel
Arrangers, Inc. v. NWA, Inc.*, 991 F.2d 1389 (8th Cir. 1993) (rejecting plaintiff's
argument that a predatory pricing claim can be based on isolating a segment of
sales and ignoring the defendant's overall pricing structure); *Morgan v. Ponder*,
892 F.2d 1355, 1362 (8th Cir. 1989) (noting that "[c]ourts have been wary of
plaintiffs' attempts to prove predatory pricing through evidence of a low price
charged for a single product out of many, or to a single customer"); *see also Pool
Water Products*, 258 F.3d at 1035-36; *Rebel Oil*, 51 F.3d at 1445.

51

The theoretical appeal of the full attribution price-cost test may be eclipsed by its practical drawbacks.  Among other problems, cost accounting is itself a difficult and arcane art,[29] and there is no easy way of determining whether a competitor is "equally efficient," as noted by the United States in its *LePage's* brief.  *See* U.S. Brief, 2004 WL 1205191, at *13 n.10.  Indeed, commentators have seriously questioned the ability of businesses, lawyers, and courts to apply the full attribution price-cost test in the real-world.  *See, e.g.,* Lambert, *supra*, at 1729 (the full attribution price-cost test "creates serious administrability difficulties"); Muris, *supra*, at 18-19 (endorsing a test based on *Brooke Group* because, *inter alia*, it is the most administrable of the proposed tests).

But this Court need not concern itself with whether Test 1 or Test 2 is preferable as a matter of antitrust policy, *because PeaceHealth wins under either one.*  There is no evidence on this record that even attributing the entire discount offered by PeaceHealth on its primary and secondary ACHS and tertiary ACHS to primary and secondary ACHS alone would have resulted in prices below PeaceHealth's costs for providing those services.  There also is no substantial evidence that McKenzie was an equally efficient provider of primary and

---

[29]    *See, e.g.,* Dennis W. Carlton, *A General Analysis of Exclusionary Conduct and Refusal to Deal — Why Aspen and Kodak are Misguided,* 68 Antitrust L.J. 659, 664 (2001) ("it is well known that calculating marginal costs from accounting data is difficult"); *see* Lambert, *supra,* at 1729 ("[a]scertaining costs is notoriously difficult, and proving another party's costs [] even more difficult").

secondary ACHS. Thus, whatever the Court thinks of the full attribution price-cost test, PeaceHealth is entitled to judgment as a matter of law.

### 3. Other Alleged Anticompetitive Conduct

Although exclusive dealing induced by bundled discounts was the only type of anticompetitive conduct from which McKenzie's damages were derived, *see supra* Part IV.D, McKenzie alleged two other types of anticompetitive conduct upon which the jury was instructed — to wit, physician arrangements and a restrictive real estate covenant. ER.655 (Jury Instr. at 34); ER.334-35 (14RT39:19-40:05). These "other" acts will not support the attempt claim, as they were competitive on their face, and, as McKenzie conceded, "merely provide[d] the context" for PeaceHealth's preferred provider contracts, ER.765 (Pl.'s Opp'n to JMOL at 46), which is to say for their jury appeal. Indeed, under the trial court's own summary judgment standard, they should have been withdrawn from jury consideration. *See supra* note 2. Nonetheless, we address them briefly.

### a. Physician Arrangements

PeaceHealth employs physicians in three practice groups in Lane County. ER.88 (Agr. Facts ¶ 30). The physicians at one of those practice groups — PeaceHealth Medical Group ("PHMG") — treat patients primarily at Sacred Heart. *Id.* As a standalone enterprise, PHMG has lost substantial amounts of money throughout its existence. ER.89 (Agr. Facts ¶ 43).

These "physician arrangements" did not meaningfully foreclose McKenzie

53

from access to physicians, or otherwise harm McKenzie. All told, PeaceHealth employs only approximately 20% of the physicians in Lane County. ER.88-89 (Agr. Facts ¶¶ 32, 39); ER.196-97 (7ART24:09-25:02); ER.236-237 (8BRT66:17-67:01). Additionally, PHMG physicians practiced primarily at Sacred Heart even prior to their affiliation with PeaceHealth. ER.88 (Agr. Facts ¶ 35); ER.200 (7ART28:18-25). Nonetheless, twenty-five PHMG physicians have privileges at McKenzie, which were reimbursed or paid for by PeaceHealth. ER.88 (Agr. Facts ¶¶ 36-37). Moreover, PeaceHealth physicians can refer patients anywhere, and, in fact, increased their admissions to McKenzie during 2000-2001. ER.190-92 (6BRT119:16-121:12); ER.309-11 (11BRT34:20-36:04). Thus, where McKenzie can offer comparable or better services, PHMG physicians may choose to refer their patients to McKenzie. Finally, 75-80% of all admissions at PeaceHealth are through independent physicians. ER.198-200 (7ART26:13-28:17); ER.240-41 (8BRT95:05-96:02).

Thus, even assuming that employment of physicians meant that a portion of the patient population were committed to PeaceHealth, McKenzie would still be able to compete for patients referred by the overwhelming 75-80% majority of independent physicians in the market. Exclusive physician networks composed of 20% or less of the physicians in the relevant market generally do not raise competitive concerns. *See* United States Dep't of Justice and Federal Trade

Comm'n, Statements of Antitrust Enforcement Policy in Health Care, 4 Trade Reg. Rep. (CCH) ¶ 13,153 (1996); *see also United States v. Women's Hosp. Found.*, 1996-2 Trade Cas. (CCH) ¶ 71,561 at 77,982 (M.D.La. Sept. 11, 1996) (consent decree allowing provider panel comprising up to 30% of physicians in region).

More importantly, PeaceHealth enjoyed the "cherished right" to select with whom it would do business. *Aspen*, 472 U.S. at 601. *See Indep. Entertainment Group, Inc. v. Nat'l Basketball Ass'n*, 853 F. Supp 333, 339-340 (C.D. Cal. 1994) ("a monopolist does not have to share its employees with a competitor even if it had done so in the past and even if its refusal to share harms plaintiffs' business"); *Ladd v. Hikes*, 639 P.2d 1307, 1310 (Or. App. 1982) (enforcing non-compete provision in physician's contract). In short, PeaceHealth's contracts with its physicians were not exclusionary.

### b.    Restrictive Covenants Re Hospital Siting

McKenzie also claimed that PeaceHealth acted anticompetitively by including a restrictive covenant in the deed to real estate it sold (the "Crescent" property). That covenant precludes the property from being developed as a hospital. The covenant was intended to preclude the siting of ambulatory surgery centers, which have been skimming the cream from hospitals' profitable services nationwide, in close proximity to Sacred Heart. ER.206-07 (7BRT39:17-40:08); ER.252 (9BRT75:04-24); ER.305-06 (11BRT24:06-25:14). The Crescent property

covenant expressly applied to "hospitals," because of the phenomenon of
ambulatory surgery centers seeking "mini-hospital" status from state regulators to
permit patients to stay overnight. ER.251-52 (9BRT74:16-75:24). However, there
was no evidence that the covenant has harmed McKenzie, since McKenzie never
planned to construct a hospital on the Crescent site anyway.[30]  ER.252-53
(9BRT75:25-76:02).  Nor is there evidence that this was the only or even the best
site for a hospital in this area.

*       *       *

In its post-trial briefing, McKenzie argued that although PeaceHealth "may
be able to justify its actions in isolation," even conduct that "appear[s] perfectly
lawful" can be found illegal when viewed in its "totality." ER.761,764 (Pl.'s
Opp'n to JMOL at 6, 15). However, where each act standing alone is neither
anticompetitive nor causes antitrust injury to McKenzie, "there can be no
synergistic result." *Cal-Comp,* 613 F.2d at 746. *See also City of Anaheim v.
Southern Cal. Edison,* 955 F.2d 1373, 1376 (9th Cir. 1992) ("[I]f all we are shown
is a number of perfectly legal acts, it becomes much more difficult to find overall
wrongdoing."); *Paladin Assocs. v. Montana Power Co.,* 328 F.3d 1145, 1151 (9th
Cir. 2003) (judgment for defendant on "an array of antitrust law challenges to what
we conclude are reasonable and unremarkable business practices"). Thus,

---

[30]     Tellingly, when McKenzie's CEO testified about potential relocation sites,
he made no mention of the Crescent property. ER.208-09 (7BRT45:24-46:16).

56

PeaceHealth's hiring of physicians and restrictive real estate covenant — which plainly do not constitute anticompetitive conduct standing alone — do not become "anticompetitive" when viewed in combination.

## VIII. CONCLUSION

For the reasons stated above, PeaceHealth requests this Court to reverse the judgment below and direct the entry of judgment for PeaceHealth or, in the alternative, to remand the case for a new trial.

DATED: September 26, 2005          Respectfully submitted,
                                   Heller Ehrman LLP


By _M. Laurence Popofsky (amd)_
   M. Laurence Popofsky
   Attorneys for Appellant PeaceHealth

## CERTIFICATE OF COMPLIANCE PURSUANT TO FED. R. APP. P. 32(a)(7)(C) FOR CASE NUMBER 05-35640

I certify that the attached opening brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), because it contains 13,789 words.

I further certify that the attached opening brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2000 in 14 point Times New Roman.

DATED this 26th day of September, 2005.

HELLER EHRMAN LLP

By _M. Laurence Popofsky (mp)_
M. Laurence Popofsky
Attorneys for Appellant PeaceHealth

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, PeaceHealth states that this appeal is related to the cross-appeal filed by Cascade Health Solutions fka McKenzie-Willamette Hospital on June 9, 2005 (the "Cross-Appeal"). The Cross-Appeal is related in that it arises out of the same case in the district court. The Cross-Appeal has been assigned Docket Number 05-35627.