Nicole M. Norris (SBN 222785)
WINSTON & STRAWN LLP
101 California Street, Suite 3900
San Francisco, CA 94111-5894
Telephone:    415-591-1000
Facsimile:    415-591-1400
Email: nnorris@winston.com

James F. Hurst (*Admitted Pro Hac Vice*)
David J. Doyle (*Admitted Pro Hac Vice*)
Samuel S. Park (*Admitted Pro Hac Vice*)
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL 60601-9703
Telephone:    312-558-5600
Facsimile:    312-558-5700
Email: jhurst@winston.com; ddoyle@winston.com; spark@winston.com

Charles B. Klein (*Admitted Pro Hac Vice*)
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, D.C. 20007
Telephone:    202-282-5000
Facsimile:    202-282-5100
Email: cklein@winston.com

Attorneys for Defendant
ABBOTT LABORATORIES

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| SMITHKLINE BEECHAM CORPORATION, d/b/a GLAXOSMITHKLINE,<br><br>Plaintiff,<br><br>vs.<br><br>ABBOTT LABORATORIES,<br><br>Defendant.<br><br>[caption continues next page] | **Case No. C 07-5702 CW**<br><br>*Related Per November 19, 2007 Order to Case No. C 04-1511 CW*<br><br>**ABBOTT LABORATORIES' REPLY BRIEF IN SUPPORT OF ITS OMNIBUS MOTION TO DISMISS PLAINTIFFS' SHERMAN ACT CLAIMS PURSUANT TO RULE 12(b)(6)**<br><br>Date:    March 6, 2008<br>Time:    2:00 p.m.<br>Courtroom: 2 (4th Floor)<br>Judge:    Hon. Claudia Wilken |

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

| | |
|---|---|
| SAFEWAY INC.; WALGREEN CO.; THE KROGER CO.; NEW ALBERTSON'S, INC.; AMERICAN SALES COMPANY, INC.; and HEB GROCERY COMPANY, LP,<br><br>　　　　Plaintiffs,<br><br>　vs.<br><br>ABBOTT LABORATORIES,<br><br>　　　　Defendant. | **No. C 07-5470 CW**<br><br>*Related Per October 31, 2007 Order to Case No. C 04-1511 CW*<br><br>**ABBOTT LABORATORIES' REPLY BRIEF IN SUPPORT OF ITS OMNIBUS MOTION TO DISMISS PLAINTIFFS' SHERMAN ACT CLAIMS PURSUANT TO RULE 12(b)(6)**<br><br>Date:　　　March 6, 2008<br>Time:　　　2:00 p.m.<br>Courtroom:　2 (4th Floor)<br>Judge:　　　Hon. Claudia Wilken |
| RITE AID CORPORATION; RITE AID HDQTRS, CORP.; JCG (PJC) USA, LLC; MAXI DRUG, INC. d/b/a BROOKS PHARMACY; ECKERD CORPORATION; CVS PHARMACY, INC.; and CAREMARK, L.L.C.,<br><br>　　　　Plaintiffs,<br><br>　vs.<br><br>ABBOTT LABORATORIES,<br><br>　　　　Defendant. | **No. C 07-6120 CW**<br><br>*Related Per December 5, 2007 Order to Case No. C 04-1511 CW*<br><br>**ABBOTT LABORATORIES' REPLY BRIEF IN SUPPORT OF ITS OMNIBUS MOTION TO DISMISS PLAINTIFFS' SHERMAN ACT CLAIMS PURSUANT TO RULE 12(b)(6)**<br><br>Date:　　　March 6, 2008<br>Time:　　　2:00 p.m.<br>Courtroom:　2 (4th Floor)<br>Judge:　　　Hon. Claudia Wilken |

# **TABLE OF CONTENTS**

INTRODUCTION ...............................................................................................................................1

ARGUMENT .....................................................................................................................................2

    I.    *Cascade* Defeats Plaintiffs' Claim About Abbott's Unilateral Pricing Decisions. ..............................................................................................................2

        A.    Plaintiffs' Claim Fails Under Cascade's "Broad" Requirement Of Below-Cost Pricing "Regardless Of The Type Of Antitrust Claim Involved." ...........................................................................................................3

        B.    Even If Cascade Narrowly Applied Only To Bundled Discounting, Plaintiffs' Complaints Would Still Fail. ........................................................6

    II.    Plaintiffs' "Other" Theories Of Exclusionary Conduct Do Not State Claims Under The Sherman Act. ..........................................................................................8

        A.    A Complaint About A Price Increase Does Not State A Sherman Act Claim. .............................................................................................................8

        B.    Plaintiffs Have Not Identified Any Basis For Liability Under A Monopoly Leveraging Theory. .....................................................................9

        C.    Plaintiffs' Cases About Standard-Setting Organizations Are Irrelevant. ........10

        D.    Plaintiffs Fail To Allege A Refusal-To-Deal Theory. ...................................11

    III.    Plaintiffs' Complaints Also Fail Under Controlling Federal Circuit Law ....................14

CONCLUSION ................................................................................................................................14

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

-i-

ABBOTT LABORATORIES' REPLY BRIEF IN SUPPORT OF ITS OMNIBUS MOTION TO DISMISS PLAINTIFFS' SHERMAN ACT CLAIMS PURSUANT TO RULE 12(b)(6), CASE NOS. C 07-5702 CW, C 07-5470 CW, C 07-6120 CW

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alaska Airlines, Inc. v. United Airlines, Inc.*,
    948 F.2d 536 (9th Cir. 1991) ...................................................................................................8

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
    472 U.S. 585 (1985) ............................................................................................2, 11, 12, 13

*Broadcom Corp. v. Qualcomm Inc.*,
    501 F.3d 297 (3d Cir. 2007) ............................................................................................10, 11

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993) .................................................................................................3, 4, 5

*Brulotte v. Thys Co.*
    379 U.S. 29 (1964) ...................................................................................................................8

*Cascade Health Solutions v. PeaceHealth*,
    --- F.3d ---, No. 05-35627, 2008 WL 269506 (9th Cir. Feb. 1, 2008) ............................ passim

*Holmes Group, Inc. v. Vornado Air Circulation Sys., Inc.*,
    535 U.S. 826 (2002) ...............................................................................................................14

*Image Technical Servs. v. Eastman Kodak Co.*,
    125 F.3d 1195 (9th Cir. 1997) .................................................................................2, 8, 9, 14

*MetroNet Servs. Corp. v. Qwest Corp.*,
    383 F.3d 1124 (9th Cir. 2004) ...............................................................................................13

*Monsanto Co. v. McFarling*,
    302 F.3d 1291 (Fed. Cir. 2002) ................................................................................................2

*Schor v. Abbott Labs.*,
    457 F.3d 608 (7th Cir. 2006) ...............................................................................2, 5, 8, 12

*Tucker v. Apple Computer, Inc.*,
    493 F. Supp. 2d 1090 (N.D. Cal. 2006) ...................................................................................9

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) ................................................................................................11

*Verizon Comm's, Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) ...............................................................................................8, 9, 12, 13

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

-ii-

ABBOTT LABORATORIES' REPLY BRIEF IN SUPPORT OF ITS OMNIBUS MOTION TO DISMISS PLAINTIFFS' SHERMAN ACT CLAIMS
PURSUANT TO RULE 12(b)(6), CASE NOS. C 07-5702 CW, C 07-5470 CW, C 07-6120 CW

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*,
    127 S. Ct. 1069 (2007) ................................................................................................3, 4

*Williamson Oil Co., Inc. v. Phillip Morris USA*,
    346 F.3d 1287 (11th Cir. 2003) ........................................................................................7

**OTHER AUTHORITIES**

Fed. R. Civ. P. 12 ..............................................................................................................2, 12

-iii-

ABBOTT LABORATORIES' REPLY BRIEF IN SUPPORT OF ITS OMNIBUS MOTION TO DISMISS PLAINTIFFS' SHERMAN ACT CLAIMS PURSUANT TO RULE 12(b)(6), CASE NOS. C 07-5702 CW, C 07-5470 CW, C 07-6120 CW

## INTRODUCTION

Plaintiffs cannot distinguish *Cascade*. In a 35-page, scholarly opinion analyzing pricing issues in a variety of antitrust contexts, the Ninth Circuit held that "above-cost pricing will not be considered exclusionary conduct for antitrust purposes." *Cascade Health Solutions v. PeaceHealth*, --- F.3d ---, No. 05-35627, 2008 WL 269506, *11 (9th Cir. Feb. 1, 2008). Like *Cascade*, the current case is about alleged exclusionary conduct based on pricing. Yet, Plaintiffs by their own admission have not alleged below-cost pricing (with the exception of a conclusory allegation in the Meijer complaint, which is addressed in a separate brief). That ends the analysis under *Cascade*.

In an effort to avoid *Cascade*, Plaintiffs deny they are alleging "bundled discounting," which was the specific factual scenario addressed in *Cascade*. But *Cascade's* holding was based on the "*broad application* of the principle that only below-cost prices are anticompetitive," which applies "*regardless* of the type of antitrust claim involved." *Cascade*, 2008 WL 269506, at *10 (emphasis added) (citing *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 223 (1993)). Thus, Plaintiffs' pricing claims fail "regardless" of whether the alleged conduct constitutes "bundled discounting."

In any event, no matter what label Plaintiffs use, the factual scenario they plead constitutes "bundled discounting" within the meaning of *Cascade*. Through Kaletra, Abbott is "offering, for a single price, two . . . goods . . . that could be sold separately" (lopinavir and ritonavir). *Id.* at *5. That is a bundle. And Plaintiffs allege Abbott is charging a "much lower price" for ritonovir when sold in the Kaletra bundle than when sold alone. (Safeway Amend. Comp. ¶ 31; Rite Aid Compl. ¶ 42; GSK Compl. ¶¶ 1, 45). That is a bundled discount.

This Court has similarly stated that the relevant liability theory is that Kaletra is "substantially cheaper" than other PIs when combined with Norvir. (10/21/04 Order at 3, Docket No. 63, C-04-1511 CW). And contrary to Plaintiffs' selective quotation, Abbott's expert also recognized that – regardless of his own view of the merits – *Plaintiffs'* exclusionary theory is bundled discounting, which he specifically explained fails under *Cascade* because Plaintiffs "do not, and cannot, allege that" Abbott prices "below cost." (Norris Decl., Ex. A, Hay Report ¶¶ 8 (2)(ii), 18).

1

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

Nevertheless, Plaintiffs now say they are complaining about Norvir's purportedly "massive price increase" rather than a discount for the Kaletra bundle. (Opp'n at 6). If so, the case should be dismissed on an entirely different ground. Norvir is patented. "The owner of a patented article can, of course, charge such price as he may choose." *Monsanto Co. v. McFarling*, 302 F.3d 1291, 1299 (Fed. Cir. 2002) (quoting *E. Bement & Sons v. Nat'l Harrow Co.*, 186 U.S. 70, 93 (1902)). The Ninth Circuit has similarly explained that a patentee "is entitled to monopoly prices on its patented" product. *Image Technical Servs. v. Eastman Kodak Co.*, 125 F.3d 1195, 1225 (9th Cir. 1997). Thus, "[t]he price of Norvir cannot violate the Sherman Act: a patent holder is entitled charge whatever the traffic will bear." *Schor v. Abbott Labs.*, 457 F.3d 608, 610 (7th Cir. 2006).

Plaintiffs alternatively attempt to recast their complaints as raising "other" exclusionary theories, including a "refusal to deal" theory under *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985). But this Court has correctly held that *Aspen* is "inapplicable" because "[t]his is not a failure to deal, or failure to cooperate, case." (7/6/06 Order at 10, Docket No. 256, C-04-1511 CW). As the Seventh Circuit put it when affirming the Rule 12(b)(6) dismissal of a mirror-image Norvir case, "Abbott will sell to anyone willing to pay its price: there is no refusal to deal." *Schor*, 457 F.3d at 610. In the end, Plaintiffs simply cannot avoid *Cascade,* which mandates dismissal under Rule 12(b)(6).

Alternatively, Plaintiffs' complaints should be dismissed under controlling Federal Circuit law, which has rejected Plaintiffs' purported cause of action. Because Plaintiffs' claim of patent monopoly leveraging requires an allegation of conduct "beyond the grant of the patent," the Federal Circuit has jurisdiction over this case. Plaintiffs' opposition never squarely addresses that dispositive point.

**ARGUMENT**

**I.    *Cascade* Defeats Plaintiffs' Claim About Abbott's Unilateral Pricing Decisions.**

Regardless of whether Plaintiffs acknowledge that they are pursuing a bundled-discount theory, *Cascade* defeats their Sherman Act claim.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

### A. Plaintiffs' Claim Fails Under *Cascade*'s "Broad" Requirement Of Below-Cost Pricing "Regardless Of The Type Of Antitrust Claim Involved."

Plaintiffs devote most of their brief to denying that they have alleged a bundled discount theory. *Cascade*'s rationale, however, broadly applies to *any* unilateral pricing conduct that purportedly harms competition.

Contrary to Plaintiffs' suggestion, *Cascade's* below-cost rule is not limited to bundled-discounting. In fact, the Ninth Circuit in *Cascade* specifically relied on Supreme Court cases *outside* the bundling context when establishing the below-cost rule – cases recognizing that pricing cannot constitute exclusionary conduct under the antitrust laws unless the pricing is below cost. *See Cascade*, 2008 WL 269506, at *7, *10 (citing and discussing *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 127 S. Ct. 1069 (2007) and *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993)). Without below-cost pricing, competitors remain free to profitably compete and, thus, are not excluded from the market. *Id*.

With the Ninth Circuit's ruling in *Cascade,* the law could not be clearer. When establishing its below-cost rule, the Ninth Circuit specifically noted that "the Supreme Court has forcefully suggested that we should not condemn prices that are above some measure of incremental cost." *Cascade*, 2008 WL 269506, at *10. That was an accurate statement. The Supreme Court has, in fact, specifically rejected the "notion that above-cost prices that are below general market levels or the costs of a firm's competitors inflict injury to competition cognizable under the antitrust laws." *Brooke Group Ltd.*, 509 U.S. at 223.

This is not a narrow principle that applies only to bundled discounting. It applies broadly to *any* alleged "deliberate use of unilateral pricing measures for anticompetitive purposes." *Weyerhaeuser*, 127 S. Ct. at 1076. Given that fact, the Ninth Circuit correctly recognized the "*broad application* of the principle that only below-cost prices are anticompetitive," which it noted the Supreme Court has "adhered to . . . *regardless* of the type of antitrust claim involved." *Cascade*, 2008 WL 269506, at *10 (emphasis added) (quoting in part *Brooke Group Ltd.*, 509 U.S. at 223).

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

3
ABBOTT LABORATORIES' REPLY BRIEF IN SUPPORT OF ITS OMNIBUS MOTION TO DISMISS PLAINTIFFS' SHERMAN ACT CLAIMS PURSUANT TO RULE 12(b)(6), CASE NOS. C 07-5702 CW, C 07-5470 CW, C 07-6120 CW

Thus, the below-cost rule controls *regardless* of how Plaintiffs characterize their complaints about Abbott's unilateral pricing decisions. *Id.*

Plaintiffs offer no logical reason for creating an exception to the below-cost rule in this case. To the contrary, because Abbott is not selling below cost, equally efficient competitors remain free to profitably sell their competitive PIs. Norvir is sold for $8.57 per day while the Kaletra bundle is now sold for $23.40 per day. Abbott's PI competitors, such as GSK (Lexiva) and BMS (Reyataz), are free to match Kaletra's price by reducing their own PI prices to $14.83, which would result in a combined PI-Norvir price of $23.40. That is *Cascade*'s main point – competitors are not impermissibly excluded from the market when they can profitably compete, which is the situation described in Plaintiffs' complaints given their failure to allege below-cost pricing.

Moreover, Doe/SEIU's economics expert previously argued that Abbott's conduct was a "first cousin" to "bundled discounting" and "raising rival's costs." (Plaintiffs' Req. for Jud. Not., Ex. 1, Hay Report ¶¶ 17, 19). After he made that argument, *Cascade* recognized that neither practice qualifies as exclusionary conduct without below-cost pricing. 2008 WL 269506, at *11 (discussing *Brooke Group* and *Weyerhaeuser*). Given that the below-cost rule applies to both "first cousins," there is no reasoned basis for creating a special exception for Abbott's pricing decisions.

As their only argument for such an exception, Plaintiffs argue that the below-cost rule should apply only to "price cutting – *not* a price increase that happens to have made other unchanged prices look low by comparison." (Opp'n at 3). In *Cascade,* however, the Ninth Circuit specifically noted that the Supreme Court applied the below-cost rule even in the context of "predatory bidding – the practice of *bidding up* input costs to drive rivals out of business." *Cascade*, 2008 WL 269506, at *11 (emphasis added) (citing *Weyerhaeuser*, 127 S. Ct. at 1078). In *Weyerhaeuser*, the Supreme Court explained that a "predatory-bidding plaintiff alleges that a predator *raised prices* for a key input to drive the plaintiff out of business." 127 S. Ct. at 1076 (emphasis added). In the short term, such practices could force a *price increase* for consumers to maintain a profit over the increased input costs. *See id.* at 1078. Nevertheless, the Supreme Court held that "only higher bidding that leads to below-cost pricing in the relevant output market will suffice as a basis for liability for predatory bidding." *Id*.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

There is simply no basis in law or economics – and Plaintiffs have offered none – to distinguish between a price differential that is caused by a price increase rather than by a price decrease. The exclusionary effect (if any) of a price differential simply does not depend on whether the cause was a price increase or a price decrease. As the Supreme Court stated in *Brooke Group*, "[a]s a general rule, the exclusionary effect of prices above a relevant measure of cost either . . . represents competition on the merits, or is beyond the practical ability of a judicial tribunal to control." 504 U.S. at 223. Plaintiffs' proposed exception thus has no basis in economics and would "not constitute sound antitrust policy." *Id*. at 224.

And even if Plaintiffs *were* correct that the below-cost rule is solely concerned with avoiding a penalty for low prices, Plaintiffs ignore that very concern here. Plaintiffs' claim turns on the fact that Abbott failed to increase Kaletra's price when increasing the price of patented Norvir. But "forcing [Abbott] to maintain [a] supracompetitive price[]" for Kaletra would "deprive[] consumers of the benefits of lower prices" contrary to "sound antitrust policy." *Id*.

In a final effort to suggest the below-cost rule is narrowly applied, Plaintiffs argue that "tying claims involve exactly the same leveraging of power from one market to another" and, yet, "the *Cascade* court refused to read below-cost limitations into tying claims." (Opp'n at 6). But the *Cascade* court did not "*refuse*" to apply the below-cost limitation to claims of tying through pricing practices; it specifically left that issue open because it had not been briefed. 2008 WL 269506, at *22 n.27. Moreover, unlike other alleged exclusionary conduct based on pricing, tying theories do not focus on whether equally efficient competitors can compete at profitable levels. Rather, tying focuses on whether the defendant "coerced" consumers into taking two products tied together by eliminating any practical option for buying the products separately. *Id.* at *10, *22 n.27.

Here, Plaintiffs are not alleging a tying theory, which is mentioned nowhere in their complaints. As the Seventh Circuit explained, "Abbott sells ritonavir as part of Kaletra, but this is not a tie-in because ritonavir is available separately as Norvir." *Schor*, 457 F.3d at 610. This Court similarly noted during an earlier motion to dismiss hearing that "[Plaintiffs] can't allege tying here." (Norris Decl., Ex. C, Mot. to Dismiss Tr. at 19, Docket No. 187, C-04-1511 CW).

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

In the end, the below-cost rule applies broadly to unilateral pricing decisions that are allegedly exclusionary. Plaintiffs' admitted failure to allege below-cost pricing mandates dismissal under *Cascade*.

### B. Even If *Cascade* Narrowly Applied Only To Bundled Discounting, Plaintiffs' Complaints Would Still Fail.

Even if *Cascade*'s rationale were limited to bundled discounting, Plaintiffs' complaints must still be dismissed because, notwithstanding their denials, bundled discounting is the essence of Plaintiffs' complaints.

There is nothing complicated about identifying an alleged bundled discount. "A bundled discount, however else it might be viewed, is a price discount on a collection of goods." *Cascade*, 2008 WL 269506, at *12. Kaletra is a bundle because Abbott is "offering, for a single price, two . . . goods," lopinavir and ritonavir, "that could be sold separately." *Id*. at *5. And Plaintiffs allege that Abbott is discounting ritonavir (that is, charging a "much lower price") when it is bundled in Kaletra. (Safeway Amend. Comp. ¶ 31; Rite Aid Compl. ¶ 42; GSK Compl. ¶¶ 1, 45). That is a bundled discount.

This Court previously recognized the same point when addressing the Doe/SEIU Plaintiffs' identical claims, noting that they are not "seeking liability under the Sherman Act for a defendant merely 'charging too much'" for Norvir. (7/6/06 Order at 10, Docket No. 256, C 04-1511 CW). Instead, the Court found that their theory was that "[a]s a result" of Norvir's price increase, "the cost of Kaletra overnight became *substantially cheaper* than the cost of using all other PIs in conjunction with Norvir." (10/21/04 Order at 3, Docket No. 63, C 04-1511 CW (emphasis added)).

Even though they are undeniably alleging a bundled discount, Plaintiffs argue that *Cascade* applies only to bundled discounts created through a price *decrease* rather than a price *increase*. As noted, that is a distinction without a difference. The Norvir price increase and the alleged Kaletra discount are two sides of the same coin. Regardless of *how* the pricing differential arose, it is the *result* – that the competitive product in the bundle (here, Kaletra) is purportedly cheaper than the competitor's product (here, competitors' PIs) – that allegedly forces consumers to purchase the bundle. The *method* by which the disputed product becomes cheaper in the bundle is irrelevant. *See*

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

*Williamson Oil Co., Inc. v. Phillip Morris USA,* 346 F.3d 1287, 1307 n.12 (11th Cir. 2003) (noting in Sherman Act case that price gap could have widened either by increasing some prices or by decreasing others).

In a further attempt to sow confusion, Plaintiffs offer out-of-context quotes from Abbott's expert report in the Doe/SEIU case. But *Abbott's* expert's position on the merits does not change the fact that *Plaintiffs'* asserted theory of exclusionary conduct is that Abbott offers a discount on the Kaletra bundle. With respect to *that* theory, Plaintiffs' opposition omits the italicized parts of this passage from Abbott's expert report to mask the fact that he argued that Abbott has not engaged in *improper* bundled discounting:

> *As discussed above*, Abbott does not offer bundled discounts. Nor is Abbott's pricing structure equivalent to a bundled discount. *Moreover, the implicit price of lopinavir is not predatory – i.e. below cost – which is a primary element of the Nalebuff [bundled discounts] model.*

(Plaintiffs' Req. for Jud. Not., Ex. 1, Hay Report ¶ 42). What is "discussed above" is that Abbott has not engaged in *improper* bundled discounting because "anticompetitive bundled discounts require that the discounts be large enough such that the implicit price of the competitive good (lopinavir according to plaintiffs' theory) is below cost when the entire discount is attributed to this good. But plaintiffs and Prof. Greer do not, and cannot, allege that the implicit price of lopinavir is below cost." (*Id.* ¶ 8 (2)(ii)).[1]

---

[1] Plaintiffs are also misreading Abbott's expert's merits argument that "Abbott's pricing structure" is not "equivalent to a bundled discount." In alleging that Abbott offers a "much lower price" on the ritonavir bundled in Kaletra, Plaintiffs assume that Abbott initially priced bundled ritonavir consistent with the price for Norvir before December 2003. Under that assumption, Abbott effectively "discounted" bundled ritonavir in December 2003 by not raising Kaletra's price along with Norvir's price increase. But the assumption is flawed. As Abbott's expert has noted, the ritonavir bundled in Kaletra *always* has been used and thus priced as a booster – never as a standalone PI like Norvir before December 2003. Thus, there was no need for Abbott to raise Kaletra's price. On the contrary, before December 2003, standalone ritonavir (Norvir) was being discounted when compared to bundled ritonavir in Kaletra, which means that Norvir's price increase brought the price of standalone ritonavir (Norvir) in line with the price of bundled ritonavir in Kaletra. Thus, Abbott is not discounting the ritonavir bundled in Kaletra. Regardless of the outcome of that merits issue, however, the fact remains that Plaintiffs' alleged exclusionary conduct is that Abbott offers a "much lower price" for ritonavir when bundled in Kaletra. Again, that is a bundled discounting claim.

7

ABBOTT LABORATORIES' REPLY BRIEF IN SUPPORT OF ITS OMNIBUS MOTION TO DISMISS PLAINTIFFS' SHERMAN ACT CLAIMS PURSUANT TO RULE 12(b)(6), CASE NOS. C 07-5702 CW, C 07-5470 CW, C 07-6120 CW

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

## II. Plaintiffs' "Other" Theories Of Exclusionary Conduct Do Not State Claims Under The Sherman Act.

In an alternative effort to avoid dismissal under *Cascade*, Plaintiffs purport to offer "a number of different theories" of exclusionary conduct. (Opp'n at 3). None of these "other" theories has any merit.

### A. A Complaint About A Price Increase Does Not State A Sherman Act Claim.

If their complaints are not about a discount for bundled Kaletra, as Plaintiffs now argue, then they are reduced to protesting Norvir's price increase. In fact, Plaintiffs state that the "crux of Abbott's anticompetitive conduct involves a massive price hike." (Opp'n at 2).

This price increase, however, cannot be the basis for a monopolization claim under the Sherman Act. The Ninth Circuit has held that "setting high prices in the original 'monopoly' market" is among the "ways that a monopolist can permissibly benefit from its position." *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 548-49 (9th Cir. 1991). In *Kodak*, the Ninth Circuit similarly explained that a defendant "is entitled to monopoly prices on its patented and copyrighted parts." 125 F.3d at 1225. And when addressing a motion to dismiss in a nearly identical case involving Norvir, the Seventh Circuit stated that "[t]he price of Norvir cannot violate the Sherman Act: a patent holder is entitled charge whatever the traffic will bear." *Schor*, 457 F.3d at 610; *accord Verizon Comm's, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) ("The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system."); *Brulotte v. Thys Co.* 379 U.S. 29, 33 (1964) ("A patent empowers the owner to exact royalties as high as he can negotiate with the leverage of that monopoly.").

Even though *Kodak* confirms a patent owner's right to set "monopoly prices," Plaintiffs rely on that case in their efforts to avoid dismissal. But far from endorsing Plaintiffs' liability theory, the Ninth Circuit specifically rejected the notion that the antitrust laws require so-called "reasonable" prices. 125 F.3d at 1225-26. The district court's injunction originally required Kodak to sell its patented photocopier parts at "reasonable" prices. *Id.* at 1225. But the Ninth Circuit rejected that part of the injunction, explaining that any such requirement would improperly deny Kodak's right to

8

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

set "monopoly prices on its patented and copyrighted products" and would extend "beyond [proper judicial] function, namely, direct price administration." *Id*.

Thus, regardless of whether Plaintiffs' complaints are truly about Norvir's price increase, rather than the purported discount on the Kaletra bundle, they would still fail to state a Sherman Act claim.

### B. Plaintiffs Have Not Identified Any Basis For Liability Under A Monopoly Leveraging Theory.

Plaintiffs next argue that Abbott engaged in anticompetitive monopoly leveraging under *Kodak*. (Opp'n at 13). But Plaintiffs do not identify any purportedly "anticompetitive conduct" other than "bundled discounting," which, as discussed above, is not actionable absent below-cost pricing. As the Supreme Court stated in *Verizon*, "leveraging presupposes anticompetitive conduct, which in this case could only be the refusal-to-deal claim we have rejected." 540 U.S. at 415 n.4. Thus, arguing that Abbott engaged in "anticompetitive monopoly leveraging" means nothing. Plaintiffs must allege that Abbott engaged in some specific form of exclusionary conduct. *See also Tucker v. Apple Computer, Inc.*, 493 F. Supp. 2d 1090, 1101-02 (N.D. Cal. 2006) (noting that "[i]n the Ninth Circuit, leveraging of a monopoly is not an independent Section 2 claim").

Contrary to Plaintiffs' contention, *Kodak* does not endorse a patent-monopoly leveraging theory untethered to any exclusionary conduct. That case was about a classic form of exclusionary conduct: a "monopolist" that "unilaterally refused to deal with competitors." *Kodak*, 125 F.3d at 1200. *Cascade* confirms the same point. The alleged monopolist in *Cascade*, PeaceHealth, was accused of leveraging a monopoly by unilaterally pricing its products in a way that harmed competition. PeaceHealth's pricing practices nearly drove the plaintiff-hospital out of business because the plaintiff offered fewer services and, thus, could not compete with PeaceHealth's bundled discounts. *Cascade*, 2008 WL 269506, at *4. Yet, the Ninth Circuit vacated the jury verdict because the jury failed to examine "whether PeaceHealth priced its own services below an appropriate measure of its cost." *Id*. at *19.

9

ABBOTT LABORATORIES' REPLY BRIEF IN SUPPORT OF ITS OMNIBUS MOTION TO DISMISS PLAINTIFFS' SHERMAN ACT CLAIMS PURSUANT TO RULE 12(b)(6), CASE NOS. C 07-5702 CW, C 07-5470 CW, C 07-6120 CW

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

By rejecting monopoly-leveraging conduct that nearly destroyed a competitor, *Cascade* confirms that there is no such thing as naked monopoly leveraging without exclusionary conduct. Accordingly, Plaintiffs' arguments about naked monopoly leveraging cannot save their complaints.

**C.     Plaintiffs' Cases About Standard-Setting Organizations Are Irrelevant.**

Plaintiffs next point to allegations in their complaints purportedly suggesting that "Abbott deceived industry participants into adopting its boosting agent as a standard and then refused to offer it on terms upon which the industry had relied." (Opp'n at 18).

This comes nowhere close to alleging actionable exclusionary conduct. Plaintiffs rely solely on a series of cases addressing the unique antitrust problems associated with private standard-setting organizations. (Opp'n at 20) (citing *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297 (3d Cir. 2007) (organization setting standards for wireless telephony); *In re Rambus, Inc.*, No. 9302, 2006 WL 2330117 (F.T.C. Aug. 2, 2006) (organization setting standards for computer memory industry); *In re Dell Computer Corp.*, 121 F.T.C. 616 (1996) (organization setting standards for computer bus design)).

These cases are inapplicable for the simple reason that there is no standard-setting organization here, and Plaintiffs do not claim otherwise. Standard setting organizations – such as, for example, a group of telecommunication companies that develop a common wireless transmission code – are generally considered "consistent with the procompetitive aspirations of antitrust law" because they promote interchangeable products to enhance consumer welfare. *Broadcom*, 501 F.3d at 309.

Some courts have found anti-competitive conduct where, for instance, a group member falsely claims to have no intellectual property over a proposed standard and then later asserts the concealed patent against anyone practicing the adopted standard. *Id*. at 310. Those cases, however, are based on the unique concerns that exist for standard-setting organizations, which set standards "in a consensus-oriented environment, where participants rely on structural protections, such as rules requiring the disclosure of [intellectual property rights], to facilitate competition and constrain the exercise of monopoly power." *Id*. at 312. In those environments, "participants are less likely to be

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

wary of deception and may not detect such conduct and take measures to counteract it until after lock-in has occurred." *Id.*

The leading case is *Broadcom,* where the Third Circuit held that "(1) in a consensus-oriented private standard-setting environment, (2) a patent holder's intentionally false promise to license essential proprietary technology on [pre-determined] terms, (3) coupled with [a] reliance on that promise when including the technology in a standard, and (4) the patent holder's subsequent breach of that promise, is actionable anticompetitive conduct." *Id.* at 314; *see also Hynix Semiconductor Inc. v. Rambus Inc.*, CV-00-20905 RMW, 2008 U.S. Dist. LEXIS 777, *13 n.3 (N.D. Cal. Jan. 5, 2008) (refusing to apply *Broadcom* "broadly"); *Int'l Norcent Tech. v. Koninklijke Philips Elecs. N.V.*, CV 07-00043 MMM, 2007 U.S. Dist. LEXIS 89946, *29 n.51 (C.D. Cal. Oct. 29, 2007) (collecting cases and rejecting application of *Broadcom* as "inapposite" where the plaintiff could not meet all of the circumstances set forth in *Broadcom*).

Plaintiffs fail to allege facts sufficient to satisfy *any* of the elements of the cause of action described in the *Broadcom* line of cases, including identifying "a consensus-oriented private standard-setting environment." 501 F.3d at 314. This is simply not a case where the industry agreed to design their PIs to work only with the Norvir "standard," rather than some alternative standard, only to then be confronted with Abbott's broken promise to make Norvir freely available at a pre-negotiated rate. In short, Plaintiffs allege nothing remotely resembling the situation described in standard-setting cases, which are completely inapplicable and, thus, cannot save their complaints.[2]

### D. Plaintiffs Fail To Allege A Refusal-To-Deal Theory.

Plaintiffs also suggest they have properly alleged a "refusal to deal" under the "*Aspen Skiing* line of cases." (Opp'n at 20 (citing *Verizon Commc'ns., Inc.*, 540 U.S. at 409)).

---

[2] In this section of their brief, Plaintiffs also cite – without explanation – *United States v. Microsoft Corp.*, 253 F.3d 34, 76-77 (D.C. Cir. 2001). *Microsoft* has nothing to do with this case. The cited portion of *Microsoft* relates to Microsoft's sale of software development tools that would create software that works with both Windows and (non-Microsoft) Java applications. But Microsoft secretly altered the development tool's code so that "Java developers . . . unwittingly wrote Java applications that ran only on Windows." *Id.* at 76 (internal quotes and alteration omitted). Plaintiffs do not allege that Abbott secretly altered Norvir so that it would work only with the Abbott PI bundled in Kaletra.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

But both this Court and the Seventh Circuit have already held that this is not a refusal-to-deal case. This Court previously stated: "*Aspen Skiing Co.*, involving a defendant's refusal to cooperate with its smaller rival, is inapposite. This is not a failure to deal, or failure to cooperate, case." (7/6/06 Order at 10, Docket No. 256, C 04-1511 CW). And the Seventh Circuit, in the context of a Rule 12(b)(6) motion to dismiss, similarly held that "there is no refusal to deal" because "Abbott will sell to anyone willing to pay its price." *Schor*, 457 F.3d at 610.

Far from alleging a refusal to deal, Plaintiffs specifically allege they suffered injury because Abbott *is* selling Norvir (at prices that are purportedly too high), *not* because Abbott is refusing to sell Norvir. For example, Safeway alleges, "Plaintiffs' injury consists of paying higher prices to purchase Norvir[.]" (Safeway Amend. Compl. ¶ 33; *see also* Rite Aid Compl. ¶ 35; GSK Compl. ¶ 48). Meijer similarly alleges, "Plaintiffs . . . during the class period . . . purchased Norvir and Kaletra directly from Abbott and suffered antitrust injury[.]" (Meijer Consolid. Am. Compl. ¶¶ 1-3).

Even if *Aspen Skiing* applied outside of the refusal-to-deal context, that case is a limited exception to the general "no duty to deal" rule, and one that does not apply here. In *Verizon*, the Supreme Court found that *Aspen Skiing* was "at or near the outer boundary of § 2 liability" (*Verizon*, 540 U.S. at 409) and, in doing so, the Court reaffirmed the importance of the general "no duty to deal" rule:

> Firms may acquire monopoly power by establishing an infrastructure that renders them uniquely suited to serve their customers. Compelling such firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities. Enforced sharing also requires antitrust courts to act as central planners, identifying the proper price, quantity, and other terms of dealing – a role for which they are ill suited.

*Id*. at 407-408. The Court thus stressed that while the right to refuse to deal is not unqualified, it has "been very cautious in recognizing . . . exceptions." *Id*. at 408.

When holding that *Aspen Skiing* was a "limited exception," the Supreme Court noted two critical aspects of the defendant's conduct in that case: (1) the defendant "turned down a proposal to sell at its own retail price, suggesting a calculation that its future monopoly retail price would be higher;" and (2) the defendant voluntarily terminated a course of dealing that, under the circumstances, suggested it was forsaking short-term profits to achieve an anticompetitive end. *Id.* at 409.

Here, Plaintiffs do not and cannot make either allegation. Plaintiffs obviously cannot allege that Abbott is refusing to sell to competitors at Norvir's retail price. That is a dispositive failing, as the Ninth Circuit explained in *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124 (9th Cir. 2004). There, the Court found the *Aspen Skiing* exception inapplicable because "Qwest ha[d] not refused to deal with MetroNet on the same terms that it deals with direct consumers." *Id.* at 1134. The Ninth Circuit emphasized the practical problems with extending *Aspen Skiing* to any such circumstance, including the fact that courts would have to "assume the day-to-day controls characteristic of a regulatory agency" in setting prices. *Id.* at 1133 (quotation omitted).

On the second essential element of the *Aspen Skiing* exception, the *MetroNet* court similarly found the exception inapplicable because Qwest's conduct did not entail a sacrifice of short-term profits for long-term gain from the exclusion of competition. *Id.* at 1132. That is also true here. Plaintiffs do not allege that Abbott's price increase for Norvir resulted in a sacrifice of short-term profits for long-term gain through the exclusion of competition. On the contrary, they are complaining that they are being "injured" because Abbott is, in fact, profiting from Norvir's price increase.

For all of these reasons – a failure to allege a refusal to deal, a failure to allege a refusal to sell to competitors at the retail price, and a failure to allege the sacrifice of short-term profits – Plaintiffs have failed to allege facts that fall within *Aspen Skiing*'s limited exception to the "no duty to deal" rule.

### III. Plaintiffs' Complaints Also Fail Under Controlling Federal Circuit Law.

Finally, Plaintiffs do not squarely address Abbott's argument that Federal Circuit precedent controls, and their complaints fail under that precedent. (*See* Opp'n at 15-17). Abbott agrees with Plaintiffs that patent defenses do not confer Federal Circuit jurisdiction, but this is not the relevant issue. They are relying on the Ninth Circuit's decision in *Kodak* for their purported claim of patent-monopoly leveraging. But that case makes clear that Plaintiffs must allege and prove that Abbott has "attempt[ed] to extend a lawful monopoly *beyond the grant of a patent*." *Kodak*, 125 F.3d at 1216 (emphasis added). "Much depends, therefore, on the definition of the patent grant and the relevant market." *Id.* The "right to relief" in these cases, thus, "necessarily depends on resolution of a substantial question of federal patent law." *Holmes Group, Inc. v. Vornado Air Circulation Sys., Inc.*, 535 U.S. 826, 830 (2002).

Plaintiffs have ignored this requirement for a well-pleaded claim and, instead, summarily assert that the issue of Federal Circuit jurisdiction has been decided. It has not. The Court has not addressed this specific argument because Abbott previously focused on a pure choice-of-law issue, rather than a jurisdictional argument given the specific pleading requirement under *Kodak*.

To avoid duplicative briefing, Abbott also incorporates the discussion on pages 6 through 8 of its GSK reply brief explaining that Abbott's license agreements did not waive its antitrust immunity under the patent laws.

### CONCLUSION

For the reasons set forth above and in Abbott's moving papers, this Court should dismiss the Plaintiffs' Sherman Act claims with prejudice.

Dated: February 21, 2008                    WINSTON & STRAWN LLP

                                            By:  /s/ James F. Hurst
                                                 James F. Hurst
                                                 Attorneys for Defendant
                                                 ABBOTT LABORATORIES

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894